UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JAMES FESCINA, Individually and On Behalf of All Other Similarly Situated

Plaintiff

vs.

CVS CORPORATION, THOMAS M. RYAN, STANLEY P. GOLDSTEIN, EUGENE APPLEBAUM, W. DON CORNWELL, THOMAS P. GERRITY, MARIAN L. HEARD, WILLIAM H. JOYCE, TERRENCE MURRAY, SHELI Z. ROSENBERG, IVAN G. SEIDENBERG, and UNKNOWN FIDUCIARY DEFENDANTS 1-100

Defendants

Civil Action No.

**04-12309 JLT**

MAGISTRATE JUDGE Alexander

RECEIPT # 59695
AMOUNT $ 150
SUMMONS ISSUED Yes
LOCAL RULE 4.1 ____
WAIVER FORM ____
MCF ISSUED ____
BY DPTY. CLK. DM
DATE 10/29/04

**CONSOLIDATED AMENDED COMPLAINT FOR
BREACHES OF FIDUCIARY DUTY UNDER THE
<u>EMPLOYEE RETIREMENT INCOME SECURITY ACT</u>**

Plaintiff James Fescina ("Plaintiff"), a participant in the CVS 401(k) Profit Sharing Plan (the "Plan") at all times relevant to this action, on behalf of himself and a class of all others similarly situated, alleges as follows:

<u>**INTRODUCTION**</u>

1.   This is a class action brought pursuant to §502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132, against Plan fiduciaries, including CVS Corporation ("CVS" or the "Company").

2. 401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of his/her retirement investment portfolio. CVS common stock is one of the investment alternatives in the Plan.

3. Plaintiff Fescina was an employee of CVS and a participant in the Plan during the Class Period alleged herein. His retirement investment portfolio included CVS stock.

4. Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to him and to the other participants and beneficiaries of the Plan during the Class Period in violation of ERISA, particularly with regard to the Plan's holdings of CVS common stock ("CVS Stock").

5. CVS is the sponsor of the Plan, a 401(k) plan that permits participants to save for retirement. Throughout the Class Period, the Plan held a significant portion of its invested assets in CVS stock. The basis for such holdings was in part because Plan participants were offered the option of purchasing CVS stock by choosing to allocate all or a portion of their contributions to the CVS Stock Fund, a separate investment fund established in 1997 that held CVS common stock. Moreover, 50% of the Company's matching contributions were paid in the form of shares of CVS preference stock through the Employee Stock Ownership Plan ("ESOP")

6. Since the Plan's holdings in CVS stock comprised a significant percentage of the overall value of the assets held by the Plan, the long-term retirement savings of Plan participants were dependent to a material degree on the performance of CVS stock, as well as the related need

for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of Plan assets.

7. During the Class Period, as described herein, Defendants knew or should have known that CVS Stock was an imprudent investment alternative for the Plan due to the substantial and material accounting and business improprieties occurring at the Company. Upon information and belief, certain Defendants played an active role in implementing and/or perpetuating the accounting and business improprieties described herein which resulted in the artificial inflation of the value of Company stock during the Class Period.

8. This action generally alleges that the fiduciaries of the Plan thus breached their fiduciary duties to the Plan and its participants under ERISA, by, among other things, selecting and maintaining CVS stock and the CVS Stock Fund as an investment alternative for Participant Contributions under the Plan when it was no longer a suitable or prudent Plan investment option.

9. The breaches alleged herein were ongoing and continuous over the course of the Class Period, and arose out of Defendants' continuing duty to review, evaluate, and monitor the suitability of the Plan's investment in CVS stock, and to provide accurate material information to enable participants to make informed investment decisions concerning their contributions invested in Company stock.

10. As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial losses; with millions of dollars of the retirement savings and anticipated retirement income of the Plan participants having been lost. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from these breaches of fiduciary duty.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA § 502(e)(1), 29 U.S.C. §1132(e)(1).

12. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

**Plaintiff**

13. Plaintiff Fescina worked for CVS, and was a participant in the Plan pursuant to §3(7) of ERISA, 29 U.S.C. §1102(7) and held CVS shares in his retirement investment portfolio during the Class Period.

**Defendants**

14. Defendant CVS Corporation ("CVS" or the "Company") is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island 02895. According to the Company's 2003 From 10-K, CVS is the second largest drugstore chain (based on sales) in the United States. As of January 3, 2004, the Company operated 4,179 retail and specialty pharmacy stores in 32 states and the District of Columbia. During fiscal 2003, CVS filled over 334 million prescriptions, or approximately 10% of the U.S. retail market.

15. CVS is a Plan Sponsor. Moreover, CVS is a fiduciary of the Plan within the meaning of ERISA. CVS exercises discretionary authority with respect to management and

administration of the Plan and/or management and disposition of the Plan's assets. CVS at all times acted through its officers and employees, including its Senior Vice President, Human Resources, and other members of the Plan Committee appointed by the Board to perform CVS's Plan-related fiduciary functions in the course and scope of their employment.

16. CVS at all times acted through its officers and employees, including the members of the Plan Committee and the Plan Administrator, who were appointed by the Company to perform Plan-related fiduciary functions, and did so in the course and scope of their employment. CVS has, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities. Through its Board of Directors (the "Directors"), or otherwise, CVS had the authority and discretion to hire and terminate said officers and employees. CVS also had the authority and discretion to appoint, monitor, and remove officers and employees from their individual fiduciary roles with respect to the Plan. By failing to properly discharge their duties under ERISA, the Directors, officers and employee fiduciaries breached duties they owed to Plan participants and their beneficiaries. Accordingly, the actions of the various Plan officers and/or managers or administrators and other employee fiduciaries are imputed to CVS under the doctrine of *respondeat superior*, and CVS is liable for these actions.

**Director Defendants**

17. Defendant Thomas M. Ryan ("Ryan") was Chairman of the Board of Directors ("Board") and Chief Executive Officer ("CEO") of CVS during the Class Period. Ryan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority

with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

18. Defendant Stanley P. Goldstein ("Goldstein"), a founder of the Company, was Chairman of the Board until April 1999, and CEO of the Company until his retirement in 1998. Goldstein served on CVS's Board during the Class Period. Goldstein was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

19. Defendant Eugene Applebaum ("Applebaum") served on CVS's Board during the Class Period. Applebaum was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20. Defendant W. Don Cornwell ("Cornwell") served on CVS's Board during the Class Period. Cornwell was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

21. Defendant Thomas P. Gerrity ("Gerrity") served on CVS's Board during the Class Period. Gerrity was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

22. Defendant Marian L. Heard ("Heard") served on CVS's Board during the Class Period. Heard was a fiduciary of the Plan within the meaning of ERISA in that she exercised

discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

23. Defendant William H. Joyce ("Joyce") served on CVS's Board during the Class Period. Joyce was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24. Defendant Terrence Murray ("Murray") served on CVS's Board during the Class Period. Murray was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

25. Defendant Sheli Z. Rosenberg ("Rosenberg") served on CVS's Board during the Class Period. Rosenberg was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

26. Defendant Ivan G. Seidenberg ("Seidenberg") served on CVS's Board during the Class Period. Seidenberg was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**CVS Plan Committee**

27. According to the Company's Form 11-K for the year ended December 31, 2000, filed by the Company with the SEC on or about June 29, 2001 (the "Form 11-K"), the general administration of the Plan and the responsibility for carrying out the provisions of the Plan are

maintained by a Plan Committee, consisting of not less than three (3) persons appointed by the Board. On information and believe, one member of the Plan Committee is the Senior Vice President, Human Resources.

28. According to the Form 11-K, a principal responsibility of the Plan Committee is the appointment of a Plan Administrator and a Plan Trustee.

29. The Plan Committee is a fiduciary within the meaning of ERISA in that it exercises discretionary authority with respect to management and administration of the Plan.

30. While the individual members of the Plan Committee during the Class Period are currently unknown to Plaintiff, once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

**The Plan Administrator**

31. According to the Form 11-K, the Plan Administrator, inter alia, maintains participant account records and instructs the Trustee to execute transactions, such as benefit payments to Plan Participants.

32. The Plan Administrator is a fiduciary within the meaning of ERISA in that it exercises discretionary authority with respect to management and administration of the Plan.

33. While the identify of the Plan Administrator during the Class Period is currently unknown to Plaintiff, once his or her identity is ascertained, Plaintiff will seek leave to join him or her under his or her true names.

**Unknown Fiduciaries**

34. There are other fiduciaries of the Plan whose identities are currently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

35. Defendants include named and de facto fiduciaries with respect to the Plan. All Defendants exercised discretionary authority or control regarding management of the Plan, management of the Plan's assets, and/or administration of the Plan.

## THE PLAN

36. The CVS 401(k) Plan is an "employee pension benefit plan," as defined by §3(2)(A) of ERISA, 29 U.S.C. §1002(2)(A). The CVS Plan is a legal entity which can sue or be sued. ERISA §502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant. Rather, pursuant to ERISA §409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan. In other words, Plaintiff in this action seeks relief on behalf of the Plan.

37. As noted above, CVS is the Sponsor of the Plan. As such, CVS, and its officers and Directors, are intimately involved in the administration of the Plan and investment of Plan assets. For example, the Senior Vice President, Human Resources of CVS is a member of the Plan Committee and the Future Fund Administrator. At a minimum, the defendant-fiduciaries who were charged with the management and/or administration of the Plan knew that a significant portion of Plan assets -- CVS Stock held by the Plan -- was materially at risk due to the accounting and business improprieties occurring at CVS during the Class Period, as described herein.

38. Under the Plan, participants may contribute through payroll deductions from 1% to 15% of their salary, on a pre-tax basis. Participants direct their investment into a choice of thirteen investment funds. Such investments can either all be in a single investment fund, or divided among a number of such funds, in any amounts equal to 1% or more. One of the thirteen investments funds available to Plan participants is the CVS Stock Fund, which invests in CVS common stock

39. According to the Form 11-K:

> The CVS Stock Fund was established as a result of the transfer of assets from the Revco D.S., Inc. 401(k) Plan during 1997. The Plan may, at the discretion of the Plan Committee, offer a company stock fund as one of the available investment funds for employee and employer contributions. The fund holds CVS common stock.

40. During the Class Period, CVS matched employee contributions, up to 5%. According to the CVS Future Fund New Hire Guide:

> When you invest in the 401(k) Plan, half of the CVS match is invested in the investment funds you select for your own contributions. . . . The second half of your match goes in to your ESOP [Employee Stock Ownership Plan] account at the end of the year, if you are a CVS employee at that time.

Payment of the portion of the matching contribution into the ESOP is made as of December 31 of each year.

41. Employees are vested immediately in their contributions. Participants vest in Company matching contributions after five years of service with CVS.

42. The CVS stock held by the Plan was materially inflated at all times during the Class Period as a result of the improper and/or illegal conduct detailed herein.

## **DEFENDANTS' FIDUCIARY STATUS**

10

43.  During the Class Period, upon information and belief, defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

44.  During the Class Period, the defendants acted as fiduciaries of the Plan pursuant to §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A), and the law interpreting that section.

45.  Instead of delegating all fiduciary responsibility for the Plan to external service providers, CVS chose to internalize its respective fiduciary functions.

**Each Defendant's Fiduciary Status**

**A.    CVS**

46.  During the Class Period, CVS held ultimate fiduciary responsibility for and authority over the Plan. CVS retained the right to terminate or amend the Plan, in whole or in part, at any time and for any reason it deems advisable. CVS wielded its fiduciary authority both directly through its primary executive arm, its Board of Directors, and through the appointment, removal and monitoring of the performance of its fiduciary delegates such as the Plan Committee and the Plan Administrator.

**B.    CVS Director Defendants**

47.  The Board of Directors during the Class Period was directly responsible for the appointment, monitoring and removal of members of the Plan Committee, and thus each members was a fiduciary of the Plan. The members of the Board had direct oversight over key fiduciary decisions of the Plan, including the appointment of members of the Plan Committee.

C.    **<u>Plan Committee</u>**

12

48. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. §1102(a)(1). The Plan Committee was thus a fiduciary of the Plan.

49. The Plan Committee members were directly appointed and removed by the Board.

50. The Plan Committee has the power and discretion to determine issues arising out of or in connection with the provisions and/or the administration of the CVS Plan.

51. Importantly, as detailed herein, the Plan Committee was responsible for the selection of the Plan Administrator.

### E. Additional Fiduciary Responsibilities

52. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under §402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

### CLASS ACTION ALLEGATIONS

53. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between December 1, 2000 and October 30,

2001 (the "Class Period") and whose accounts held CVS Stock acquired during that period.

54.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

   (a)   whether defendants each owed a fiduciary duty to Plaintiff and members of the Class;

   (b)   whether defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

   (c)   whether defendants violated ERISA; and

   (d)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

57.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

59.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' CONDUCT

### CVS's Dramatically Expands Through Aggressive Acquisitions

60.     Through a series of major acquisitions between 1996 and 1998, CVS increased the number of retail stores it operated from approximately 1,400 to approximately 4,122 retail pharmacies in 24 states and the District of Columbia, and began touting itself as the largest chain drugstore company in the United States based on store count.

61.     CVS's Retail Pharmacy sales are divided between pharmacy sales and sales of general merchandise, including, over-the-counter drugs, greeting cards, film and photo finishing services, beauty products and cosmetics, seasonal merchandise and convenience food (referred to by CVS as

"front store" sales). Following its acquisitions of Revco D.S., Inc. (finalized on May 29, 1997) and Arbor Drugs, Inc., (finalized on March 31, 1998), CVS's business has shifted substantially more heavily to pharmacy sales. By 2000, pharmacy sales had increased to represent approximately 63% of total sales for the year, up from 43.9% in 1996.

62.    As a result of this shift, defendants knew that CVS's ability to continue to manage and grow its Retail Pharmacy business segment and to maintain and increase pharmacy sales was critical to the success of its overall operations. However, by the beginning of the Class Period, CVS was experiencing a number of undisclosed problems that were having a materially negative impact on its Retail Pharmacy business.

**CVS's Inability to Offset Declining Gross Margins**

63.    In the months preceding the Class Period, CVS had suffered from substantially declining gross margin rates, which presented a threat to CVS's operating profits and earnings. The Company attributed this adverse trend to the fact that pharmacy sales were becoming an increasingly larger percentage of CVS's total sales as compared to front store sales, and the margin on pharmacy sales is lower than the margin on front store sales. This is especially true with respect to pharmacy sales paid for by third party insurance programs, including managed care organizations, as such organizations, in order to reduce their prescription drug costs, brought substantial pressure to bear on pharmacies like CVS to accept lower rates of reimbursement.

64.    CVS represented that it would be able to mitigate the negative impact that increased pharmacy sales were having on the Company's gross margins and operating profits by increasing operating efficiencies. Accordingly, in June 2000, CVS changed its procedures for handling in-store markdowns of damaged merchandise, store supplies, unsaleable merchandise and/or outdated

merchandise. Previously, CVS stores had manually kept track of in-store markdowns and returns of damaged merchandise on a weekly basis. Pursuant to the new procedure, inter alia, in-store markdowns and returns were to be taken and tracked on a daily basis using an electronic RF device.

65. According to the Company's internal policy manual issued in connection with this change, the new markdown policy would allow for "more accurate and timely [markups and markdowns] on a daily basis" and would avoid the need to take unnecessarily large write-offs of damaged merchandise at any point in time.

66. In connection with this change in procedure, on May 25, 2000, CVS management issued a memorandum to all CVS store managers, announcing that CVS would institute a new procedure for handling markdowns and returns of damaged items commencing on June 18, 2000. In describing the reasons for the change in policy for handling return of damaged merchandise, the memorandum stated the following:

DAMAGE RETURN PROCEDURE CHANGE

BACKGROUND
A new damage return process has been developed in conjunction with the new manual markdown application introduction on the RF Unit. The intent of this new process is to tighten controls on non-returnable and "un-billable" merchandise being sent to Damage Track.

> In 1999 stores sent over $1.4 million dollars worth of non-returnable and pristine merchandise back to Damage Track (pristine being defined as perfectly good merchandise with no visible signs of the product or package being damaged or outdated).
>
> Additionally, as a company, we returned $25 million dollars more merchandise than we received credit from suppliers. This variance resulted in a company P&L write-off. If this write-off was shared evenly between all 4000 plus stores, your P&L Contribution A line would have been negatively adjusted by $6250.00.

Needless to say, we cannot afford to repeat this write-off in 2000. Therefore, the following new procedures have been developed and must be implemented IMMEDIATELY.

67.     As the memorandum makes clear, CVS intended to more effectively and accurately handle markdowns and returns of damaged merchandise by keeping track of this information on a daily basis. The memorandum also demonstrates the magnitude of the issue. As indicated above, in 1999, CVS returned $25 million worth of merchandise to suppliers for which it did not receive any credit. This amount does not include damaged merchandise that was not returnable and was written off and/or merchandise that was damaged and sold at a marked down price.

68.     Ironically, in an effort to hide costs and artificially inflate earning for the year, several months later, in November 2000, CVS, in direct contravention of its new markdown and damage return policy instead directed its store managers to hold in abeyance recording any store initiated markdowns until following the beginning of the next fiscal year, in January, 2001. As part of this directive, store managers corporation-wide were instructed to segregate and hold in a designated section of each store's respective stockroom all merchandise that was to be written-off and/or marked down.

69.     Specifically, on November 20, 2000, CVS management issued a memorandum to all CVS store managers, stating that, effective immediately, "[n]o store initiated markdowns should be taken between now and January 1, 2001." The memorandum included the following additional information regarding the sudden policy turnaround:

> Further Information:
> What markdowns CANNOT be performed, effective immediately?
> -- Store level markdowns
>     -- Damaged / non-returnable items

18

    -- Damaged / unsaleable items
        NOTE: Returnable Damages going back to the warehouse should still be processed as normal
    -- Cosmetic prepack markdowns
    -- Not in planogram discontinued / Discontinued Other
    -- End of Season Down to Zero markdowns
    -- Outdated non-returnable product (i.e., Russell Stover)

How do I handle the Damaged Items that are not returnable or unsaleable?
    -- Hold in the designated clearance location in your stockroom.
    -- Visual merchandising will allocate endcaps in the January Merchandising Planner to assist with liquidating these items.

70. Accordingly, from November 20, 2000 through at least the end of fiscal 2000, defendants did not allow any of CVS's 4,100-plus stores to take markdowns or write-off damaged or otherwise unsaleable goods. As a result, each store was required to keep thousands of dollars of damaged merchandise in storerooms that should have been discounted or marked down to zero. As one former CVS store manager put it, this policy resulted in "trays and cases of unsaleable merchandise taking up space in the back of the store, in the back room."

71. This sudden reversal in policy reflected a clear intent by CVS, through its senior management, to avoid having to write-off millions of dollars of damaged and/or discounted merchandise until sometime in 2001. Indeed, numerous CVS store managers discussed among themselves the fact that the new policy served no legitimate business purpose and was implemented in order to allow the Company to report that it had achieved its forecasted numbers for fiscal 2000, thereby allowing CVS executives to reap substantial bonuses.

72. Demonstrating defendants intent in this regard is the fact that they allowed stores to continue to process unsaleable merchandise that could be returned for a credit, while they prevented stores from processing unsaleable merchandise for which credit was not available.