Generally Accepted Accounting Principals ("GAAP") required this unsaleable merchandise should be written off and disposed of. However, pursuant to defendants' instructions, stores were required to retain this merchandise, which could not be sold or returned, through at least the end of 2000 before any required write-offs could be recorded.

73.     As a result of the foregoing, CVS knowingly cut off the flow of information from stores that would allow the Company to properly account for discounted and unsaleable merchandise, in violation of GAAP. By doing so, defendants were able to delay the writedown of millions of dollars of inventory, thereby artificially improving the Company's gross margin and inflating its reported operating results for the fourth quarter and year end 2000, resulting in CVS Stock price being artificially inflated during the Class Period.

**CVS's Determination To Close Hundreds Of Underperforming Stores**

74.     In addition to allowing Plan participants to continue to invest in CVS Stock despite the open and blatant accounting improprieties resulting from the Company-wide directive to thousands of CVS stores not to properly account for damaged and non-returnable goods, the defendants further breached their fiduciary duties to Plan participants as follows.

75.     As described above, between 1996 and 1998, CVS acquired approximately 2,600 stores in connection with the Revco and Arbor Drugs acquisitions. Many of the stores acquired in these transactions were located in undesirable strip mall locations and/or were unprofitable. CVS's publicly touted strategy was to relocate as many stores as possible out of strip mall locations to larger more profitable stand-alone locations. Indeed, CVS emphasized its relocation strategy in press releases and SEC filings issued both before and throughout the Class Period,

20

noting that by relocating stores the Company was immediately able to increase these stores' profitability.

76.     Defendants however knew, at all relevant times, that a certain percentage of its stores that were located in undesirable locations would not be able to be relocated and would need to be closed. Further, defendants knew that other stores that were underperforming could not be made profitable and would also need to be closed.

77.     Indeed, since completing the Revco acquisition in 1997, the problem of underperforming stores was regularly discussed at meetings of CVS senior management. By 1999, CVS had developed an action plan to try and improve performance at a number of underperforming stores. If performance could not be improved at a store, defendants' plan was to try and sell the store or, if the store could not be sold, to schedule it for closure.

78.     In the beginning of 2001, CVS set up a cross-functional task force assigned with the responsibility of determining which of its stores would need to be closed. The task force was headed up by CVS's Treasurer, Phil Galbo. Mr. Galbo reported directly to Douglas Sgarro, CVS's Senior Vice President - Administration and Chief Legal Officer. Also centrally involved in this process was Larry Merlo, CVS's Executive Vice President in charge of stores, and, on information and belief, the Human Resources department of CVS.

79.     By the first quarter of 2001, the task force had determined that approximately 200 stores would need to be closed. Many of the stores targeted for closure were stores acquired from Revco or Arbor Drugs that had long been recognized as underperforming. The stores scheduled for closing were identified on a list that was circulated at CVS's headquarters.

Although the list was refined over time, the number of stores to be closed always remained at approximately 200.

80. As a result of the foregoing, by the beginning of 2001, CVS's recognized need, and clear intention to close approximately 200 stores had become common knowledge internally at the Company, and was the subject of discussions among CVS employees. For example, in January 2001, a CVS District Manager disclosed to a group of store managers that CVS would be closing a number of mid-western stores sometime later in the year in connection with a restructuring plan.

81. Rather than publicly disclosing its plans to close approximately 200 stores, however, throughout the Class Period, defendants misleadingly emphasized CVS's plans to open new stores in new markets and relocate stores in existing markets.

### CVS's Inability to Attract and Retain Adequate Numbers of Pharmacists to Staff its Stores

82. In addition to the issue of closing hundreds of non- and underperforming stores, CVS also long recognized it faced ever-increasing, critical problems with attracting and retaining adequate numbers of qualified pharmacists.

83. For some time, there has been an ongoing shortage of pharmacists in the United States. The shortage has been attributed to a number of factors, including, the growing number of prescription drugs being used to treat illnesses, the aging population and an increase of the number of years necessary to obtain a pharmacist degree from 5 years to 6 years.

84. Although the pharmacist shortage has had some impact on the entire industry, the problem has been particularly acute for CVS. This is true for several reasons. First, as alleged

22

herein, CVS has engaged in rapid expansion, resulting in a dramatic increase in the number of pharmacists the Company required to staff its stores. For example, according to a former CVS manager in CVS's construction division, at the time CVS acquired Arbor Drugs in 1998, the chain, whose operations were focused in the Detroit region, was suffering from a deficit of approximately 100 pharmacists that were needed to properly staff stores in the region. Unknown to the investing public, since completing the acquisition in 1998, CVS has struggled to try and maintain adequate pharmacy staffing in these stores.

85.   Further adding to the problem is the fact that, as described above, CVS has focused for the past several years on a strategy of relocating existing stores in smaller strip mall locations to larger stand-alone locations. Many of these new locations are open 24 hours, thereby further increasing the need for pharmacists at CVS.

86.   As early as 1997, the pharmacist shortage had been identified internally at CVS as a problem that was negatively impacting the Company's operations. From 1997 through 2000, and continuing throughout the Class Period, CVS's Pharmacy Operations Group was involved in trying to solve the problem and was aware that their efforts were inadequate. Additionally, since 1997, CVS's Information Systems department was also involved in trying to address the adverse impact that the pharmacist shortage was having on the Company, and knew that the problem was critical and remained unresolved. At weekly meetings led by Howard Edels, the Company's Chief Information Officer, senior managers of the Information System department would discuss issues that affected the Company. At these meetings, the pharmacist shortage was regularly raised as a problem hindering the Company's performance.

87. The impact of the pharmacist shortage became more acute throughout 2000. By late 2000, CVS senior management, including CVS's Chief Information Officer, internally stressed the need to improve recruitment of pharmacists in order to try and address the problem. Such a problem -- and the concomitant personnel issues it consistently triggered -- were clearly also actively discussed, recognized and known to the Company Human Resources department.

88. Rather than disclosing the extent of the impact that the pharmacist shortage was having on CVS, defendants instead chose to create the impression that CVS was handling the situation and, in fact, was better positioned to attract and retain qualified pharmacists than its competitors. Indeed, CVS consistently represented that the pharmacist shortage was not affecting the Company's operations and its ability to grow.

89. For example, on October 31, 2000, Bear Stearns issued an analyst report, based on information provided by CVS, which stated the following:

> CVS has been successful in attracting and retaining pharmacists at reasonable costs, despite the largest pharmacist shortage the U.S. has ever seen. Beyond incenting pharmacists with stock options and an improved 401K plan, CVS is making the pharmacists' job more enjoyable by automating tedious, routine tasks with new technologies. To this end, automated pill-counting technology has been implemented in roughly 700 stores, a number which we expect to increase as benefits are realized from improved workflow and employee morale.

90. Similarly, in an article published by Chain Drug Review on December 11, 2000, Jim Roberts, the Vice President of CVS's Southeast region, commented on the impact that the pharmacist shortage was having on CVS as follows: "We've positioned ourselves as the preferred place to work." Mr. Roberts further stated, "[a]s a preferred provider we are able to

24

attract the very best pharmacists in the marketplace and on pharmacy school campuses where we currently recruit across the country."

91. The foregoing examples are representative of statements made by defendants, both before and during the Class Period, designed to create the impression that the pharmacist shortage was not having a materially adverse impact on CVS's operations. Contrary to these representations, however, at least by the end of 2000, it had become apparent and obvious internally at CVS that the Company's efforts to recruit and retain adequate levels of pharmacist staffing were insufficient.

92. By February 2001, the pharmacist shortage resulted in customers experiencing unreasonably long waits to fill prescriptions, temporary store closings and reduced store hours at different CVS locations on a regular basis. The pharmacist shortage was particularly acute in certain regions of the country, including, among others, the Detroit and Washington, D.C. areas. However, the impact of the pharmacist shortage during the Class Period was felt at CVS stores throughout the country. For example, in late 2000 and early 2001, CVS experienced a severe shortage of pharmacists at its stores in Rhode Island. To try and compensate for this problem, CVS began closing pharmacies in the region on Sundays and had the pharmacist staff alternate from store to store. Similarly, from February through May 2001, temporary store closings due to lack of pharmacists transpired at stores around the country, including stores in Connecticut, South Carolina, North Carolina, Pennsylvania, Florida and elsewhere. Defendants did not disclose any of the problems they were having as a result of the pharmacist shortage.

93. Moreover, contrary to defendants' representations that it was addressing the pharmacist shortage by establishing CVS as "a preferred place to work," the Company's inability

25

to attract and retain pharmacists was actually exacerbated by the fact that CVS paid less than its competitors. Further, to try and compensate for the ever-widening shortage, CVS required that its pharmacists work extensive amounts of unpaid overtime. Due to the severity of the shortage, some CVS pharmacists were required to work in excess of 70 hours per week or more. Additionally, CVS regularly required that its pharmacists travel extensive distances to cover pharmacies that were inadequately staffed.

94.   Not surprisingly, and as well know within the Company, particularly its Human Resources department, CVS's treatment of its pharmacists resulted in high turnover, and negatively affected the Company's ability to attract new pharmacists, in November 2000, a group of CVS current and former pharmacists brought a collective action against the Company alleging that its failure to pay overtime violated the Fair Labor Standards Act. Similar suits by CVS pharmacists were brought in early 2001. Defendants did not disclose the existence of any of these lawsuits in its press releases or public filings until March 21, 2002, when it finally reported that the November 2000 action had been brought by pharmacists seeking recovery of unpaid overtime and liquidated damages.

95.   Thus, contrary to defendants' repeated public statements that CVS was better suited to handle the pharmacist shortage than most other retailers, CVS knew that they were unable to adequately staff its retail stores and the pharmacist shortage was having a materially negative impact on CVS's operations. In fact, the pharmacist shortage was actually having a more severe impact on CVS's operations than it was having on many of its competitors. For example, although one of CVS's main competitor, Walgreen, Inc., had been required to close or

26

reduce hours at approximately 1% of its stores due to the pharmacist shortage, CVS had been required to close or reduce hours at 15% of its stores during the same period.

**CVS Made Repeated False and Misleading**
**Statements During the Class Period**

96. On February 6, 2001, the first day of the Class Period, CVS issued a press release announcing "record sales and earnings for the fourth quarter [of 2000] and the year ended December 30, 2000." The Company reported $5.5 billion in net sales during the fourth quarter and fourth quarter earnings of $0.51 per share, a purported increase of 19.6% over the same period the prior year (after excluding results from an extra week in fiscal 1999). For the year, the Company reported $20.1 billion in net sales and earnings of $1.80 per share, a purported increase of 17.7% over the results of the prior year (after excluding a nonrecurring gain and the extra week in 1999).

97. In the same press release, CVS commented on the Company's store growth as follows:

> For the year, CVS opened 158 new stores and relocated 230 others. The Company entered three new, high growth markets in 2000 and prepared to enter additional new markets. There remain 41 of the Top 100 U.S. drugstore markets in which CVS currently has no presence, offering significant opportunity for future growth. As of December 30, 2000, CVS operated 4,133 retail and specialty pharmacy stores in 31 states and the District of Columbia.

98. In the February 6 press release, Defendant Ryan commented on CVS's reported results as follows:

> "The year 2000 was another successful year for CVS. We once again achieved double-digit same store sales growth, excellent expense control, and produced record earnings," stated Tom Ryan, Chairman, President and Chief Executive Officer.

27

99. Defendant Ryan concluded by stating:

> I am very pleased that we have been able to consistently meet or beat our goals, all while we continue to invest in new stores and relocations, as well as in new business channels, which will help accelerate our future growth. I believe we are better positioned than at any other time in the Company's history to capitalize on the significant opportunities in healthcare.

100. Also on February 6, 2001, CVS held a conference call with the investment community led by defendant Ryan. During the conference call, defendant Ryan further stated:

> Let me outline our preliminary real estate plan for 2001. We'll open 150 to 170 brand new CVS stores. We'll relocate 140 to 150 CVS stores. We'll close an additional 60 to 70 stores for a net new-store CVS growth of 90 to 100 stores for 2001. This equates to 300-plus new [stores], less than we've had in the past but a much higher net new-store growth because we're closing fewer stores.

101. Defendants knew, or negligently failed to know that the financial results they announced on February 6 and the statements commenting on those results were materially false and misleading, as the Company's gross margins and operating profits had been artificially inflated by defendants' failure to properly account for marked down and damaged merchandise in violation of GAAP. As a consequence, reported earnings for the fourth quarter and year end 2000 were artificially inflated.

102. Additionally, defendants knew, or negligently failed to know that their comments regarding CVS's growth plans and business prospects were materially false and misleading because they failed honestly and fully to disclose the fact that CVS had already determined a requirement to close approximately 200 specifically identified non- and underperforming stores, as well as the fact that the Company, overall, was being adversely impacted by the ongoing pharmacist shortage.

28

103. In March, 2001, CVS both issued its Annual Report to Stockholders and filed with the SEC its Form 10-K for fiscal year 2000, both of which also contained similar false and misleading representations. Moreover, other representations and public filings over the Class Period also included similar false and misleading representations, and/or failed to disclose material information regarding necessary store closings and the Company's ongoing and worsening problem hiring and retaining sufficient numbers of qualified pharmacists.

104. For example, on May 14, 2001, Jim Smith, CVS's senior vice president of health services was quoted in an article published by Racher Press Inc. as follows: "By making the value it places on pharmacists abundantly clear, CVS Corp. is coping better with the nationwide pharmacist shortage than most retailers."

105. Similarly, on May 11, 2001, J.P. Morgan issued an analyst report, based on information provided by CVS at its May 10 meeting with securities analysts, which stated the following: "CVS addressed its strategies to attract and retain quality pharmacists and technicians. CVS offers stock options to pharmacists, who can also participate in 401K and employee stock programs. The company discussed Excellence in Pharmacy Innovation and Care (EPIC), its program which focuses on workflow processes in the pharmacy, automation (for pill counting), as well as labor productivity, in terms of the cost benefits of shifting work from the pharmacist to the technician. 60% of the company's new pharmacy staff are hired away from competitors, while 40% from colleges."

**The Truth is Revealed**

106. On October 30, 2001, the last day of the Class Period, CVS shocked the market by issuing a press release announcing that CVS's financial results for the third quarter of 2001 had

29

fallen substantially from the previous year. In this regard, defendants reported that net earnings were down 16.0% from the third quarter of 2000. In response to this negative information, defendant Ryan commented:

> We are disappointed with our results for the third quarter and committed to taking the necessary actions to improve performance and restore healthy long-term growth. With that in mind, we have completed a thorough analysis of our business and are today announcing a series of actions to best position CVS for the future.
>
> \* \* \*
>
> The Company's plan includes a series of sales generation and expense reduction initiatives, including:
>
> -- Undertaking a store consolidation program, under which approximately 200 stores will be closed during the first quarter of 2002
>
> -- Closing one of CVS' ten distribution facilities and one of ProCare's two mail order facilities.
>
> \* \* \*
>
> In connection with certain of these actions, the Company expects to record a pre-tax restructuring and asset impairment charge of approximately $350 million, of $0.56 per diluted share, in the fourth quarter of 2001.

107.    The market reacted immediately to this additional surprising announcement. On October 30, 2001, the price of CVS stock fell $7.72 to $23.90 per share, a one-day decrease of 24%, and a decrease of 61% from the Class Period high of $62.10 per share reached on March 3, 2001.

108.    As set forth above, throughout the Class Period, defendants knew or were negligent in not knowing that the Company's stock price was artificially inflated based on the facts as alleged herein.

## Defendants Knew Or Should Have Known That
## CVS Stock Was Not A Prudent Plan Investment

109. At all relevant times, Defendants knew or should have known that CVS was engaged in the questionable accounting practices and, moreover, was facing material operational problems and risks never disclosed to the public or Plan participants, which made CVS Stock an imprudent Plan investment.

110. CVS, the Plan Committee, Plan Administrator, and the Individual Defendants failed properly to take into account these material adverse factors, that put CVS Stock at risk, as well as the fact that CVS Stock was inflated in value when determining the prudence of investing and holding Plan assets in CVS Stock.

111. As a result of defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that CVS made to Plan participants did not effectively inform Plan participants of the past, immediate, and future dangers of investing in Company Stock.

112. In addition, named and unnamed Defendants, as fiduciaries responsible for monitoring the investment of Plan assets, failed to adequately review the performance of the Plan Committee to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

113. The Company, the Plan Committee, the Plan Administrator, and other individual Plan fiduciary delegates failed to conduct an appropriate investigation into whether CVS Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding CVS's improper activities so that participants could

make informed decisions regarding CVS Stock in the Plan, or otherwise failed to protect the Plan and its participants against inevitable losses.

114.   An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in CVS Stock offered by the Plan, under these circumstances, was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

115.   Because defendants knew or should have known that Company stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Company stock.

116.   Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of Company stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plan in connection with the Plan's acquisition and holding of Company stock.

117.   Despite the availability of these and other options, defendants failed to take any action to protect participants from losses as a result of Plan investment in CVS Stock during the Class Period.

**Defendants Regularly Communicated With Participants In The
Plan Concerning CVS Stock Offered By The Plan, Yet Failed
To Disclose The Imprudence Of Investment In Company Stock**

118.  Upon information and belief, the Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company's common stock, a substantial asset of the Plan. During the Class Period, the Company fostered a positive attitude toward the Company's stock, and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

119.  As noted above, these SEC filings and related Company statements and releases were inaccurate, incomplete and materially misleading, causing Plan participants to purchase, and to hold and maintain, Plan investments in CVS Stock.

120.  The Company, the Plan Committee, the Plan Administrator, and or the Plan's individual fiduciary delegates failed to provide Plan participants with complete and accurate information regarding CVS Stock, such that the participants could appreciate the true risks presented by investments in CVS Stock and could make informed decisions regarding investments in the Plan.

## **CLAIMS FOR RELIEF UNDER ERISA**

121.  At all relevant times, defendants were and acted as fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

122.  ERISA §502, 29 U.S.C. §1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA §409, 29 U.S.C. §1109.

33

123. ERISA §409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

124. ERISA §404(a)(1)(A) and (B), 29 U.S.C. §1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

125. These fiduciary duties under ERISA §404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things,

    a. The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance Company stock, to ensure that each investment is a suitable option for the plan; and

    b. A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know

34

that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

126. ERISA §405(a), 29 U.S.C. §1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> "...in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

127. Plaintiff therefore brings this action under the authority of ERISA §502 for Plan-wide relief pursuant to ERISA §409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the defendants.

## CAUSATION

128. The Plan suffered at least millions of dollars in losses because substantial assets of the Plan were imprudently allowed to be put at great risk by Defendants, through investment by the Plan in CVS Stock during the Class Period, in breach of defendants' fiduciary duties.

129. Defendants are responsible for losses caused by participant direction of investment in CVS Stock because defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA §404(c), 29 U.S.C. §1104(c), and the regulations promulgated thereunder.

35

Defendants concealed material, non-public facts from participants, and provided misleading, inaccurate, and incomplete information to them regarding the nature of the Defendants' illicit activities and therefore the ongoing earnings levels of CVS, as well as the true underlying values of CVS Stock offered by the Plan, misrepresenting its soundness as investment vehicles. As a consequence, participants did not exercise independent control over their investments in CVS Stock, and defendants remain liable under ERISA for losses caused by such investment.

130. Had the defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in CVS Stock and divesting the Plan from Company stock offered by the Plan when maintaining such investment alternatives became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Company common stock.

131. Had the defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in CVS Stock offered by the Plan, eliminating this investment alternative when it became imprudent and divesting the Plan from any then-existing investments in this investment alternatives when maintaining such investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through such continued tainted investment.

## COUNT I

### Failure to Prudently and Loyally Manage Plan Assets
### (Breaches of Fiduciary Duties in Violation of ERISA §404)

132. Plaintiff incorporates the allegations contained in the previous paragraphs of this complaint as if fully set forth herein.