# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

————————————————————— :
JAMES FESCINA, Individually and On : 
Behalf of All Other Similarly Situated :
: Civil Action No.  04-12309-JLT
Plaintiff :
:
vs. :
:
CVS CORPORATION, THOMAS M. :
RYAN, STANLEY P. GOLDSTEIN, :
EUGENE APPLEBAUM, W. DON :
CORNWELL, THOMAS P. GERRITY, :
MARIAN L. HEARD, WILLIAM H. :
JOYCE, TERRENCE MURRAY, :
SHELI Z. ROSENBERG, IVAN G. :
SEIDENBERG, **DAVID RICKARD,** :
**ZENON P. LANKOWSKY,** :
**ROSEMARY MEDE,** and UNKNOWN :
FIDUCIARY DEFENDANTS 1-100 :
:
Defendants :
————————————————————— :

## AMENDED COMPLAINT FOR
## BREACHES OF FIDUCIARY DUTY UNDER THE
## EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff James Fescina ("Plaintiff"), a participant in the CVS 401(k) Profit Sharing Plan

(the "**401(k)** Plan") **and the CVS Corporation and Subsidiaries Employee Stock Ownership**

**Plan (the "CVS ESOP") (collectively, the "Plans")** at all times relevant to this action, on

behalf of himself and a class of all others similarly situated, alleges as follows:

**INTRODUCTION**

1.      This is a class action brought pursuant to §502 of the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. §1132, against ~~Plan~~ fiduciaries **of the Plans**,

including CVS Corporation ("CVS" or the "Company").

2.      401(k) plan**s, governed under ERISA,** confer tax benefits on participating

employees to incentivize saving for retirement and/or other long-term goals.  An employee

participating in a 401(k) plan ~~may have~~ **typically has** the option of purchasing the common stock

of his employer, ~~often~~ **routinely** the sponsor of the plan, for part of his/her retirement investment

portfolio.  ~~CVS common stock, is one of the investment alternatives in the Plan.~~

3.      **Employee Stock Ownership Plans ("ESOPs"), also governed under ERISA,**
**are designed to function as both an employee retirement benefit pan and a mechanism of**
**corporate finance that encourages employee ownership.  Consideration paid into ESOPs**
**are typically in the form of stock of the company.  The assets of an ESOP are held in a trust**
**under the control of fiduciaries.**

4.      Plaintiff Fescina was an employee of CVS and a participant in the Plan**s** during

the Class Period alleged herein.  His retirement investment portfolio included CVS **common**

stock **and CVS Preference Stocks[1], the value of which was and is directly tied to the value of**

**CVS common stock.**.

---

[1]      **CVS Preference Stock is a special stock which cannot be purchased on the**
**stock market by the general public.  Each share of Preference Stock is worth 2.314 shares**
**of CVS common stock, and has a guaranteed floor value of $53.45 per share (equivalent to**
**a floor price of $23.10 per share of CVS common stock).**

5.      Plaintiff alleges that Defendants, as fiduciaries of the Plan**s**, breached their duties to him and to the other participants and beneficiaries of the Plan**s** during the Class Period in violation of ERISA, particularly with regard to the ~~Plan's~~ **Plans'** holdings of CVS common stock ("CVS stock") **and CVS Preference Stock.**

6.      CVS is the sponsor of the Plan**s. As noted above, both the** ~~a~~ 401(k) Plan **and the CVS ESOP** ~~that~~ permit**s** participants to save for retirement.  Throughout the Class Period, the Plan**s** held ~~a significant portion of its~~ **substantial**  invested assets in CVS **common** stock **and/or CVS Preference Stock.**  The basis for such holdings was in part because **the 401(k)** Plan participants were offered the option of purchasing CVS stock by choosing to allocate all or a portion of their **401(k)** contributions to the CVS Stock Fund, a separate investment fund established in 1997 that held CVS common stock.  Moreover, 50% of the Company's matching contributions were paid in the form of shares of CVS ~~preference stock~~ **Preference Stock** ~~through the Employee Stock Ownership Plan ("ESOP")~~.  **These matching contributions were held in the Diversified ESOP Account.   As noted above, eligible CVS employees were also paid CVS Preference Stock through the CVS ESOP.**

7.      Since the **401(k)** Plan's holdings in CVS stock comprised a ~~significant percentage~~ **substantial portion** of the overall value of the assets held by the Plan, **and the value of the CVS Preference Stock held in the CVS ESOP and Diversified ESOP Account was directly tied to the value of CVS common stock,** the long-term retirement savings of ~~Plan~~ participants **in the Plans** were dependent to a material degree on the performance of CVS **common** stock, as well as the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of Plan assets.

3

8.    During the Class Period, as described herein, Defendants knew or should have known that CVS Stock **and/or CVS Preference Stock were** ~~was an~~ imprudent investments alternative**s** for the Plan**s** due to the substantial and material accounting and business improprieties occurring at the Company.  Upon information and belief, certain Defendants played an active role in implementing and/or perpetuating the accounting and business improprieties described herein which resulted in the artificial inflation of the value of Company stock during the Class Period.

9.    This action ~~generally~~ alleges that ~~the~~ fiduciaries of the Plan**s** ~~thus~~ breached their fiduciary duties to the Plan**s** and ~~its~~ **their** participants under ERISA, by, among other things, selecting and maintaining CVS **common** stock and the CVS Stock Fund as an investment alternative for participant contributions under the **401(k)** Plan **and continuing to permit Plan participants to invest in the CVS Stock Fund** when **they knew or should have known that** it was no longer a suitable or prudent Plan investment option.

10.    **In addition, the fiduciaries of the CVS ESOP breached their fiduciary duties to plan participants by failing to take appropriate steps to mitigate damages to Plan participants in acquiring new, and/or continuing to hold existing CVS Preference Stock based on what these fiduciaries know or should have know regarding accounting misconduct and material misrepresentations by Company officials, and the resultant artificial inflation of the value of CVS common stock – and thus to the CVS Preference Stock – during the Class Period.**

11.    The breaches alleged herein were ongoing and continuous over the course of the Class Period, and arose out of**, *inter alia*,** Defendants' continuing duty to review, evaluate, and

monitor the suitability of the **401(k)** Plan's investment in CVS stock, and to provide accurate material information to enable participants to make informed investment decisions concerning **the investment of** their contributions **and Company matching and ESOP contributions** ~~invested~~ in Company **common and preference** stock.

12.     As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan~~s~~ ~~has~~ **have** suffered substantial losses; with millions of dollars of the retirement savings and anticipated retirement income of the Plan participants having been lost. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan**s** the losses resulting from these breaches of fiduciary duty.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

14.     Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan**s** ~~was~~ **were** administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

**Plaintiff**

15.     Plaintiff Fescina worked for CVS, and was a participant in the Plan**s** pursuant to §3(7) of ERISA, 29 U.S.C. §1102(7) and **acquired and** held CVS ~~shares~~ **common stock** in his retirement investment portfolio **and acquired and held CVS Preference Stock in his ESOP and Diversified ESOP Account** during the Class Period.

5

**Defendants**

16.     Defendant CVS Corporation ("CVS" or the "Company") is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island 02895.  According to the Company's 2003 From 10-K, CVS is the second largest drugstore chain (based on sales) in the United States.  As of January 3, 2004, the Company operated 4,179 retail and specialty pharmacy stores in 32 states and the District of Columbia.  During calendar 2003, CVS filled over 334 million prescriptions, or approximately 10% of the U.S. retail market.

17.     CVS is a the Plan Sponsor **of the Plans**.  Moreover, CVS is a fiduciary of the Plans within the meaning of ERISA.  CVS**, through its Board of Directors, senior officers and employees,** exercises discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plan's **Plans'** assets.  CVS at all times acted through its officers and employees, including its **Chief Financial Officer, General Counsel and** Senior Vice President, Human Resources, **all** and other members of the Plan Committee appointed by the Board to perform CVS's **401(k)** Plan-related fiduciary functions in the course and scope of their employment.

18.     CVS at all times acted through its officers and employees, including the members of the Plan Committee, and the **401(k)** Plan Administrator, **and the fiduciaries responsible for the administration of the CVS ESOP and Diversified ESOP Account,** who were appointed by the **Board of Directors of the** Company to perform Plan-related fiduciary functions, and did so in the course and scope of their employment.  CVS has, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities.  Through

its Board of Directors (the "Directors") **and/or senior management** ~~or otherwise~~, CVS had the authority and discretion to hire and terminate said officers and employees. CVS also had the **responsibility,** authority and discretion to appoint, monitor, and remove officers and employees from their individual fiduciary roles with respect to the Plan**s**. By failing to properly discharge their duties under ERISA, the Directors, officers and employee fiduciaries breached duties they owed to ~~Plan~~ participants **of the Plans** and their beneficiaries. Accordingly, the actions of the various Plan officers and/or managers or administrators and other employee fiduciaries are imputed to CVS under the doctrine of *respondeat superior*, and CVS is liable for these actions.

**Director Defendants**

19.    Defendant Thomas M. Ryan ("Ryan") was Chairman of the Board of Directors ("Board") and Chief Executive Officer ("CEO") of CVS during the Class Period. **As such, Ryan – acting as a member of the Business Planning Committee ("BPC") and otherwise – was intimately familiar with and involved in the multiple instances of misconduct alleged herein.** Ryan was a fiduciary of the Plan**s** within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan**s** and/or management and disposition of the Plans' assets**, including, <u>inter</u> <u>alia</u>, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.**

20.    Defendant Stanley P. Goldstein ("Goldstein"), a founder of the Company, was Chairman of the Board until April 1999, and CEO of the Company until his retirement in 1998. Goldstein served on CVS's Board during the Class Period. Goldstein was a fiduciary of the Plan**s** within the meaning of ERISA in that he exercised discretionary authority with respect to

management and administration of the Plan**s** and/or management and disposition of the Plans'

assets**, including, *inter alia*, responsibility for the selection, monitoring and removal of the**

**members of the Plan Committee and Administrators of the Plans.**

      21.    Defendant Eugene Applebaum ("Applebaum") served on CVS's Board during the

Class Period. Applebaum was a fiduciary of the Plan**s** within the meaning of ERISA in that he

exercised discretionary authority with respect to management and administration of the Plan**s**

and/or management and disposition of the Plans' assets**, including, <u>inter alia</u>, responsibility for**

**the selection, monitoring and removal of the members of the Plan Committee and**

**Administrators of the Plans** .

      22.    Defendant W. Don Cornwell ("Cornwell") served on CVS's Board during the

Class Period. Cornwell was a fiduciary of the Plan**s** within the meaning of ERISA in that he

exercised discretionary authority with respect to management and administration of the Plan**s**

and/or management and disposition of the Plans' assets**, including, <u>inter alia</u>, responsibility for**

**the selection, monitoring and removal of the members of the Plan Committee and**

**Administrators of the Plans.**

      23.    Defendant Thomas P. Gerrity ("Gerrity") served on CVS's Board during the Class

Period. Gerrity was a fiduciary of the Plan**s** within the meaning of ERISA in that he exercised

discretionary authority with respect to management and administration of the Plan**s** and/or

management and disposition of the Plans' assets**, including, <u>inter alia</u>, responsibility for the**

**selection, monitoring and removal of the members of the Plan Committee and**

**Administrators of the Plans.**

24.     Defendant Marian L. Heard ("Heard") served on CVS's Board during the Class Period.  Heard was a fiduciary of the Plan**s** within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan**s** and/or management and disposition of the Plans' assets**, including, <u>inter</u> <u>alia</u>, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.**

25.     Defendant William H. Joyce ("Joyce") served on CVS's Board during the Class Period.  Joyce was a fiduciary of the Plan**s** within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan**s** and/or management and disposition of the Plans' assets**, including, <u>inter</u> <u>alia</u>, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.**

26.     Defendant Terrence Murray ("Murray") served on CVS's Board during the Class Period.  Murray was a fiduciary of the Plan**s** within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan**s** and/or management and disposition of the Plans' assets**, including, <u>inter</u> <u>alia</u>, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.**

27.     Defendant Sheli Z. Rosenberg ("Rosenberg") served on CVS's Board during the Class Period.  Rosenberg was a fiduciary of the Plan**s** within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan**s** and/or management and disposition of the Plans' assets**, including, <u>inter</u> <u>alia</u>, responsibility for**

9

the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

28.     Defendant Ivan G. Seidenberg ("Seidenberg") served on CVS's Board during the Class Period.  Seidenberg was a fiduciary of the Plan**s** within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan**s** and/or management and disposition of the Plans' assets**, including, <u>inter alia</u>, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.**

<u>CVS ~~401(k)~~ Plan Committee</u>

29.     **The Plan Committee administers both the 401(k) Plan and the ESOP.** According to the ~~Company's Form 11-K for the year ended December 31, 2000, filed by the Company with the SEC on or about June 29, 2001 (the "Form 11-K"),~~ **401(k) Profit Sharing Plan of CVS Corporation And Affiliated Companies (the "401(k) Plan")**[2], **Article 10, "Administration Of Plan,"** the general administration of the **401(k)** Plan and the responsibility for carrying out the provisions of the Plan are **vested in and** maintained by a Plan Committee, consisting of not less than three (3) persons appointed **x**~~f~~**rom time to time** by the Board **to serve at the pleasure of the Board**.[3]  On information and belief, ~~one~~ **the** member**s** of the Plan Committee **during the Class Period included Defendant David Rickard, Chief Financial**

_____

[2]     **The version of the 401(k) Plan relevant to this litigation is the one that was Amended and Restated as of January 1, 1999, including amendments through July 1, 2000 (attached hereto as Exhibit A).**

[3]     **Under Article 1, "Definitions," Section 1.10, "Committee" is defined as "the persons named by the Board of Directors to administer and supervise the Plan as provided in Article 10.**

10

Officer; Defendant Zenon P. Lankowsky, General Counsel; and Defendant Rosemary

Mede, ~~is the~~ Senior Vice President, Human Resources.

      30.     **According to Section 10.02 of the 401(k) Plan, "Duties of Committee":**

> **The Committee shall administer the Plan in accordance with its terms and shall have all powers necessary to carry out the provision of the Plan not otherwise reserved to the Company, the Employer, the Board of Directors, or the Trustee.  The Committee shall elect a chairman from their number and a secretary who may be but need not be one of the members of the Committee; may appoint from their number such subcommittees with such powers as they shall determine; may authorize one or more of their number or any agent to execute or deliver any instrument or make any payment on their behalf; may retain counsel, employ agents and provide for such clerical, accounting, and consulting services as they may require in carrying out the provisions of the Plan; and may allocate among themselves or delegate to other persons all or such portion of their duties under the Plan, other than those granted to the Trustee under the trust agreement adopted for use in implementing the Plan, as they, in their sole discretion, shall decide.**

      31.     **In addition, Section 10.07 of the 401(k0 Plan, "Establishment of Rules,"**

provides that:

> **. . .   The Committee shall have the total and complete discretionary authority to construe and interpret the Plan, to make factual determinations and to determine all questions arising in the administration, interpretation, and application of the Plan (including, but not limited to, the power to make a determination of an individual's eligibility for Plan participation, the right, amount, form, and timing of any benefit payable under the Plan and the date on which any individual ceases to be a Member).**

      32.     **The Company's Form 11-K for the year ended December 31, 2000, filed by**

the Company with the SEC on or about June 29, 2001 (the "Form 11-K), specifies one of

**the** ~~According to the Form 11-K, a~~ principal responsibilit~~y~~**ies** of the Plan Committee is **to** ~~the~~ appoint~~ment of~~ a Plan Administrator and a Plan Trustee.

33.    **As noted above, the Plan Committee also performs similar general administrative fiduciary functions for and has responsibilities over the ESOP.**

34.    **As such,** the Plan Committee is a fiduciary within the meaning of ERISA in that it exercises discretionary authority with respect to **the** management and administration of the **ESOP and the 401(k)** Plan**, including, specifically, in the determination of whether or not to offer the CVS Stock Fund as one of the available investment fund options for employee and employer matching contributions under the 401(k) Plan**.  **The 401(k) Plan itself specifies at Section 10.13, "Named Fiduciary," that "For the purposes of ERISA, the Committee shall be the fiduciary of the Plan."**

35.    ~~While the individual members of the Plan Committee during the Class Period are currently unknown to Plaintiff, once their identities are ascertained, Plaintiff will seek leave to join them under their true names.~~

**The Administrators of the Plans**

36.    According to the Form 11-K, the **401(k)** Plan Administrator, <u>inter</u> <u>alia</u>, maintains participant account records and instructs the Trustee to execute transactions, such as benefit payments to **401(k)** Plan Participants.

37.    **Likewise, the CVS ESOP is administered and managed by one or more fiduciaries acting in the capacity of Plan Administrators.**

12

38.     The **401(k) and ESOP** Plan Administrator**s** ~~is a~~ **are** fiduciar~~y~~**ies** within the meaning of ERISA in that ~~it~~ **they** exercise~~s~~ discretionary authority with respect to management and administration of the Plan**s**.

39.     While the identify of the **401(k) and ESOP** Plan Administrator**s** during the Class Period ~~is~~ **are** currently unknown to Plaintiff, once ~~his or her identity is~~ **their identities are** ascertained, Plaintiff will seek leave to join ~~him or her under his or her~~ **them under their** true names.

**Unknown Fiduciaries**

40.     There are other fiduciaries of the **both the 401(k)** Plan, **as well as of the CVS ESOP and Diversified ESOP Account** whose identities are currently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

41.     Defendants include named and de facto fiduciaries with respect to the Plan**s**. All Defendants exercised discretionary authority or control regarding management of the Plan**s**, management of the Plans' assets, and/or administration of the Plan**s**.

**THE PLANS**

42.     The CVS 401(k) Plan **and ESOP are** ~~is an~~ "employee pension benefit plan**s**," as defined by §3(2)(A) of ERISA, 29 U.S.C. §1002(2)(A). The CVS Plan**s are** ~~is a~~ legal entit~~y~~**ies** which can sue or be sued. ERISA §502(d)(1), 29 U.S.C. §1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan**s are** ~~is~~ neither a plaintiff nor a defendant. Rather, pursuant to ERISA §409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan**s**. In other words, Plaintiff in this action seeks relief on behalf of the Plan**s**.

43.     As noted above, CVS is the Sponsor of the Plan**s**.  As such, CVS, and its officers and Directors, are intimately involved in the administration of the Plan**s** and investment of Plan assets.  ~~For example, the Senior Vice President, Human Resources of CVS is a member of the Plan Committee and the Future Fund Administrator.~~  At a minimum, the Defendants -- fiduciaries who were charged with the **reasonable and prudent** management and/or administration of the Plan**s** -- knew that a significant portion of Plan assets, **namely** CVS Stock held by the **401(k)** Plan **and the CVS Preference Stock held by the CVS ESOP and Diversified ESOP Account**, ~~was~~ **were** materially at risk due to the **open and notorious internal** accounting and business improprieties **directed by Company senior management and** occurring at CVS during the Class Period, as described herein.

44.     Under the **401(k)** Plan, participants may contribute through payroll deductions from 1% to 15% of their salary, on a pre-tax basis.  **According to the 401(k) Plan, contributions to the 401(k) Plan will be invested in one or more Investment Funds, as authorized by the Plan Committee, "which from time to time may include the CVS Stock Fund and such equity funds, international equity funds, fixed income funds, money market funds, investment contract funds or other funds as the Committee elects to offer." *Id.*, Section 4.01(a).**

45.     **During the Class Period, the Plan Committee authorized thirteen investment funds for 401(k) Plan participants to invest in, one of which was the CVS Stock Fund.** ~~Participants direct their investment into a choice of thirteen investment funds.~~  **Such 401(k) Plan participants'** investments ~~can~~ **could** ~~either~~ all be in a single investment fund, or divided among a number of such funds, in any amounts equal to 1% or more.  **As noted above, o**ne of the

14

thirteen investments funds available to **401(k)** Plan participants is the CVS Stock Fund, which

invests in CVS common stock

46.    According to the Form 11-K:

The CVS Stock Fund was established as a result of the transfer of
assets from the Revco D.S., Inc. 401(k) Plan during 1997.  The
Plan *may, at the discretion of the Plan Committee, offer a company
stock fund as one of the available investment funds* for employee
and employer contributions.  The fund holds CVS common stock.

(Emphasis added.)

47.    During the Class Period, CVS matched employee contributions, up to 5%.

According to the CVS Future Fund New Hire Guide:

When you invest in the 401(k) Plan, half of the CVS match is
invested in the investment funds you select for your own
contributions. . . .  The second half of your match goes in to your
ESOP [Employee Stock Ownership Plan] account at the end of the
year, if you are a CVS employee at that time.

48.    Payment of the portion of the matching contribution **in the form of CVS**

**Preference Stock** into the **Diversified** ESOP **Account as well as payment of the Company**

**contribution of CVS Preference Stock into the CVS ESOP are both** ~~is~~ made **in March, with**

**the calculation of the number of Preference Stock units being based upon the value of CVS**

**common stock** as of ~~December 31 of each~~ **the last business day of December of the prior** year.

49.    Employees are vested immediately in their **personal** contributions.  **Preceding**

**and during the Class Period,** participants **were** vest**ed** in Company matching contributions **and**

**ESOP contributions** after five years of service with CVS.

15

50.     The **value of** CVS **common** stock **and Preference Stock** held by the Plan~~s was~~ **were** materially inflated at all times during the Class Period as a result of the improper and/or illegal conduct detailed herein.

## DEFENDANTS' FIDUCIARY STATUS

51.     During the Class Period, upon information and belief, **as detailed herein, D**efendants had discretionary authority with respect to the management of the Plan**s** and/or the management or disposition of the Plans' assets.

52.     During the Class Period, the Defendants acted as fiduciaries of the Plan**s** pursuant to §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A), and the law interpreting that section.

53.     Instead of delegating all fiduciary responsibility for the Plan**s** to external service providers, CVS chose to internalize its respective fiduciary functions.  **As alleged herein, under the circumstances present during the Class Period, this decision reflected conflicts of interests resulting in the breach of these Defendants' fiduciary duties to the Plans and their beneficiaries.  These conflicts of interest included, for example, the fact that the compensation – at a minimum as to incentive awards -- of members of the Plan Committee and other senior officers was dependent upon *inter alia* the Company meeting pre-established objectives for consolidated earnings before federal income tax and return on net assets.  As detailed herein, the purpose of the accounting and other misconduct herein alleged was to effectuate the goal of artificially increasing CVS' consolidated earnings.**

### Each Defendant's Fiduciary Status

**A.     CVS**

16

54.     During the Class Period, CVS held ultimate fiduciary responsibility for and authority over the **administration of the** Plan**s and the investment of Plan assets**.  CVS retained the right to terminate or amend the Plan**s**, in whole or in part, at any time and for any reason it deems advisable.  CVS wielded its fiduciary authority both directly through its primary executive arm, its Board of Directors, and through the appointment, removal and monitoring of the performance of its fiduciary delegates such as the Plan Committee and the ~~Plan~~ Administrator**s of the Plans**.

## B.     CVS Director Defendants

55.     The Board of Directors during the Class Period was directly responsible for the appointment, monitoring and removal of **personnel with direct fiduciary responsibility for the running of the Plans.  These included** *inter alia* **the** members of the Plan Committee, and thus each member **of the Board** was a fiduciary of the Plan**s**.  The members of the Board had direct oversight over **and the responsibility to monitor other** key fiduciary ~~decisions~~ administrators of the Plan**s**. ~~including the appointment of members of the Plan Committee.~~

## C.     The ~~Plan~~ Administrators of the Plans

56.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  §402(a)(1), 29 U.S.C. §1102(a)(1).  **Thus, both the CVS 401(k) Plan and the ESOP were controlled and managed by fiduciaries appointed and overseen by the Board.**

57.     **Management and administration of the ESOP and the 401(k) Plan rested in the hands of the Plan Committee.**  The Plan Committee was thus a fiduciary of the **both the**

ESOP and the 401(k) Plan.  **Moreover, the 401(k) Plan, at Section 10.13, specifically designates the Plan Committee as fiduciaries "for the purposes of ERISA."**

58.    The Plan Committee members were directly appointed and **could be** removed by the Board.

59.    The Plan Committee has the power and discretion to determine issues arising out of or in connection with the provisions and/or the administration of the CVS **ESOP and the 401(k)** Plan **and the investment of Plan assets**.

60.    Importantly, as detailed herein, the Plan Committee **had full discretion to determine whether or not to offer and/or continue to offer the CVS Stock Fund as one of the investment fund options available to Plan participants.  Moreover, the Plan Committee** was **also** responsible for the selection of the Plan Administrator**s**.

E.    <u>**Additional Fiduciary Responsibilities**</u>

61.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under §402(a)(1), but also any other persons who act in fact as fiduciaries, <u>i.e.</u>, perform fiduciary functions.  Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent ... he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets ... ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA **for both the CVS 401(k) Plan and the ESOP**.

<u>**CLASS ACTION ALLEGATIONS**</u>

62.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of himself and the following class of persons similarly

situated (the "Class"):

> All persons who were participants in or beneficiaries of the **CVS
> 401(k) Plan and/or ESOP** at any time between December 1, 2000
> and October 30, 2001 (the "Class Period") and ~~whose accounts
> held~~ **who held, purchased, acquired or had contributed** CVS
> Stock **and/or CVS Preference Stock to their plan accounts**
> ~~acquired~~ during that period.

63.    The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time,

and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a

minimum, thousands of members of the Class who participated in, or were beneficiaries of, the

Plan**s and acquired and/or held CVS common stock and/or CVS Preference Stock pursuant

to the Plans** during the Class Period.

64.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class.  Among the

questions of law and fact common to the Class are:

> (a)    whether Defendants each owed a fiduciary duty to Plaintiff and members
> of the Class;
>
> (b)    whether Defendants breached their fiduciary duties to Plaintiff and
> members of the Class by failing to act prudently and solely in the interests
> of the Plans' participants and beneficiaries;
>
> (c)    whether Defendants violated ERISA; and
>
> (d)    whether the members of the Class have sustained damages and, if so, what
> is the proper measure of damages.

19

65.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' ~~wrongful conduct in violation of federal law~~ **consistent and pervasive breaches of their fiduciary duties to the Plans and Plan participants** as complained of herein.

66.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

67.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

68.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' CONDUCT

## CVS Dramatically Expands Through Aggressive Acquisitions

69.    Through a series of major acquisitions between 1996 and 1998, CVS increased

the number of retail stores it operated from approximately 1,400 to approximately 4,122 ~~retail~~

~~pharmacies~~ in 24 states and the District of Columbia, and began touting itself as the largest chain

drugstore company in the United States based on store count.

70.    CVS's Retail Pharmacy sales are divided between pharmacy sales and sales of

general merchandise, including, over-the-counter drugs, greeting cards, film and photo finishing

services, beauty products and cosmetics, seasonal merchandise and convenience food (referred to

by CVS as "front store" sales).  Following its acquisitions of Revco D.S., Inc. (finalized on May

29, 1997) and Arbor Drugs, Inc., (finalized on March 31, 1998), CVS's business ~~has~~ shifted

substantially ~~more heavily~~ to pharmacy sales.  By 2000, pharmacy sales had increased to

represent approximately 63% of total sales for the year, up from 43.9% in 1996.  **Pharmacy sales**

**(as compared to "front store sales") offer a substantially lower profit margin.**

71.    As a result of this shift, Defendants knew that CVS's ability to continue to manage

and grow its Retail Pharmacy business segment and to maintain and increase pharmacy sales was

critical to the success of its overall operations.  However, **in the months preceding and during**

~~by the beginning of~~ the Class Period, CVS was experiencing a number of undisclosed problems

that were having a materially negative impact on its ~~Retail Pharmacy business~~ **income and**

**earnings.   As a result, throughout 2000, the Company's total sales numbers were below**

**what was internally budgeted, creating ever increasing pressure on the Company and**

**senior management to find creative ways to still meet Wall Street expectations, a very**

**important goal for the Company.  Meeting market expectations was a critical**

consideration.  For example, the Company publicly boasted in its 2000 Annual Report, filed

with the SEC and distributed to shareholders in March 2001, that:

> This outstanding performance solidified our track record of
> meeting or beating Wall Street's expectations every quarter
> since [CVS] became a stand-alone public company in the Fall
> of 1996 . . . ."

72.    As detailed herein, in light of CVS's internal awareness  of declining gross

margins and lower earnings and earnings per share (EPS) contrasted with strong earnings

expectations by the market, the Company pursued improper and/or illegal schemes and

earnings manipulations to give the appearance of strong earnings which deceived the

market and artificially inflated the Company's stock price.  Based upon their senior

positions and responsibilities at CVS, as detailed herein, and the open nature of this

misconduct at the senior level of management, the Defendants knew or should have known

of these schemes and manipulations as they occurred preceding and over the course of the

Class Period.

~~CVS's Inability to Offset Declining Gross Margins~~

**CVS Faces Declining Gross Margins**

73.    In the months preceding the Class Period, CVS had suffered from substantially

declining  gross margin rates, which presented a threat to CVS's operating profits and earnings.

The Company attributed this adverse trend to the fact that pharmacy sales were becoming an

increasingly larger percentage of CVS's total sales as compared to front store sales, and the

margin on pharmacy sales was lower than the margin on front store sales.  This is especially true

with respect to pharmacy sales paid for by third party insurance programs, including managed

care organizations, as such organizations, in order to reduce their prescription drug costs, brought

substantial pressure to bear on pharmacies like CVS to accept lower rates of reimbursement.

74.     CVS represented that it would be able to mitigate the negative impact that

increased pharmacy sales were having on the Company's gross margins and operating profits by

increasing operating efficiencies.  ~~Accordingly,~~ In ~~June~~ **May** 2000, CVS **announced that it had**

changed its procedures for handling in-store markdowns of damaged merchandise, store supplies,

unsaleable merchandise and/or outdated merchandise **in order to be more efficient**.  Previously,

CVS stores had manually kept track of in-store markdowns and returns of damaged merchandise

on a weekly basis.  Pursuant to the new procedure, *inter alia*, in-store markdowns and returns

were to be taken and tracked **electronically** on a *daily* basis ~~using an electronic RF device~~.

75.     According to the Company's internal policy manual issued in connection with this

change, the new markdown policy would allow for "more accurate and timely [markups and

markdowns] on a daily basis" and would avoid the need to take unnecessarily large write-offs of

damaged merchandise at any point in time.

76.     In connection with this change in procedure, on May 25, 2000, CVS management

issued a memorandum to all CVS store managers, announcing that CVS would institute a new

procedure for handling markdowns and returns of damaged items commencing on June 18, 2000.

In describing the reasons for the change in policy for handling return of damaged merchandise,

the memorandum stated the following:

                    DAMAGE RETURN PROCEDURE CHANGE

BACKGROUND
A new damage return process has been developed in conjunction with the new manual
markdown application introduction on the RF Unit.  The intent of this new process is to

23

tighten controls on non-returnable and "un-billable" merchandise being sent to Damage Track.

> In 1999 stores sent over $1.4 million dollars worth of non-returnable and pristine merchandise back to Damage Track (pristine being defined as perfectly good merchandise with no visible signs of the product or package being damaged or outdated).

> Additionally, as a company, we returned $25 million dollars more merchandise than we received credit from suppliers. This variance resulted in a company P&L write-off. If this write-off was shared evenly between all 4000 plus stores, your P&L Contribution A line would have been negatively adjusted by $6250.00.

Needless to say, we cannot afford to repeat this write-off in 2000. Therefore, the following new procedures have been developed and must be implemented IMMEDIATELY.

77.    As the memorandum makes clear, CVS intended to more effectively and accurately handle markdowns and returns of damaged merchandise by keeping track of this information on a daily basis. The memorandum also demonstrates the magnitude of the issue. As indicated above, in 1999, CVS returned $25 million worth of merchandise to suppliers for which it did not receive any credit. This amount does not include damaged merchandise that was not returnable and was written off and/or merchandise that was damaged and sold at a marked down price.

**CVS Entered the Class Period Facing Substantial Sales Shortfalls
and Turned to Earnings Manipulation to Disguise This Fact**

78.    **Throughout 2000, the Company's sales were consistently lower than internally budgeted. This substantial, but never disclosed "gap" raised a material risk that CVS would not be able to achieve its internal budget, raising the specter of not meeting analyst earnings expectations.**

24

79.    **To respond to this potential crisis, in November 2000, at the direction of defendant Ryan and other members of the Business Planning Committee (BPC) -- which consisted of Company senior management, including Defendant Ryan, Defendant Rickard, the Chief Financial Officer and member of the Plan Committee -- determined to suspend in-store markdowns.**

80.    **Ironically, based on the improved automated system for tracking markdowns and returns of damaged items implemented in June 2000, CVS was able to more effectively monitor store-initiated markdowns, and thus Defendants knew or should have known that such markdowns were running significantly higher than budget, having a material negative impact on the Company's margins and earnings -- an issue recognized and discussed among senior management.**

81.    ~~Ironically, in an effort to hide costs and artificially inflate earning for the year, several months later, in November 2000,~~ **Thus,** CVS, in direct contravention of its new markdown and damage return policy **-- and in violation of Generally Accepted Accounting Principles (GAAP) requirements --** ~~instead~~ **in November 2000** directed its store managers to hold in abeyance recording any store initiated markdowns until following the beginning of the next fiscal year, in January, 2001.  As part of this directive, store managers corporation-wide were instructed to segregate and hold in a designated section of each store's respective stockroom all merchandise that was to be written-off and/or marked down.

82.    Specifically, on November 20, 2000, CVS management issued a memorandum to all CVS store managers, stating that, effective immediately, "[n]o store initiated markdowns

should be taken between now and January 1, 2001." The memorandum included the following

additional information regarding the sudden policy turnaround:

> Further Information:
> What markdowns CANNOT be performed, effective immediately?
>   -- Store level markdowns
>     -- Damaged / non-returnable items
>     -- Damaged / unsaleable items
>         NOTE:  Returnable Damages going back to the warehouse should still be
>         processed as normal
>     -- Cosmetic prepack markdowns
>     -- Not in planogram discontinued / Discontinued Other
>     -- End of Season  Down to Zero markdowns
>     -- Outdated non-returnable product (i.e., Russell Stover)
>
> How do I handle the Damaged Items that are not returnable or unsaleable?
>     -- Hold in the designated clearance location in your stockroom.
>     -- Visual merchandising will allocate endcaps in the January Merchandising Planner to
>        assist with liquidating these items.

83.    Accordingly, from November 20, 2000 through at least the end of fiscal 2000,

Defendants did not allow any of CVS's 4,100-plus stores to take markdowns or write-off

damaged or otherwise unsaleable goods.  As a result, each store was required to keep ~~thousands~~

~~of dollars of~~ damaged merchandise in storerooms that should have been discounted or marked

down to zero.  As one former CVS store manager put it, this policy resulted in "trays and cases of

unsaleable merchandise taking up space in the back of the store, in the back room."

84.    This sudden reversal in policy reflected a clear intent by CVS, through its senior

management, to avoid having to write-off millions of dollars of damaged and/or discounted

merchandise until sometime in 2001.  ~~Indeed, numerous CVS store managers discussed among~~

~~themselves the fact that the new policy served no legitimate business purpose and was~~

26

~~implemented in order to allow the Company to report that it had achieved its forecasted numbers for fiscal 2000, thereby allowing CVS executives to reap substantial bonuses.~~

85.    Demonstrating Defendants' intent in this regard is the fact that they allowed stores to continue to process unsaleable merchandise that could be returned for a credit, while they prevented stores from processing unsaleable merchandise for which credit was not available. Generally Accepted Accounting Principals ("GAAP") required this unsaleable merchandise should be written off and disposed of.  However, pursuant to ~~Defendants'~~ instructions **from Company headquarters,** stores were required to retain this merchandise, which could not be sold or returned, through at least the end of 2000 before any required write-offs could be recorded.

86.    As a result of the foregoing, CVS knowingly ~~cut off the flow of information from stores that would allow the Company~~ **ceased** to properly account for discounted and unsaleable merchandise, in violation of GAAP **during the last six weeks of 2000**.  By doing so, Defendants were able to delay the write-down of millions of dollars of inventory, thereby artificially improving the Company's gross margin and inflating its reported operating results for the fourth quarter and year end 2000, resulting in CVS stock price being artificially inflated during the Class Period.  **The Defendants therefore knew or should have known that the price of CVS common and preference stock during the Class Period was artificially inflated.**

**CVS's Determination To Close Hundreds**
**Of Underperforming Stores**

87.    In addition to allowing Plan participants to continue to invest in CVS Stock **and to contribute CVS Preference Stock** despite the open and blatant accounting improprieties **and**

27

**earnings manipulation described above** ~~resulting from the Company-wide directive to~~ ~~thousands of CVS stores not to properly account for damaged and non-returnable goods~~, the Defendants further breached their fiduciary duties to Plan participants as follows.

88.    As ~~described~~ **noted** above, between 1996 and 1998, CVS acquired approximately 2,600 stores in connection with the Revco and Arbor Drugs acquisitions.  Many of the stores acquired in these transactions were located in undesirable strip mall locations and/or were unprofitable.  CVS's publicly touted strategy was to relocate as many stores as possible out of strip mall locations to larger more profitable stand-alone locations.  Indeed, CVS emphasized its relocation strategy in press releases and SEC filings issued both before and throughout the Class Period, noting that by relocating stores, the Company was immediately able to increase these stores' profitability.

89.    Defendants, however, knew at all relevant times that a certain percentage of its stores that were located in undesirable locations ~~would not be able to~~ **could not** be relocated and ~~would~~ need**ed** to be closed.  Further, Defendants knew **or should have known** that other **under-performing** stores that ~~were underperforming~~ could not be made profitable and ~~would also~~ need**ed** to be closed.

90.    Indeed, since completing the Revco acquisition in 1997, the problem of underperforming stores was regularly discussed at meetings of CVS senior management.  By 1999, CVS had developed an action plan to try and improve performance at a number of underperforming stores.  If performance could not be improved at a store, Defendants' plan was to try and sell the store or, if the store could not be sold, to schedule it for closure.  **By definition,**

**closing a store entailed incurring costs that could have a negative impact on CVS's earnings.**

91.    ~~In the beginning of 2001, CVS set up a cross-functional task force assigned with the responsibility of determining which of its stores would need to be closed.  The task force was headed up by CVS's Treasurer, Phil Galbo.  Mr. Galbo reported directly to Douglas Sgarro, CVS's Senior Vice President - Administration and Chief Legal Officer.  Also centrally involved in this process was Larry Merlo, CVS's Executive Vice President in charge of stores, and, on information and belief, the Human Resources department of CVS.~~

92.    ~~By the first quarter of 2001, the task force had determined that approximately 200 stores would need to be closed.  Many of the stores targeted for closure were stores acquired from Revco or Arbor Drugs that had long been recognized as underperforming.  The stores scheduled for closing were identified on a list that was circulated at CVS's headquarters.  Although the list was refined over time, the number of stores to be closed always remained at approximately 200.~~

93.    **CVS routinely performed analyses of store profitability and tracked stores that consistently under-performed.**  As a result of ~~the foregoing~~ **such internal analysis and tracking**, by the beginning of 2001, CVS's recognized need, and clear intention to close ~~approximately 200~~ **a substantial number of** stores had become common knowledge internally at the Company, and was the subject of discussions among CVS employees.  ~~For example, in January 2001, a CVS District Manager disclosed to a group of store managers that CVS would be closing a number of mid-western stores sometime later in the year in connection with a restructuring plan.~~  **CVS failed to publically disclose, however, that it had repeatedly delayed**

**closing a large block of these unprofitable and non-performing stores because such a closure would have triggered the requirement to take a substantial charge, which would have adversely affected the Company's earnings and margins.  This material, non-public information was known or should have been known by Defendants during the Class Period.**

94.     Rather than publicly disclosing its plans to close approximately 200 stores, however, throughout the Class Period, Defendants**, in breach of their fiduciary duties, permitted the Company to repeatedly issue** misleading~~ly~~ **public representations that improperly** emphasized CVS's plans to open new stores in new markets and relocate stores in existing markets**, while remaining silent about the substantial number of stores it needed -- but refused -- to close**.

95.     **It was not until the end of the Class Period that CVS finally announced that, pursuant to a restructuring, it would be closing an additional approximately 200 stores, and would take a charge of $350 million (incurred principally in connection with the closure of these 200 stores).**

**CVS's Was Unable to Attract and Retain**
**Adequate Numbers of Pharmacists to Staff its Stores**

96.     In addition to **recognizing the need to close** ~~the issue of closing~~ hundreds of ~~non-unprofitable~~ and underperforming stores, CVS also ~~long~~ recognized **that** it faced ever-increasing, critical problems with attracting and retaining adequate numbers of qualified pharmacists.

30

97.    For some time **preceding the Class Period,** there **had** ~~has~~ been an ongoing shortage of pharmacists in the United States.  ~~The~~ **This** shortage ~~has~~ **had** been attributed to a number of factors, including the growing number of prescription drugs being used to treat illnesses, the aging population, and an increase of the number of years necessary to obtain a pharmacist degree from 5 years to 6 years.

98.    Although the pharmacist shortage ~~has~~ **had** had some impact on the entire industry, the problem ~~has~~ **had** been particularly acute for CVS.  This is true for several reasons.  First, as alleged herein, CVS ~~has~~ **had** engaged in rapid expansion, resulting in a dramatic increase in the number of pharmacists the Company ~~required~~ **needed** to staff its stores.  For example, according to a former ~~CVS~~ manager in CVS's construction division, at the time CVS acquired Arbor Drugs in 1998, the chain, whose operations were focused in the Detroit region, was suffering from a deficit of approximately 100 pharmacists ~~that were~~ needed to properly staff stores in the region. Unknown to the investing public, **but known or recklessly or negligently disregarded by the Defendants at the time,** since completing the acquisition in 1998, CVS ~~has~~ **had** struggled to try and maintain adequate pharmacy staffing in these stores.

99.    Further adding to the problem ~~is~~ **was** the fact that, as described above, CVS ~~has~~ **had** focused for the past several years on a strategy of relocating existing stores in smaller strip mall locations to larger stand-alone locations.  Many of these new locations were open 24 hours, thereby further increasing the need for pharmacists at CVS.

100.    As early as 1997, the pharmacist shortage had been identified internally at CVS as a problem that was negatively ~~impacting~~ **affecting** the Company's operations.  ~~From 1997 through 2000, and continuing throughout the Class Period, CVS's Pharmacy Operations Group~~

31

~~was involved in trying to solve the problem and was aware that their efforts were inadequate.~~ ~~Additionally, since 1997, CVS's Information Systems department was also involved in trying to~~ ~~address the adverse impact that the pharmacist shortage was having on the Company, and knew~~ ~~that the problem was critical and remained unresolved.  At weekly meetings led by Howard~~ ~~Edels, the Company's Chief Information Officer, senior managers of the Information System~~ ~~department would discuss issues that affected the Company.  At these meetings, the pharmacist~~ ~~shortage was regularly raised as a problem hindering the Company's performance.~~  The impact of the pharmacist shortage **at the Company, particularly in certain critical geographic areas, continued to** ~~became~~ **become** more acute throughout 2000**, a fact documented and tracked within the Company**.  By late 2000, CVS senior management, including CVS's Chief Information Officer, internally stressed the need to improve recruitment of pharmacists in order to try and address the problem.  Such a problem -- and the concomitant personnel issues it consistently triggered -- **reasonably would have been** ~~were clearly also~~ actively discussed, recognized and known to **members of the BPC, other senior management and, particularly,** the Company's Human Resources department**, whose head was a member of the Plan Committee.**

101.    Rather than disclosing the extent of the impact that the pharmacist shortage was having on CVS, Defendants, **in breach of their fiduciary duties to the Plans and Plan participants,** instead chose to create the **false** impression that CVS was handling the situation and, in fact, was better positioned to attract and retain qualified pharmacists than its competitors. Indeed, CVS consistently represented that the pharmacist shortage was ~~not affecting~~ **having no material effect on** the Company's operations and its ability to grow.

32

102. For example, on October 31, 2000, Bear Stearns issued an analyst report, based on information provided by CVS, which stated the following:

> CVS has been successful in attracting and retaining pharmacists at reasonable costs, despite the largest pharmacist shortage the U.S. has ever seen. Beyond incenting pharmacists with stock options and an improved 401K plan, CVS is making the pharmacists' job more enjoyable by automating tedious, routine tasks with new technologies. To this end, automated pill-counting technology has been implemented in roughly 700 stores, a number which we expect to increase as benefits are realized from improved workflow and employee morale.

103. Similarly, in an article published by Chain Drug Review on December 11, 2000, Jim Roberts, the Vice President of CVS's Southeast region, commented on the impact that the pharmacist shortage was having on CVS as follows: "We've positioned ourselves as the preferred place to work." Mr. Roberts further stated, "[a]s a preferred provider we are able to attract the very best pharmacists in the marketplace and on pharmacy school campuses where we currently recruit across the country."

104. The foregoing examples are representative of statements made by ~~defendants~~ **and on behalf of the Company,** both before and during the Class Period, designed to create the impression that the pharmacist shortage was not having a materially adverse impact on CVS's operations. Contrary to these representations, however, at least by the end of 2000, it had become apparent and obvious internally at CVS that the Company's efforts to recruit and retain adequate levels of pharmacist staffing **in particular, critical geographic areas,** were insufficient. **These material, adverse facts were thus known or recklessly or negligently disregarded by Defendants.**

33

105.    **As described above, leading up to and during the Class Period,** ~~By February 2001,~~ the pharmacist shortage resulted in **significant increases in customer complaints based on** ~~customers experiencing~~ unreasonably long waits to fill prescriptions, temporary store closings and reduced store hours at different CVS locations on a regular basis.  The pharmacist shortage was particularly acute in certain regions of the country, including, among others, ~~the~~ Detroit~~,~~ **Cleveland, parts of Connecticut,** and Washington, D.C. ~~areas~~.

106.    **In addition to these critical markets, CVS was experiencing the adverse affects of the pharmacist shortage in other locations as well.**  For example, in late 2000 and early 2001, CVS experienced a severe shortage of pharmacists at its stores in Rhode Island.  To try and compensate for this problem, CVS began closing pharmacies in the region on Sundays and had the pharmacist staff alternate from store to store.  Similarly, from February through May 2001, temporary store closings due to lack of pharmacists transpired at stores around the country, including stores in Connecticut, South Carolina, North Carolina, Pennsylvania, Florida and elsewhere.  Defendants did not disclose any of the problems they were having as a result of the pharmacist shortage.

107.    **As reflected by the above,** ~~However,~~ the **adverse** impact of the pharmacist shortage during the Class Period was felt at CVS stores throughout the country.  Moreover contrary to **the Company's** ~~defendants'~~ representations that it was addressing the pharmacist shortage by establishing CVS as "a preferred place to work," the Company's inability to attract and retain pharmacists was actually exacerbated by the fact that CVS paid less than its competitors.  Further, to try and compensate for the ever-widening shortage, CVS required that its pharmacists work extensive amounts of unpaid overtime.  Due to the severity of the shortage,

34

some CVS pharmacists were required to work in excess of 70 hours per week or more.
Additionally, CVS regularly required that its pharmacists travel extensive distances to cover
pharmacies that were inadequately staffed.

108.     Not surprisingly, and well known within the Company, particularly its Human
Resources Department, CVS's treatment of its pharmacists resulted in high turnover, and
negatively affected the Company's ability to attract new pharmacists.  **In fact,** in November
2000, a group of CVS current and former pharmacists brought a collective action against the
Company alleging that its failure to pay overtime violated the Fair Labor Standards Act.  Similar
suits by CVS pharmacists were brought in early 2001.  ~~Defendants~~ **CVS** did not disclose the
existence of any of these lawsuits in its press releases or public filings until **after the Class
Period, on** March 21, 2002, when it finally reported that the November 2000 action had been
brought by pharmacists seeking recovery of unpaid overtime and liquidated damages.

109.     Thus, contrary to ~~defendants'~~ **the Company's** repeated public statements that
CVS was better suited to handle the pharmacist shortage than most other retailers, ~~CVS~~ **the
Defendants** knew **or should have known** that **CVS was** ~~they were~~ unable to adequately staff its
retail stores and the pharmacist shortage was having a material, negative impact on CVS's
operations **and earnings**.  In fact, the pharmacist shortage was actually having a more severe
impact on CVS's operations than it was having on many of its competitors.  For example,
although one of CVS's main competitor**s**, Walgreen, Inc., had been required to close or reduce
hours at approximately 1% of its stores due to the pharmacist shortage, CVS had been required to
close or reduce hours at 15% of its stores during the same period.  **As the Defendants knew or**

should have known, these nonpublic adverse facts would have had a substantial negative

impact on the value of CVS stock were they disclosed.

**CVS Made Repeated False and Misleading**
**Statements During the Class Period**

110.    On February 6, 2001, ~~the first day of the Class Period,~~ CVS issued a press release

announcing "record sales and earnings for the fourth quarter [of 2000] and the year ended

December 30, 2000."  The Company reported $5.5 billion in net sales during the fourth quarter

and fourth quarter earnings of $0.51 per share, a purported increase of 19.6% over the same

period the prior year (after excluding results from an extra week in fiscal 1999).  For the year, the

Company reported $20.1 billion in net sales and earnings of $1.80 per share, a purported increase

of 17.7% over the results of the prior year (after excluding a nonrecurring gain and the extra

week in 1999).

111.    In the same press release, CVS commented on the Company's store growth as

follows:

> For the year, CVS opened 158 new stores and relocated 230 others.  The
> Company entered three new, high growth markets in 2000 and prepared to
> enter additional new markets. There remain 41 of the Top 100 U.S.
> drugstore markets in which CVS currently has no presence, offering
> significant opportunity for future growth.  As of December 30, 2000, CVS
> operated  4,133 retail and specialty pharmacy stores in 31 states and the
> District of Columbia.

112.    In the February 6 press release, Defendant Ryan commented on CVS's reported

results as follows:

> "The year 2000 was another successful year for CVS.  We once
> again achieved double-digit same store sales growth, excellent
> expense control, and produced record earnings," stated Tom Ryan,
> Chairman, President and Chief Executive Officer.

36

113.    Defendant Ryan concluded by stating:

> I am very pleased that we have been able to consistently meet or beat our goals, all while we continue to invest in new stores and relocations, as well as in new business channels, which will help accelerate our future growth. I believe we are better positioned than at any other time in the Company's history to capitalize on the significant opportunities in healthcare.

114.    Also on February 6, 2001, CVS held a conference call with the investment community led by Defendant Ryan.  During the conference call, Defendant Ryan further stated:

> Let me outline our preliminary real estate plan for 2001.  We'll open 150 to 170 brand new CVS stores.  We'll relocate 140 to 150 CVS stores.  We'll close an additional 60 to 70 stores for a net new-store CVS growth of 90 to 100 stores for 2001.  This equates to 300-plus new [stores], less than we've had in the past but a much higher net new-store growth because we're closing fewer stores.

115.    Defendants knew, or **recklessly or** negligently failed to know that the financial results they announced on February 6 and the statements commenting on those results were materially false and misleading, as the Company's gross margins and operating profits had been artificially inflated by ~~defendants'~~, **_inter alia_, the**  failure to properly account for marked down and damaged merchandise in violation of GAAP **in the last six weeks of fiscal year 2000.**  As a consequence, reported earnings **and other financial results** for the fourth quarter and year end 2000 were artificially inflated.

116.    Additionally, Defendants knew, or **recklessly or** negligently failed to know that their comments regarding CVS's growth plans and business prospects were materially false and misleading because they failed honestly and fully to disclose the fact that CVS had already determined a requirement to close approximately 200 specifically identified ~~non-~~ **unprofitable**

37

and underperforming stores, as well as the fact that the Company, overall, was being adversely ~~impacted~~ **affected** by the ongoing pharmacist shortage.

117.    In March, 2001, CVS ~~both~~ issued its Annual Report to Stockholders and filed with the SEC its Form 10-K for fiscal year 2000, both of which also contained similar false and misleading representations.  Moreover, other representations and public filings over the Class Period also included similar false and misleading representations, and/or failed to disclose material information regarding necessary store closings and the Company's ongoing and worsening problem hiring and retaining sufficient numbers of qualified pharmacists.

118.    For example, on May 14, 2001, Jim Smith, CVS's Senior Vice President of Health Services, was quoted in an article published by *Racher Press Inc.* as follows:  "By making the value it places on pharmacists abundantly clear, CVS Corp. is coping better with the nationwide pharmacist shortage than most retailers."

119.    Similarly, on May 11, 2001, J.P. Morgan issued an analyst report, based on information provided by CVS at its May 10 meeting with securities analysts, which stated the following:

> CVS addressed its strategies to attract and retain quality pharmacists and technicians.  CVS offers stock options to pharmacists, who can also participate in 401K and employee stock programs.   The company discussed Excellence in Pharmacy Innovation and Care (EPIC), its program which focuses on workflow processes in the pharmacy, automation (for pill counting), as well as labor productivity, in terms of the cost benefits of shifting work from the pharmacist to the technician. 60% of the company's new pharmacy staff are hired away from competitors, while 40% from colleges.

**CVS Is Forced to Make a Partial Disclosure**

120.    **On June 15, Credit Suisse First Boston ("CSFB") analyst Ed Comeau issued a report which disclosed information never revealed by the Company, namely that contrary to the Company's repeated prior assertions, CVS's operations were actually being negatively affected by the pharmacy shortage:**

> **[W]e have become increasingly concerned regarding the recent trend of softer pharmacy sales. We believe CVS is experiencing staffing and service issues in its pharmacy, which may have also complicated the roll out of its EPIC pharmacy workflow system. Our recently completed survey of CVS pharmacies supports this conclusion.**
>
> **\*  \*  \***
>
> **We surveyed 77 CVS pharmacies across the country. Of that group, 35% cited labor shortages in the pharmacy and 53% experienced problems keeping up with script volume problems. While these results may present pharmacist opinions consistent with the challenges facing all drug chains, we did find that 41% cited the loss of customers due to service levels issues such as wait times.**

121.    **Based on these concerns, Comeau downgraded his recommendation on CVS stock from "strong buy" to "hold." The market reacted adversely to this information, causing the Company's stock price to drop from $54.49 per share on June 14, 2001 to $47.55 per share on June 15, 2001.**

122.    **As detailed herein, this information, based on Comeau's own investigation, was fully consistent with non-public information readily available and actively discussed by senior management at CVS over the entire course of the Class Period and even before. Rather than disclose this information to the market, however, as described above, senior**

39

officers of the Company made repeated misleading representations that falsely implied the pharmacist shortage was not a problem for CVS.

123.    It was thus only in response to the Comeau analyst report, and the strong adverse market reaction thereto, that CVS reported on June 27, 2001 that it expected to miss its earnings target for the second quarter, 2001, and identified the pharmacist shortage as the most significant factor why.  Even then, CVS couched this disclosure in deceptive language, describing this long-standing problem as being instead " the result of current economic and business trends."

124.    Later on June 27, CVS held a conference call with securities analysts, during which Defendant Ryan stated, *inter alia*:

> Let me talk a little bit about the pharmacist shortage. Obviously, the shortage is an industry issue and its affecting all of us, all of our competitors.  But we have had a severe shortage in four of our major markets.  And these markets have–we have–we are the significant leader in these markets. On average, these four markets, we have over a 30-plus share. Markets are Washington– metro Washington DC, Hartford, Connecticut, Detroit and Cleveland.  And obviously, we have some other isolated areas.
>
> And as a result, we have actually had to close stores or reduce department hours, leading to obvious service issues.  We closed – reduced hours on . . . pharmacy departments on Sunday. We've shortened hours on Saturday.  And to be quite honest, we could have lived with this and I think our customers would understand it to a point.
>
> Where we've had the problem is where we've had to actually close some pharmacy departments during the weekday because we didn't have pharmacists to cover the shifts.  So a customer may walk into a CVS store in some of these markets and the pharmacy department may be closed at one o'clock and not

**open again until four o'clock–obviously unacceptable
obviously impacting our pharmacy comps.**

[The Full Truth Is Revealed]

125.    On October 30, 2001, the last day of the Class Period, CVS shocked the market by

issuing a press release announcing that CVS's financial results for the third quarter of 2001 had

fallen substantially from the previous year.  In this regard, Defendants reported that net earnings

were down 16.0% from the third quarter of 2000.  In response to this negative information,

defendant Ryan commented:

> We are disappointed with our results for the third quarter and committed
> to taking the necessary actions to improve performance and restore healthy
> long-term growth.  With that in mind, we have completed a thorough
> analysis of our business and are today announcing a series of actions to
> best position CVS for the future.
>
> *   *   *
>
> The Company's plan includes a series of sales generation and expense
> reduction initiatives, including:
>
>      -- Undertaking a store consolidation program, under which
> approximately 200 stores will be closed during the first quarter of 2002
>
>      -- Closing one of CVS' ten distribution facilities and one of
> ProCare's two mail order facilities.
>
> *   *   *
>
> In connection with certain of these actions, the Company expects to record
> a pre-tax restructuring and asset impairment charge of approximately $350
> million, of $0.56 per diluted share, in the fourth quarter of 2001.

126.    The market reacted immediately to this additional surprising announcement.  On

October 30, 2001, the price of CVS stock fell $7.72  to $23.90 per share, a one-day decrease of

24%, and a decrease of 61% from the Class Period high of $62.10 per share reached on March 3, 2001.

127.    As set forth above, throughout the Class Period, Defendants knew or were **reckless or** negligent in not knowing that the Company's stock price was artificially inflated based on the facts as alleged herein.

**Defendant Ryan Sold With Adverse Inside**
**Information During the Class Period**

128.    **Defendant Ryan, as CEO of the Company, was a member of the BPC throughout the Class Period.  As such, he had full access to and thus knew or should have known all of the adverse inside information and earnings manipulation detailed above.**

129.    **Nonetheless, on May 22 and 23, 2001, Defendant Ryan, while in possession of this material adverse inside information, sold 95,040 shares of CVS stock, garnering $3.54 million in proceeds.  This sale represented approximately 27% of Ryan's total CVS holdings.**

130.    **Such insider sales constituted a further breach of Defendant Ryan's fiduciary duty to Plan members.**

**Defendants Knew Or Should Have Known That CVS Common**
**And Preference Stock Were Not Prudent Plan Investments**

131.    At all relevant times, Defendants knew or should have known that CVS was engaged in the questionable accounting practices **and earnings manipulation** and, moreover, was facing material operational problems and risks never disclosed to the public or Plan participants, which made CVS **common and/or preference** stock an imprudent Plan investment**s**.

42

132.    **At a minimum,** CVS, **the Director Defendants, the Plan Committee, the ESOP Administrators and the 401(k)** Plan Administrator ~~and the Individual Defendants~~ **breached their fiduciary duties by failing reasonably and** ~~failed~~ properly to take into account these material adverse factors that put CVS stock at risk, as well as the fact that CVS stock was inflated in value when determining the prudence of **continuing to** invest~~ing~~ and hold~~ing~~ Plan assets in CVS **common** stock **and/or CVS Preference Stock, and permit Plan participants to do so as well**.

133.    As a result of Defendants' knowledge **(or reckless or negligent disregard)** of and, at times, ~~implication~~ **active participation** in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that CVS made to Plan participants did not effectively **or reasonably** inform Plan participants of the **true and known** past, immediate, and future dangers of investing in Company stock **during the Class Period**.

134.    In addition, named and unnamed Defendants, as fiduciaries responsible for monitoring the investment of ~~Plan~~ assets **of the Plans**, failed to adequately review the performance of the Plan Committee, **Administrators of the Plans, and other fiduciaries** to ensure that they were fulfilling their fiduciary duties **to Plan participants** under the Plan**s** and ERISA.

135.    The Company, **the Director Defendants,** the Plan Committee, ~~the Plan~~ Administrator**s of the Plans**, and other **unnamed** ~~individual~~ Plan fiduciar**ies** ~~delegates~~ **breached their fiduciary duties by failing** ~~failed~~ to conduct ~~an~~ appropriate investigation into whether CVS Stock **and/or CVS Preference Stock were** ~~was a~~ prudent investment**s** for the

43

Plan**s** and, in connection therewith, fail~~ed~~**ing** to provide ~~the~~ Plan participants with **reasonable**

**and accurate** information regarding CVS's improper activities so that participants could make

informed decisions regarding CVS stock in the **401(k)** Plan, or otherwise fail~~ed~~**ing** to

**reasonably and appropriately** protect the Plan**s** and ~~its~~ **their** participants against inevitable

losses.

136.    **In light of the material adverse facts which Defendants knew or should have**

**known, any** ~~An~~ **reasonable and** adequate investigation by Defendants would have revealed to a

reasonable fiduciary that **continuing to permit investments of CVS common and/or**

**preference stock in the CVS Stock Fund and/or CVS ESOP** ~~investment by the Plan in CVS~~

~~stock offered by the Plan~~, under these circumstances, was imprudent.  A prudent fiduciary acting

under similar circumstances would have acted to protect participants **of the Plans** against

unnecessary losses, and would have made ~~a~~ different investment decision**s**.

137.    Because Defendants knew or should have known that Company stock**, and thus**

**CVS Preference Stock, were** ~~was~~ not ~~a~~ prudent investment option**s** for the Plan**s**, they had an

obligation to protect the Plan**s** and ~~its~~ **their** participants from unreasonable and entirely

predictable losses incurred as a result of the Plans' **continued** investment in Company **common**

**and/or preference** stock.  **Their failure to do so constituted a clear breach of their fiduciary**

**duty to the Plans and to participants in the Plans.**

138.    Defendants had available to them several different options for satisfying this duty,

including:  making appropriate public disclosures as necessary; **refusing to purchase additional**

**common stock or to award additional Preference Stock until assured that the wrongdoing**

**at the Company had ceased and all necessary public disclosures had occurred,** divesting the

Plan**s** of Company stock **and/or Preference Stock**; consulting independent fiduciaries regarding

appropriate measures to take in order to prudently and loyally serve the participants of the Plan**s**;

or resigning as fiduciaries of the Plan**s** to the extent that as a result of their employment by the

Company they could not loyally serve participants in the Plan**s** in connection with the Plans'

**continued** acquisition and holding of Company **common and/or preference** stock.

139.     Despite the availability of these and other **reasonable** options, Defendants**, in**

**breach of their fiduciary duties,** failed to take any action to protect participants from losses as a

result of Plan investment**s** in CVS stock **and/or CVS Preference Stock** during the Class Period.

**Defendants Communicated With Plan Participants**
**Concerning CVS Stock Offered By The Plan, Yet Failed**
**To Disclose The Imprudence Of Investment In Company Stock**

140.     Upon information and belief, the Company ~~regularly~~ communicated with

employees, including participants in the **401(k)** Plan, about the performance, future financial and

business prospects of the Company's common stock, a substantial asset of the **401(k)** Plan.

During the Class Period, the Company fostered a positive attitude toward the Company's stock,

and/or allowed participants in the **401(k)** Plan to follow their natural bias towards investment in

the equities of their employer by not disclosing negative material information **they knew or**

**should have known** concerning investment in the Company's stock.  As such, participants in the

Plan could not appreciate the true risks presented by investments in the Company's stock, and

therefore could not make informed decisions regarding their investments in the **401(k)** Plan.

141.     As noted above, these SEC filings and related Company statements and releases

were inaccurate, incomplete and materially misleading, causing **401(k)** Plan participants to

purchase, and to hold and maintain, Plan investments in CVS Stock.

45

**142.    These inaccurate, incomplete and materially misleading representations were**
**specifically directed by the Defendants to 401(k) Plan participants.  For example, the**
**Company filed the Form S-8, dated June 22, 2001.  This document, a registration statement**
**relating to over 3.5 million shares of CVS common stock "to be offered pursuant to the**
**401(k) Profit Sharing Plan of CVS Corporation and Affiliated Companies," specifically**
**incorporated by reference: "(a) The CVS Annual Report on Form 10-K for the fiscal year**
**ended December 30, 2000" and "(b) All other reports filed by CVS pursuant to Section**
**13(a) or 15(d) of the Securities Exchange Act of 1934 . . . since the end of the fiscal year**
**covered by the Annual Report of Form 10-K referred to in (a) above."  The Form S-8 was**
**signed by each of the Director Defendants.**

**143.    As detailed above, the public filings specifically incorporated by reference in**
**the Form S-8, provided to 401(k) Plan participants by Defendants in their capacity as**
**fiduciaries of the 401(k) Plan, contained false and misleading representations resulting in**
**the price of CVS stock being artificially inflated during the Class Period.**

144.    The Company, **the Director Defendants,** the Plan Committee, the ~~Plan~~
Administrator**s of the Plans**, and or the Plan's **other** individual fiduciar**yies** ~~delegates~~ **breached**
**their fiduciary duties by, inter alia, failing** ~~failed~~ to provide **401(k)** Plan participants with
complete and accurate information regarding CVS stock, such that the participants could
**reasonably, adequately and accurately** appreciate the true risks presented by investments in
CVS stock and could make informed decisions regarding **their** investments in the **401(k)** Plan.

## <u>CLAIMS FOR RELIEF UNDER ERISA</u>

46

145.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

146.    ERISA §502, 29 U.S.C. §1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA §409, 29 U.S.C. §1109.

147.    ERISA §409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

148.    ERISA §404(a)(1)(A) and (B), 29 U.S.C. §1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of  providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

149.    These fiduciary duties under ERISA §404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things,

        a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in

this instance Company stock, to ensure that each investment is a suitable option for the

plan; and

      b.     A duty to disclose and inform, which encompasses: (i) a negative duty not

to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know

that silence might be harmful; and (iii) a duty to convey complete and accurate

information material to the circumstances of participants and beneficiaries.

      150.    ERISA §405(a), 29 U.S.C. §1105(a), "Liability for breach by co-fiduciary,"

provides, in pertinent part, that:

> "... in addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be
> liable for a breach of fiduciary responsibility of another fiduciary
> with respect to the same plan in the following circumstances: (A) if
> he participates knowingly in, or knowingly undertakes to conceal,
> an act or omission of such other fiduciary, knowing such act or
> omission is a breach; (B) if, by his failure to comply with section
> 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his
> specific responsibilities which give rise to his status as a fiduciary,
> he has enabled such other fiduciary to commit a breach; or (c) if he
> has knowledge of a breach by such other fiduciary, unless he
> makes reasonable efforts under the circumstances to remedy the
> breach."

      151.    Plaintiff therefore brings this action under the authority of ERISA §502 for Plan-

wide relief pursuant to ERISA §409(a) to recover losses sustained by the Plans arising out of the

breaches of fiduciary duties by the Defendants.

## CAUSATION

      152.    The Plans suffered at least millions of dollars in losses because substantial assets of

the Plans were imprudently allowed to be put at great risk by Defendants, through investment by the

Plan in CVS Stock **and/or CVS Preference Stock** during the Class Period, in breach of Defendants' fiduciary duties.

153.    Defendants are responsible for losses caused by participant direction of investment in CVS Stock **and/or CVS Preference Stock** because Defendants **breached their fiduciary duties by, *inter alia*, failing** ~~failed~~ to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA §404©), 29 U.S.C. §1104©), and the regulations promulgated thereunder.  **In addition,** Defendants **breached their fiduciary duties by concealing** ~~concealed~~ material, non-public facts from participants, and provid~~ing~~**ed** misleading, inaccurate, and incomplete information to them regarding the nature of the ~~Defendants'~~ **Company's** illicit activities and therefore the **real** ongoing earnings levels of CVS, as well as the true underlying values of CVS stock offered by the **401(k)** Plan, misrepresenting its soundness as investment vehicles.  As a consequence, **401(k) Plan** participants **could not and** did not exercise independent control over their investments in CVS stock, and Defendants remain liable under ERISA for losses caused by such investment.  **Likewise, this misconduct resulted in Plan participants receiving artificially inflated CVS Preference Stock in their CVS ESOP and Diversified ESOP Accounts.**

154.    Had the Defendants **reasonably and** properly discharged their fiduciary and/or co-fiduciary duties, including **adequately monitoring appointees and** the provision of full and accurate disclosure of material facts concerning investment in CVS stock and divesting the Plan ~~from~~ **of** Company stock offered by the **401(k)** Plan **and/or of CVS Preference Stock offered by the CVS ESOP** when maintaining such investment alternatives became imprudent, the Plan**s** would

49

have avoided a substantial portion of the losses that it suffered through its continued investment in ~~Company common stock~~ **these stocks**.

155.    Moreover, had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in CVS stock offered by the **401(k)** Plan, eliminating this investment alternative when it became imprudent and divesting the Plan**s** from any then-existing investments in this investment alternative **and/or in CVS Preference Stock** when maintaining such investment**s** became imprudent, the Plan**s** would have avoided a substantial portion of the losses that ~~it~~ **they** suffered through such continued tainted investment.

## COUNT I

### Failure to Prudently and Loyally Manage Plan Assets
### (Breaches of Fiduciary Duties in Violation of
### ERISA §404 By All Defendants)

156.    Plaintiff incorporates the allegations contained in the previous paragraphs of this complaint as if fully set forth herein.

157.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

158.    As alleged above the Defendants were all responsible, in different ways and to differing extents, for the selection, maintenance and monitoring of the Plans' investment options, including the option of Company Stock **and CVS Preference Stock**.

159.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are

responsible for ensuring that assets within the plan are prudently invested. The Defendants were responsible for ensuring that all investments in the CVS Stock Fund in the **401(k)** Plan **and the CVS Preference Stock in the ESOP and Diversified ESOP Account** were prudent, and are liable for losses incurred as a result of such investments being imprudent.

160. Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan to do so.

161. The Defendants breached their duties to prudently and loyally manage the Plans' assets. During the Class Period these Defendants knew or should have known that CVS **common** stock **and/or CVS Preference Stock were** ~~was~~ not ~~a~~ suitable and appropriate investment**s** for the Plan**s** as described herein for either (i) CVS **common** stock **and/or Preference Stock** purchased through participant contributions to the **401(k)** Plan **or contributed to participants in the CVS ESOP**, or (ii) CVS **common** stock **and/or Preference Stock** accumulated by the Plan**s** through Company matching contributions. Nonetheless, during the Class Period, these fiduciaries continued to offer the CVS stock**s** as ~~an~~ investment option**s** for the Plan. Moreover, during the Class Period, despite their knowledge **or reckless or negligent disregard** of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan**s**, and indirectly the Plan**s** participants and beneficiaries, from suffering losses as a result of the Plans' investment in CVS **common and/or preference** stock.

51

162.     The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

163.     The Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, making no effort to remedy, and/or knowingly undertaking to conceal, their fellow defendant-fiduciaries' failure to prudently and loyally manage Plans' assets in the exercise of their discretion with respect to the offering Company **common and/or preference** stock as ~~an~~ investment option**s** in the Plan**s**, despite knowing that such failures were breaches of their ERISA-mandated fiduciary duties.

164.     Defendants named in this Count were unjustly enriched by the fiduciary breaches described in this Count.

165.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan**s**, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

166.     Pursuant to ERISA §502(a), 29 U.S.C. §1132(a) and ERISA §409, 29 U.S.C. §1109(a), Defendants in this Count are liable to restore the losses to the Plan**s** caused by their breaches of fiduciary duties alleged in this Count.

### COUNT II

**Failure to Monitor the Plan Committee and Administrators
of the Plans and Provide Them With Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA
§404 by CVS and the Director Defendants)**

167.    Plaintiff incorporates the allegations contained in the previous paragraphs of this complaint as if fully set forth herein.

168.    At all relevant times, as alleged above, CVS and the Director Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

169.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of CVS and the Director Defendants included the responsibility to monitor other fiduciaries.

170.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries (including, inter alia, the Plan Committee and ~~Plan~~ Administrator**s of the Plans**).  In this case, that meant that the monitoring fiduciary, CVS and the Director Defendants, had the duty to:

a.    Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan**s**, the goals of the Plan**s**, and the behavior of Plan**s'** participants.

b.    Ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed.

c.    Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job.

d.    Ensure that the monitored fiduciaries had adequate information and to do their job of overseeing the Plan**s'** investments.

e.    Ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to ~~Plan~~ investment options **of the Plans**.

f.    Ensure that the monitored fiduciaries reported regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

171.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

172.    The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

173.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

54

174.    CVS and the Director Defendants breached their fiduciary monitoring duties by, among other things, (i) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business improprieties alleged above, which made **the** Company**'s common and/or preference** stock an imprudent retirement investment**s**, and (ii) failing to ensure that the monitored fiduciaries appreciated the ~~substantial~~ risk**s** inherent in the ~~significant~~ **substantial** investment by rank and file employees in ~~an~~ undiversified employer stock fund**s**.  CVS and the Director Defendants knew or should have known **of the underlying problems and resultant artificial inflation of the value of CVS common and/or preference stock, and thus,** that the fiduciaries they were responsible for monitoring were imprudently allowing the Plan**s** to continue offering CVS **common and/or preference** stock as ~~a~~ Plan investment**s**, and continuing to invest in CVS **common and/or preference** stock when it no longer was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

175.    In addition, as a result of its inappropriate practices and implicit knowledge thereof, CVS and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of CVS that ~~it~~ **they** knew or should have known that these ~~defendants~~ **fiduciaries** needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, **CVS and the Director D**efendants breached their monitoring duties under the Plan**s** and ERISA.

176.    CVS and the Director Defendants are liable as a co-fiduciaries because: (i) they knowingly participated in the fiduciary breaches by their fellow defendant-fiduciaries in the activities

55

implicated in this Count; (ii) they enabled the breaches by these defendants; and/**or** (iii) they had knowledge of these breaches yet failed to make any effort to remedy them.

177.    These defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

178.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan**s**, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

179.    Pursuant to ERISA §502(a), 29 U.S.C. §1132(a) and ERISA §409, 29 U.S.C. §1109(a), defendants in this Count are liable to restore the losses to the Plan**s** caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**Failure to Provide Complete and Accurate Information
to Plan Participants and Beneficiaries
(Breaches of Fiduciary Duties in Violation of §§404
and 405 of ERISA By All Defendants)**

180.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

181.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C.§1002(21)(A).

182.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications and material disclosures.

183.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that

participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding plan investment options, such that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all **401(k)** Plan investment options, including investment in CVS stock.

184. **As alleged herein, Defendants made repeated communications in their capacity as fiduciaries to 401(k) Plan participants which were false and misleading and/or materially omissive regarding material financial and operation problems the Company was facing. These communications included the Form S-8, filed by CVS in June, 2001, and signed by each of the Director Defendants.**

185. Because investment in the ~~Plan~~ **CVS investment fund** was not diversified (i.e., the Defendants chose to invest the **401(k)** Plan's assets, and/or allow those assets to be invested ~~so heavily~~ in CVS **common** stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to CVS stock.

186. The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding CVS **common** stock, CVS's financial and business improprieties, public misrepresentations and inflated earnings, and the consequent artificial inflation of the value of CVS **common and/or preference** stock and, generally, by conveying inaccurate information regarding the soundness of CVS stock and the prudence of investing retirement contributions in CVS stock. These failures were particularly devastating to the Plan**s** and the**ir**

participants; a ~~significant percentage~~ **substantial portion** of the **401(k)** Plan's assets were invested in CVS **common** stock **and all or substantially all of the ESOP assets were invested in CVS Preference Stock** during the Class Period and, thus, losses in ~~this~~ **these** investment**s** had ~~an enormous~~ **material** impact on the value of participants' retirement assets.

187.    Defendants in this Count are also liable as co-fiduciaries because (i) they knowingly **(or recklessly or negligently)** participated in and ~~knowingly~~ undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding CVS stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and**/or** (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

188.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts and omissions of the Defendants in this complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in CVS **common and/or preference** stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in CVS stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

58

189.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

190.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

191.    Pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) and ERISA §409, 29 U.S.C. §1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of §§404
### and 405 of ERISA Against All Defendants)

192.    Plaintiff incorporates the allegations contained in the previous paragraphs of this complaint as if fully set forth herein.

193.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

194.    ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

195.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia, failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in the CVS **common and/or preference** stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made CVS stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company above the interests of the participants with respect to the Plan's investment in Company stock.

196.    **In addition, Defendant Ryan breached his fiduciary duty of loyalty by selling CVS common stock during the Class Period while in possession of material adverse inside information, garnering substantial illegal and/or improper profits to himself.**

197.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' otherwise participants and beneficiaries, lost a significant portion of their retirement investment.

198.    Pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) and ERISA §409, 29 U.S.C. §1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

199.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been so heavily invested in Company **common and/or preference** stock.

60

200. As a consequence of the Defendants' breaches, the Plan**s** suffered significant losses.

201. ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA §409, 29 U.S.C. §1109. Section 409 requires "any person who is a fiduciary ... who breaches any of the ... duties imposed upon fiduciaries ... to make good to such plan any losses to the plan ... ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate ... ."

202. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

203. Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plan**s** to make good to the Plan**s** the losses to the Plan**s** resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, **including insider sales,** as provided by ERISA §409(a), 29 U.S.C. §1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (iii) reasonable attorney fees and expenses, as provided by ERISA §502(g), 29 U.S.C. §1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and (v) interests on these amounts, as provided by law; and (vi) such other legal or equitable relief as may be just and proper.

204.    Each defendant is jointly liable for the acts of the other defendants as a co-fiduciary.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants **of the Plans**;

B.    An Order compelling the Defendants to make good to the Plan**s** all losses to the Plan**s** resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan**s** resulting from imprudent investment of the Plans' assets, and to restore to the Plan**s** all profits the Defendants made through use of the Plans' assets, and to restore to the Plan**s** all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan**s or otherwise** as the result of breaches of fiduciary duty;

D.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.    Actual damages in the amount of any losses the Plan**s** suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.    An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in Company **CVS common and/or preference** stock maintained by the Plan**s** in proportion to the accounts' losses attributable to the decline in the price/value of Company stock;

G.      An Order awarding costs pursuant to 29 U.S.C. §1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. §1132(g) and the

common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary

relief against the Defendants.

DATED: July 1, 2005

Respectfully submitted,

**LAW OFFICES
   BERNARD M. GROSS, P.C.**

By:_____/s_____
Deborah R. Gross (Bar #546151)
100 Penn Sq. East, Suite 450
Philadelphia, PA 19107
Telephone:  215-561-3600
Facsimile:  215-561-3000

OF COUNSEL:

**MORRIS AND MORRIS LLC
   COUNSELORS AT LAW**
Karen L. Morris
Patrick F. Morris
4001 Kennett Pike, Suite 300
Greenville, DE 19807
Telephone: 302-426-0400
Facsimile: 302-426-0406

**LAW OFFICES OF
   BRUCE G. MURPHY**
Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL   32963
(828) 737-0500