# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES FESCINA, Individually and On Behalf of All Other Similarly Situated   : <br> : <br> : <br> Plaintiff   : <br> : <br> vs.   : <br> : <br> CVS CORPORATION, THOMAS M. RYAN, STANLEY P. GOLDSTEIN, EUGENE APPLEBAUM, W. DON CORNWELL, THOMAS P. GERRITY, MARIAN L. HEARD, WILLIAM H. JOYCE, TERRENCE MURRAY, SHELI Z. ROSENBERG, IVAN G. SEIDENBERG, DAVID RICKARD, ZENON P. LANKOWSKY, ROSEMARY MEDE, and UNKNOWN FIDUCIARY DEFENDANTS 1-100   : <br> : <br> Defendants   : | Civil Action No.  04-12309-JLT |

# AMENDED COMPLAINT FOR
# BREACHES OF FIDUCIARY DUTY UNDER THE
# EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff James Fescina ("Plaintiff"), a participant in the CVS 401(k) Profit Sharing Plan (the "401(k) Plan") and the CVS Corporation and Subsidiaries Employee Stock Ownership Plan (the "CVS ESOP") (collectively, the "Plans") at all times relevant to this action, on behalf of himself and a class of all others similarly situated, alleges as follows:

## INTRODUCTION

This is a class action brought pursuant to §502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132, against fiduciaries of the Plans, including CVS Corporation ("CVS" or the "Company").

1.    401(k) plans, governed under ERISA, confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan typically has the option of purchasing the common stock of his employer, routinely the sponsor of the plan, for part of his/her retirement investment portfolio.

2.    Employee Stock Ownership Plans ("ESOPs"), also governed under ERISA, are designed to function as both an employee retirement benefit pan and a mechanism of corporate finance that encourages employee ownership.  Consideration paid into ESOPs are typically in the form of stock of the company.  The assets of an ESOP are held in a trust under the control of fiduciaries.

3.    Plaintiff Fescina was an employee of CVS and a participant in the Plans during the Class Period alleged herein.  His retirement investment portfolio included CVS common stock and CVS Preference Stocks[1], the value of which was and is directly tied to the value of CVS common stock..

4.    Plaintiff alleges that Defendants, as fiduciaries of the Plans, breached their duties to him and to the other participants and beneficiaries of the Plans during the Class Period in violation

---

[1]    CVS Preference Stock is a special stock which cannot be purchased on the stock market by the general public.  Each share of Preference Stock is worth 2.314 shares of CVS common stock, and has a guaranteed floor value of $53.45 per share (equivalent to a floor price of $23.10 per share of CVS common stock).

of ERISA, particularly with regard to the Plans' holdings of CVS common stock ("CVS stock") and CVS Preference Stock.

5.      CVS is the sponsor of the Plans.  As noted above, both the 401(k) Plan and the CVS ESOP permit participants to save for retirement.  Throughout the Class Period, the Plans held substantial invested assets in CVS common stock and/or CVS Preference Stock.  The basis for such holdings was in part because the 401(k) Plan participants were offered the option of purchasing CVS stock by choosing to allocate all or a portion of their 401(k) contributions to the CVS Stock Fund, a separate investment fund established in 1997 that held CVS common stock.  Moreover, 50% of the Company's matching contributions were paid in the form of shares of CVS Preference Stock These matching contributions were held in the Diversified ESOP Account.  As noted above, eligible CVS employees were also paid CVS Preference Stock through the CVS ESOP.

6.      Since the 401(k) Plan's holdings in CVS stock comprised a substantial portion of the overall value of the assets held by the Plan, and the value of the CVS Preference Stock held in the CVS ESOP and Diversified ESOP Account was directly tied to the value of CVS common stock, the long-term retirement savings of participants in the Plans were dependent to a material degree on the performance of CVS common stock, as well as the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of Plan assets.

7.      During the Class Period, as described herein, Defendants knew or should have known that CVS Stock and/or CVS Preference Stock were imprudent investments alternatives for the Plans due to the substantial and material accounting and business improprieties occurring at the Company.  Upon information and belief, certain Defendants played an active role in implementing and/or

3

perpetuating the accounting and business improprieties described herein which resulted in the artificial inflation of the value of Company stock during the Class Period.

8.    This action alleges that fiduciaries of the Plans breached their fiduciary duties to the Plans and their participants under ERISA, by, among other things, selecting and maintaining CVS common stock and the CVS Stock Fund as an investment alternative for participant contributions under the 401(k) Plan and continuing to permit Plan participants to invest in the CVS Stock Fund when they knew or should have known that it was no longer a suitable or prudent Plan investment option.

9.    In addition, the fiduciaries of the CVS ESOP breached their fiduciary duties to plan participants by failing to take appropriate steps to mitigate damages to Plan participants in acquiring new, and/or continuing to hold existing CVS Preference Stock based on what these fiduciaries know or should have know regarding accounting misconduct and material misrepresentations by Company officials, and the resultant artificial inflation of the value of CVS common stock – and thus to the CVS Preference Stock – during the Class Period.

10.    The breaches alleged herein were ongoing and continuous over the course of the Class Period, and arose out of, *inter alia,* Defendants' continuing duty to review, evaluate, and monitor the suitability of the 401(k) Plan's investment in CVS stock, and to provide accurate material information to enable participants to make informed investment decisions concerning the investment of their contributions and Company matching and ESOP contributions in Company common and preference stock.

11.    As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plans have suffered substantial losses; with millions of dollars of the retirement

4

savings and anticipated retirement income of the Plan participants having been lost. Under ERISA, the breaching fiduciaries are obligated to restore to the Plans the losses resulting from these breaches of fiduciary duty.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

13.    Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

### Plaintiff

14.    Plaintiff Fescina worked for CVS, and was a participant in the Plans pursuant to §3(7) of ERISA, 29 U.S.C. §1102(7) and acquired and held CVS common stock in his retirement investment portfolio and acquired and held CVS Preference Stock in his ESOP and Diversified ESOP Account during the Class Period.

### Defendants

15.    Defendant CVS Corporation ("CVS" or the "Company") is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island 02895. According to the Company's 2003 From 10-K, CVS is the second largest drugstore chain (based on sales) in the United States.  As of January 3, 2004, the Company operated 4,179 retail and specialty

pharmacy stores in 32 states and the District of Columbia. During calendar 2003, CVS filled over 334 million prescriptions, or approximately 10% of the U.S. retail market.

16.    CVS is the Sponsor of the Plans.  Moreover, CVS is a fiduciary of the Plans within the meaning of ERISA.  CVS, through its Board of Directors, senior officers and employees, exercises discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.  CVS at all times acted through its officers and employees, including its Chief Financial Officer, General Counsel and Senior Vice President, Human Resources, all members of the Plan Committee appointed by the Board to perform CVS's 401(k) Plan-related fiduciary functions in the course and scope of their employment.

17.    CVS at all times acted through its officers and employees, including the members of the Plan Committee, the 401(k) Plan Administrator, and the fiduciaries responsible for the administration of the CVS ESOP and Diversified ESOP Account, who were appointed by the Board of Directors of the Company to perform Plan-related fiduciary functions, and did so in the course and scope of their employment.  CVS has, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities.  Through its Board of Directors (the "Directors") and/or senior management CVS had the authority and discretion to hire and terminate said officers and employees.  CVS also had the responsibility, authority and discretion to appoint, monitor, and remove officers and employees from their individual fiduciary roles with respect to the Plans.  By failing to properly discharge their duties under ERISA, the Directors, officers and employee fiduciaries breached duties they owed to participants of the Plans and their beneficiaries.  Accordingly, the actions of the various Plan officers and/or managers or

administrators and other employee fiduciaries are imputed to CVS under the doctrine of *respondeat superior*, and CVS is liable for these actions.

**Director Defendants**

18.    Defendant Thomas M. Ryan ("Ryan") was Chairman of the Board of Directors ("Board") and Chief Executive Officer ("CEO") of CVS during the Class Period.  As such, Ryan – acting as a member of the Business Planning Committee ("BPC") and otherwise – was intimately familiar with and involved in the multiple instances of misconduct alleged herein.  Ryan was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, including, *inter alia*, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

19.    Defendant Stanley P. Goldstein ("Goldstein"), a founder of the Company, was Chairman of the Board until April 1999, and CEO of the Company until his retirement in 1998.  Goldstein served on CVS's Board during the Class Period.  Goldstein was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, including, *inter alia*, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

20.    Defendant Eugene Applebaum ("Applebaum") served on CVS's Board during the Class Period.  Applebaum was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, including, *inter alia*, responsibility for the

7

selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

21.    Defendant W. Don Cornwell ("Cornwell") served on CVS's Board during the Class Period. Cornwell was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, including, *inter alia*, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

22.    Defendant Thomas P. Gerrity ("Gerrity") served on CVS's Board during the Class Period. Gerrity was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, including, *inter alia*, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

23.    Defendant Marian L. Heard ("Heard") served on CVS's Board during the Class Period. Heard was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, including, *inter alia*, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

24.    Defendant William H. Joyce ("Joyce") served on CVS's Board during the Class Period. Joyce was a fiduciary of the Plans within the meaning of ERISA in that he exercised

discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, including, *inter alia*, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

25.     Defendant Terrence Murray ("Murray") served on CVS's Board during the Class Period.  Murray was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, including, *inter alia*, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

26.     Defendant Sheli Z. Rosenberg ("Rosenberg") served on CVS's Board during the Class Period.  Rosenberg was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, including, *inter alia*, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

27.     Defendant Ivan G. Seidenberg ("Seidenberg") served on CVS's Board during the Class Period.  Seidenberg was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, including, *inter alia*, responsibility for the selection, monitoring and removal of the members of the Plan Committee and Administrators of the Plans.

**CVS Plan Committee**

28.     The Plan Committee administers both the 401(k) Plan and the ESOP.  According to

the 401(k) Profit Sharing Plan of CVS Corporation And Affiliated Companies (the "401(k) Plan")[2],

Article 10, "Administration Of Plan," the general administration of the 401(k) Plan and the

responsibility for carrying out the provisions of the Plan are vested in and maintained by a Plan

Committee, consisting of not less than three (3) persons appointed from time to time by the Board

to serve at the pleasure of the Board.[3]  On information and belief, the members of the Plan

Committee during the Class Period included Defendant David Rickard, Chief Financial Officer;

Defendant Zenon P. Lankowsky, General Counsel; and Defendant Rosemary Mede, Senior Vice

President, Human Resources.

29.     According to Section 10.02 of the 401(k) Plan, "Duties of Committee":

> The Committee shall administer the Plan in accordance with its terms
> and shall have all powers necessary to carry out the provision of the
> Plan not otherwise reserved to the Company, the Employer, the Board
> of Directors, or the Trustee.  The Committee shall elect a chairman
> from their number and a secretary who may be but need not be one of
> the members of the Committee; may appoint from their number such
> subcommittees with such powers as they shall determine; may
> authorize one or more of their number or any agent to execute or
> deliver any instrument or make any payment on their behalf; may
> retain counsel, employ agents and provide for such clerical,
> accounting, and consulting services as they may require in carrying
> out the provisions of the Plan; and may allocate among themselves or
> delegate to other persons all or such portion of their duties under the

---

[2]     The version of the 401(k) Plan relevant to this litigation is the one that was
Amended and Restated as of January 1, 1999, including amendments through July 1, 2000
*(attached hereto as Exhibit A).*

[3]     Under Article 1, "Definitions," Section 1.10, "Committee" is defined as "the
persons named by the Board of Directors to administer and supervise the Plan as provided in
Article 10.

Plan, other than those granted to the Trustee under the trust agreement adopted for use in implementing the Plan, as they, in their sole discretion, shall decide.

30.    In addition, Section 10.07 of the 401(k0 Plan, "Establishment of Rules," provides that:

> . . .  The Committee shall have the total and complete discretionary authority to construe and interpret the Plan, to make factual determinations and to determine all questions arising in the administration, interpretation, and application of the Plan (including, but not limited to, the power to make a determination of an individual's eligibility for Plan participation, the right, amount, form, and timing of any benefit payable under the Plan and the date on which any individual ceases to be a Member).

31.    The Company's Form 11-K for the year ended December 31, 2000, filed by the Company with the SEC on or about June 29, 2001 (the "Form 11-K), specifies one of the principal responsibilities of the Plan Committee is to appoint a Plan Administrator and a Plan Trustee.

32.    As noted above, the Plan Committee also performs similar general administrative fiduciary functions for and has responsibilities over the ESOP.

33.    As such, the Plan Committee is a fiduciary within the meaning of ERISA in that it exercises discretionary authority with respect to the management and administration of the ESOP and the 401(k) Plan, including, specifically, in the determination of whether or not to offer the CVS Stock Fund as one of the available investment fund options for employee and employer matching contributions under the 401(k) Plan.  The 401(k) Plan itself specifies at Section 10.13, "Named Fiduciary," that "For the purposes of ERISA, the Committee shall be the fiduciary of the Plan."

**The Administrators of the Plans**

34.    According to the Form 11-K, the 401(k) Plan Administrator, *inter alia*, maintains participant account records and instructs the Trustee to execute transactions, such as benefit payments to 401(k) Plan participants.

35.    Likewise, the CVS ESOP is administered and managed by one or more fiduciaries acting in the capacity of Plan Administrators.

36.    The 401(k) and ESOP Plan Administrators are fiduciaries within the meaning of ERISA in that they exercise discretionary authority with respect to management and administration of the Plans.

37.    While the identify of the 401(k) and ESOP Plan Administrators during the Class Period are currently unknown to Plaintiff, once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

**Unknown Fiduciaries**

38.    There are other fiduciaries of the both the 401(k) Plan, as well as of the CVS ESOP and Diversified ESOP Account whose identities are currently unknown to Plaintiff.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

39.    Defendants include named and de facto fiduciaries with respect to the Plans.  All Defendants exercised discretionary authority or control regarding management of the Plans, management of the Plans' assets, and/or administration of the Plans.

## THE PLANS

40.    The CVS 401(k) Plan and ESOP are "employee pension benefit plans," as defined by §3(2)(A) of ERISA, 29 U.S.C. §1002(2)(A).  The CVS Plans are legal entities which can sue or

12

be sued. ERISA §502(d)(1), 29 U.S.C. §1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are neither a plaintiff nor a defendant. Rather, pursuant to ERISA §409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans. In other words, Plaintiff in this action seeks relief on behalf of the Plans.

41.     As noted above, CVS is the Sponsor of the Plans. As such, CVS, and its officers and Directors, are intimately involved in the administration of the Plans and investment of Plan assets. At a minimum, the Defendants -- fiduciaries who were charged with the reasonable and prudent management and/or administration of the Plans -- knew that a significant portion of Plan assets, namely CVS Stock held by the 401(k) Plan and the CVS Preference Stock held by the CVS ESOP and Diversified ESOP Account, were materially at risk due to the open and notorious internal accounting and business improprieties directed by Company senior management and occurring at CVS during the Class Period, as described herein.

42.     Under the 401(k) Plan, participants may contribute through payroll deductions from 1% to 15% of their salary, on a pre-tax basis. According to the 401(k) Plan, contributions to the 401(k) Plan will be invested in one or more Investment Funds, as authorized by the Plan Committee, "which from time to time may include the CVS Stock Fund and such equity funds, international equity funds, fixed income funds, money market funds, investment contract funds or other funds as the Committee elects to offer." *Id.*, Section 4.01(a).

43.     During the Class Period, the Plan Committee authorized thirteen investment funds for 401(k) Plan participants to invest in, one of which was the CVS Stock Fund. 401(k) Plan participants' investments could all be in a single investment fund, or divided among a number of such funds, in any amounts equal to 1% or more. As noted above, one of the thirteen investments

13

funds available to 401(k) Plan participants is the CVS Stock Fund, which invests in CVS common stock

44.     According to the Form 11-K:

> The CVS Stock Fund was established as a result of the transfer of assets from the Revco D.S., Inc. 401(k) Plan during 1997. The Plan *may, at the discretion of the Plan Committee, offer a company stock fund as one of the available investment funds* for employee and employer contributions. The fund holds CVS common stock.

(Emphasis added.)

45.     During the Class Period, CVS matched employee contributions, up to 5%. According to the CVS Future Fund New Hire Guide:

> When you invest in the 401(k) Plan, half of the CVS match is invested in the investment funds you select for your own contributions. . . . The second half of your match goes in to your ESOP [Employee Stock Ownership Plan] account at the end of the year, if you are a CVS employee at that time.

46.     Payment of the portion of the matching contribution in the form of CVS Preference Stock into the Diversified ESOP Account as well as payment of the Company contribution of CVS Preference Stock into the CVS ESOP are both made in March, with the calculation of the number of Preference Stock units being based upon the value of CVS common stock as of the last business day of December of the prior year.

47.     Employees are vested immediately in their personal contributions. Preceding and during the Class Period, participants were vested in Company matching contributions and ESOP contributions after five years of service with CVS.

14

48.    The value of CVS common stock and Preference Stock held by the Plans were materially inflated at all times during the Class Period as a result of the improper and/or illegal conduct detailed herein.

## DEFENDANTS' FIDUCIARY STATUS

49.    During the Class Period, upon information and belief, as detailed herein, Defendants had discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

50.    During the Class Period, the Defendants acted as fiduciaries of the Plans pursuant to §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A), and the law interpreting that section.

51.    Instead of delegating all fiduciary responsibility for the Plans to external service providers, CVS chose to internalize its respective fiduciary functions.  As alleged herein, under the circumstances present during the Class Period, this decision reflected conflicts of interests resulting in the breach of these Defendants' fiduciary duties to the Plans and their beneficiaries.  These conflicts of interest included, for example, the fact that the compensation – at a minimum as to incentive awards -- of members of the Plan Committee and other senior officers was dependent upon *inter alia* the Company meeting pre-established objectives for consolidated earnings before federal income tax and return on net assets.  As detailed herein, the purpose of the accounting and other misconduct herein alleged was to effectuate the goal of artificially increasing CVS' consolidated earnings.

**Each Defendant's Fiduciary Status**

**A.    CVS**

52.    During the Class Period, CVS held ultimate fiduciary responsibility for and authority over the administration of the Plans and the investment of Plan assets.  CVS retained the right to terminate or amend the Plans, in whole or in part, at any time and for any reason it deems advisable. CVS wielded its fiduciary authority both directly through its primary executive arm, its Board of Directors, and through the appointment, removal and monitoring of the performance of its fiduciary delegates such as the Plan Committee and the Administrators of the Plans.

**B.    CVS Director Defendants**

53.    The Board of Directors during the Class Period was directly responsible for the appointment, monitoring and removal of personnel with direct fiduciary responsibility for the running of the Plans.  These included *inter alia* the members of the Plan Committee, and thus each member of the Board was a fiduciary of the Plans.  The members of the Board had direct oversight over and the responsibility to monitor other key fiduciary administrators of the Plans.

**C.    The Administrators of the Plans**

54.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  §402(a)(1), 29 U.S.C. §1102(a)(1).  Thus, both the CVS 401(k) Plan and the ESOP were controlled and managed by fiduciaries appointed and overseen by the Board.

55.    Management and administration of the ESOP and the 401(k) Plan rested in the hands of the Plan Committee.  The Plan Committee was thus a fiduciary of the both the ESOP and the

16

401(k) Plan.  Moreover, the 401(k) Plan, at Section 10.13, specifically designates the Plan Committee as fiduciaries "for the purposes of ERISA."

56.    The Plan Committee members were directly appointed and could be removed by the Board.

57.    The Plan Committee has the power and discretion to determine issues arising out of or in connection with the provisions and/or the administration of the CVS ESOP and the 401(k) Plan and the investment of Plan assets.

58.    Importantly, as detailed herein, the Plan Committee had full discretion to determine whether or not to offer and/or continue to offer the CVS Stock Fund as one of the investment fund options available to Plan participants.  Moreover, the Plan Committee was also responsible for the selection of the Plan Administrators.

E.    **Additional Fiduciary Responsibilities**

59.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under §402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent ... he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets ... ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA for both the CVS 401(k) Plan and the ESOP.

17

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the CVS 401(k) Plan and/or ESOP at any time between December 1, 2000 and October 30, 2001 (the "Class Period") and who held, purchased, acquired or had contributed CVS Stock and/or CVS Preference Stock to their plan accounts during that period.

61.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plans and acquired and/or held CVS common stock and/or CVS Preference Stock pursuant to the Plans during the Class Period.

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

18

63.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' consistent and pervasive breaches of their fiduciary duties to the Plans and Plan participants as complained of herein.

64.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

65.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

66.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

**DEFENDANTS' CONDUCT**

**CVS Dramatically Expands Through Aggressive Acquisitions**

67.     Through a series of major acquisitions between 1996 and 1998, CVS increased the number of retail stores it operated from approximately 1,400 to approximately 4,122 in 24 states and the District of Columbia, and began touting itself as the largest chain drugstore company in the United States based on store count.

68.     CVS's Retail Pharmacy sales are divided between pharmacy sales and sales of general merchandise, including, over-the-counter drugs, greeting cards, film and photo finishing services, beauty products and cosmetics, seasonal merchandise and convenience food (referred to by CVS as "front store" sales).  Following its acquisitions of Revco D.S., Inc. (finalized on May 29, 1997) and Arbor Drugs, Inc., (finalized on March 31, 1998), CVS's business shifted substantially to pharmacy sales.  By 2000, pharmacy sales had increased to represent approximately 63% of total sales for the year, up from 43.9% in 1996.  Pharmacy sales (as compared to "front store sales") offer a substantially lower profit margin.

69.     As a result of this shift, Defendants knew that CVS's ability to continue to manage and grow its Retail Pharmacy business segment and to maintain and increase pharmacy sales was critical to the success of its overall operations.  However, in the months preceding and during the Class Period, CVS was experiencing a number of undisclosed problems that were having a materially negative impact on its income and earnings.  As a result, throughout 2000, the Company's total sales numbers were below what was internally budgeted, creating ever increasing pressure on the Company and senior management to find creative ways to still meet Wall Street expectations, a very important goal for the Company.  Meeting market expectations was a critical consideration.

For example, the Company publicly boasted in its 2000 Annual Report, filed with the SEC and distributed to shareholders in March 2001, that:

> This outstanding performance solidified our track record of meeting or beating Wall Street's expectations every quarter since [CVS] became a stand-alone public company in the Fall of 1996 . . . ."

70.     As detailed herein, in light of CVS's internal awareness of declining gross margins and lower earnings and earnings per share (EPS) contrasted with strong earnings expectations by the market, the Company pursued improper and/or illegal schemes and earnings manipulations to give the appearance of strong earnings which deceived the market and artificially inflated the Company's stock price. Based upon their senior positions and responsibilities at CVS, as detailed herein, and the open nature of this misconduct at the senior level of management, the Defendants knew or should have known of these schemes and manipulations as they occurred preceding and over the course of the Class Period.

## CVS Faces Declining Gross Margins

71.     In the months preceding the Class Period, CVS had suffered from substantially declining gross margin rates, which presented a threat to CVS's operating profits and earnings. The Company attributed this adverse trend to the fact that pharmacy sales were becoming an increasingly larger percentage of CVS's total sales as compared to front store sales, and the margin on pharmacy sales was lower than the margin on front store sales. This is especially true with respect to pharmacy sales paid for by third party insurance programs, including managed care organizations, as such organizations, in order to reduce their prescription drug costs, brought substantial pressure to bear on pharmacies like CVS to accept lower rates of reimbursement.

72.    CVS represented that it would be able to mitigate the negative impact that increased pharmacy sales were having on the Company's gross margins and operating profits by increasing operating efficiencies. In May 2000, CVS announced that it had changed its procedures for handling in-store markdowns of damaged merchandise, store supplies, unsaleable merchandise and/or outdated merchandise in order to be more efficient. Previously, CVS stores had manually kept track of in-store markdowns and returns of damaged merchandise on a weekly basis. Pursuant to the new procedure, *inter alia*, in-store markdowns and returns were to be taken and tracked electronically on a *daily* basis.

73.    According to the Company's internal policy manual issued in connection with this change, the new markdown policy would allow for "more accurate and timely [markups and markdowns] on a daily basis" and would avoid the need to take unnecessarily large write-offs of damaged merchandise at any point in time.

74.    In connection with this change in procedure, on May 25, 2000, CVS management issued a memorandum to all CVS store managers, announcing that CVS would institute a new procedure for handling markdowns and returns of damaged items commencing on June 18, 2000. In describing the reasons for the change in policy for handling return of damaged merchandise, the memorandum stated the following:

DAMAGE RETURN PROCEDURE CHANGE

BACKGROUND
A new damage return process has been developed in conjunction with the new manual markdown application introduction on the RF Unit. The intent of this new process is to tighten controls on non-returnable and "un-billable" merchandise being sent to Damage Track.

> In 1999 stores sent over $1.4 million dollars worth of non-returnable and pristine merchandise back to Damage Track (pristine being defined as perfectly good merchandise with no visible signs of the product or package being damaged or outdated).
>
> Additionally, as a company, we returned $25 million dollars more merchandise than we received credit from suppliers. This variance resulted in a company P&L write-off. If this write-off was shared evenly between all 4000 plus stores, your P&L Contribution A line would have been negatively adjusted by $6250.00.

Needless to say, we cannot afford to repeat this write-off in 2000. Therefore, the following new procedures have been developed and must be implemented IMMEDIATELY.

75.     As the memorandum makes clear, CVS intended to more effectively and accurately handle markdowns and returns of damaged merchandise by keeping track of this information on a daily basis. The memorandum also demonstrates the magnitude of the issue. As indicated above, in 1999, CVS returned $25 million worth of merchandise to suppliers for which it did not receive any credit. This amount does not include damaged merchandise that was not returnable and was written off and/or merchandise that was damaged and sold at a marked down price.

**CVS Entered the Class Period Facing Substantial Sales Shortfalls
and Turned to Earnings Manipulation to Disguise This Fact**

76.     Throughout 2000, the Company's sales were consistently lower than internally budgeted. This substantial, but never disclosed "gap" raised a material risk that CVS would not be able to achieve its internal budget, raising the specter of not meeting analyst earnings expectations.

77.     To respond to this potential crisis, in November 2000, defendant Ryan directed the Business Planning Committee (BPC) -- which consisted of Company senior management, including Defendant Ryan, Defendant Rickard, the Chief Financial Officer and member of the Plan Committee -- determined to suspend in-store markdowns.

78.    Ironically, based on the improved automated system for tracking markdowns and returns of damaged items implemented in June 2000, CVS was able to more effectively monitor store-initiated markdowns, and thus Defendants knew or should have known that such markdowns were running significantly higher than budget, having a material negative impact on the Company's margins and earnings -- an issue recognized and discussed among senior management.

79.    Thus, CVS, in direct contravention of its new markdown and damage return policy -- and in violation of Generally Accepted Accounting Principles (GAAP) requirements -- in November 2000 directed its store managers to hold in abeyance recording any store initiated markdowns until following the beginning of the next fiscal year, in January, 2001.  As part of this directive, store managers corporation-wide were instructed to segregate and hold in a designated section of each store's respective stockroom all merchandise that was to be written-off and/or marked down.

80.    Specifically, on November 20, 2000, CVS management issued a memorandum to all CVS store managers, stating that, effective immediately, "[n]o store initiated markdowns should be taken between now and January 1, 2001."  The memorandum included the following additional information regarding the sudden policy turnaround:

> Further Information:
> What markdowns CANNOT be performed, effective immediately?
>   -- Store level markdowns
>       -- Damaged / non-returnable items
>       -- Damaged / unsaleable items
>           NOTE:  Returnable Damages going back to the warehouse should still be processed as normal
>       -- Cosmetic prepack markdowns
>       -- Not in planogram discontinued / Discontinued Other
>       -- End of Season  Down to Zero markdowns
>       -- Outdated non-returnable product (i.e., Russell Stover)
>
> How do I handle the Damaged Items that are not returnable or unsaleable?

24

-- Hold in the designated clearance location in your stockroom.

-- Visual merchandising will allocate endcaps in the January Merchandising Planner to assist with liquidating these items.

81.     Accordingly, from November 20, 2000 through at least the end of fiscal 2000, Defendants did not allow any of CVS's 4,100-plus stores to take markdowns or write-off damaged or otherwise unsaleable goods.  As a result, each store was required to keep damaged merchandise in storerooms that should have been discounted or marked down to zero.  As one former CVS store manager put it, this policy resulted in "trays and cases of unsaleable merchandise taking up space in the back of the store, in the back room."

82.     This sudden reversal in policy reflected a clear intent by CVS, through its senior management, to avoid having to write-off millions of dollars of damaged and/or discounted merchandise until sometime in 2001.

83.     Demonstrating Defendants' intent in this regard is the fact that they allowed stores to continue to process unsaleable merchandise that could be returned for a credit, while they prevented stores from processing unsaleable merchandise for which credit was not available. Generally Accepted Accounting Principals ("GAAP") required this unsaleable merchandise should be written off and disposed of.  However, pursuant to instructions from Company headquarters, stores were required to retain this merchandise, which could not be sold or returned, through at least the end of 2000 before any required write-offs could be recorded.

84.     As a result of the foregoing, CVS knowingly ceased to properly account for discounted and unsaleable merchandise, in violation of GAAP during the last six weeks of 2000. By doing so, Defendants were able to delay the write-down of millions of dollars of inventory, thereby artificially improving the Company's gross margin and inflating its reported operating results

25

for the fourth quarter and year end 2000, resulting in CVS stock price being artificially inflated during the Class Period. The Defendants therefore knew or should have known that the price of CVS common and preference stock during the Class Period was artificially inflated.

**CVS's Determination To Close Hundreds**
**Of Under Performing Stores**

85.     In addition to allowing Plan participants to continue to invest in CVS Stock and to contribute CVS Preference Stock despite the open and blatant accounting improprieties and earnings manipulation described above, the Defendants further breached their fiduciary duties to Plan participants as follows.

86.     As noted above, between 1996 and 1998, CVS acquired approximately 2,600 stores in connection with the Revco and Arbor Drugs acquisitions. Many of the stores acquired in these transactions were located in undesirable strip mall locations and/or were unprofitable. CVS's publicly touted strategy was to relocate as many stores as possible out of strip mall locations to larger more profitable stand-alone locations. Indeed, CVS emphasized its relocation strategy in press releases and SEC filings issued both before and throughout the Class Period, noting that by relocating stores, the Company was immediately able to increase these stores' profitability.

87.     Defendants, however, knew at all relevant times that a certain percentage of its stores that were located in undesirable locations could not be relocated and needed to be closed. Further, Defendants knew or should have known that other under-performing stores that could not be made profitable and needed to be closed.

88.     Indeed, since completing the Revco acquisition in 1997, the problem of underperforming stores was regularly discussed at meetings of CVS senior management. By 1999,

CVS had developed an action plan to try and improve performance at a number of underperforming stores. If performance could not be improved at a store, Defendants' plan was to try and sell the store or, if the store could not be sold, to schedule it for closure. By definition, closing a store entailed incurring costs that could have a negative impact on CVS's earnings.

89.     CVS routinely performed analyses of store profitability and tracked stores that consistently under-performed. As a result of such internal analysis and tracking, by the beginning of 2001, CVS's recognized need, and clear intention to close a substantial number of stores had become common knowledge internally at the Company, and was the subject of discussions among CVS employees. CVS failed to publically disclose, however, that it had repeatedly delayed closing a large block of these unprofitable and non-performing stores because such a closure would have triggered the requirement to take a substantial charge, which would have adversely affected the Company's earnings and margins. This material, non-public information was known or should have been known by Defendants during the Class Period.

90.     Rather than publicly disclosing its plans to close approximately 200 stores, however, throughout the Class Period, Defendants, in breach of their fiduciary duties, permitted the Company to repeatedly issue misleading public representations that improperly emphasized CVS's plans to open new stores in new markets and relocate stores in existing markets, while remaining silent about the substantial number of stores it needed -- but refused -- to close.

91.     It was not until the end of the Class Period that CVS finally announced that, pursuant to a restructuring, it would be closing an additional approximately 200 stores, and would take a charge of $350 million (incurred principally in connection with the closure of these 200 stores).

**CVS's Was Unable to Attract and Retain**
**Adequate Numbers of Pharmacists to Staff its Stores**

92.     In addition to recognizing the need to close hundreds of unprofitable and under performing stores, CVS also recognized that it faced ever-increasing, critical problems with attracting and retaining adequate numbers of qualified pharmacists.

93.     For some time preceding the Class Period, there had been an ongoing shortage of pharmacists in the United States. This shortage had been attributed to a number of factors, including the growing number of prescription drugs being used to treat illnesses, the aging population, and an increase of the number of years necessary to obtain a pharmacist degree from 5 years to 6 years.

94.     Although the pharmacist shortage had had some impact on the entire industry, the problem had been particularly acute for CVS. This is true for several reasons. First, as alleged herein, CVS had engaged in rapid expansion, resulting in a dramatic increase in the number of pharmacists the Company needed to staff its stores. For example, according to a former manager in CVS's construction division, at the time CVS acquired Arbor Drugs in 1998, the chain, whose operations were focused in the Detroit region, was suffering from a deficit of approximately 100 pharmacists needed to properly staff stores in the region. Unknown to the investing public, but known or recklessly or negligently disregarded by the Defendants at the time, since completing the acquisition in 1998, CVS had struggled to try and maintain adequate pharmacy staffing in these stores.

95.     Further adding to the problem was the fact that, as described above, CVS had focused for the past several years on a strategy of relocating existing stores in smaller strip mall locations to

larger stand-alone locations. Many of these new locations were open 24 hours, thereby further increasing the need for pharmacists at CVS.

96.     The impact of the pharmacist shortage at the Company, particularly in certain critical geographic areas, continued to become more acute throughout 2000, a fact documented and tracked within the Company. By late 2000, CVS senior management, including CVS's Chief Information Officer, internally stressed the need to improve recruitment of pharmacists in order to try and address the problem. Such a problem -- and the concomitant personnel issues it consistently triggered -- reasonably would have been actively discussed, recognized and known to members of the BPC, other senior management and, particularly, the Company's Human Resources department, whose head was a member of the Plan Committee.

97.     Rather than disclosing the extent of the impact that the pharmacist shortage was having on CVS, Defendants, in breach of their fiduciary duties to the Plans and Plan participants, instead chose to create the false impression that CVS was handling the situation and, in fact, was better positioned to attract and retain qualified pharmacists than its competitors. Indeed, CVS consistently represented that the pharmacist shortage was having no material effect on the Company's operations and its ability to grow.

98.     For example, on October 31, 2000, Bear Stearns issued an analyst report, based on information provided by CVS, which stated the following:

> CVS has been successful in attracting and retaining pharmacists at reasonable costs, despite the largest pharmacist shortage the U.S. has ever seen. Beyond incenting pharmacists with stock options and an improved 401K plan, CVS is making the pharmacists' job more enjoyable by automating tedious, routine tasks with new technologies. To this end, automated pill-counting technology has been implemented in roughly 700 stores, a number which we

29

expect to increase as benefits are realized from improved workflow and employee morale.

99.     Similarly, in an article published by Chain Drug Review on December 11, 2000, Jim Roberts, the Vice President of CVS's Southeast region, commented on the impact that the pharmacist shortage was having on CVS as follows: "We've positioned ourselves as the preferred place to work." Mr. Roberts further stated, "[a]s a preferred provider we are able to attract the very best pharmacists in the marketplace and on pharmacy school campuses where we currently recruit across the country."

100.     The foregoing examples are representative of statements made by and on behalf of the Company, both before and during the Class Period, designed to create the impression that the pharmacist shortage was not having a materially adverse impact on CVS's operations. Contrary to these representations, however, at least by the end of 2000, it had become apparent and obvious internally at CVS that the Company's efforts to recruit and retain adequate levels of pharmacist staffing in particular, critical geographic areas, were insufficient. These material, adverse facts were thus known or recklessly or negligently disregarded by Defendants.

101.     As described above, leading up to and during the Class Period, the pharmacist shortage resulted in significant increases in customer complaints based on unreasonably long waits to fill prescriptions, temporary store closings and reduced store hours at different CVS locations on a regular basis. The pharmacist shortage was particularly acute in certain regions of the country, including, among others, Detroit, Cleveland, parts of Connecticut, and Washington, D.C.

102.     In addition to the above critical markets, CVS was experiencing the adverse affects of the pharmacist shortage in other locations as well. For example, in late 2000 and early 2001, CVS

experienced a severe shortage of pharmacists at its stores in Rhode Island.  To try and compensate

for this problem, CVS began closing pharmacies in the region on Sundays and had the pharmacist

staff alternate from store to store.  Similarly, from February through May 2001, temporary store

closings due to lack of pharmacists transpired at stores around the country, including stores in

Connecticut, South Carolina, North Carolina, Pennsylvania, Florida and elsewhere.  Defendants did

not disclose any of the problems they were having as a result of the pharmacist shortage.

103.    As reflected by the above, the adverse impact of the pharmacist shortage during the

Class Period was felt at CVS stores throughout the country.  Moreover contrary to the Company's

representations that it was addressing the pharmacist shortage by establishing CVS as "a preferred

place to work," the Company's inability to attract and retain pharmacists was actually exacerbated

by the fact that CVS paid less than its competitors.  Further, to try and compensate for the ever-

widening shortage, CVS required that its pharmacists work extensive amounts of unpaid overtime.

Due to the severity of the shortage, some CVS pharmacists were required to work in excess of 70

hours per week or more.  Additionally, CVS regularly required that its pharmacists travel extensive

distances to cover pharmacies that were inadequately staffed.

104.    Not surprisingly, and well known within the Company, particularly its Human

Resources Department, CVS's treatment of its pharmacists resulted in high turnover, and negatively

affected the Company's ability to attract new pharmacists.  In fact, in November 2000, a group of

CVS current and former pharmacists brought a collective action against the Company alleging that

its failure to pay overtime violated the Fair Labor Standards Act.  Similar suits by CVS pharmacists

were brought in early 2001.  CVS did not disclose the existence of any of these lawsuits in its press

releases or public filings until after the Class Period, on March 21, 2002, when it finally reported that

31

the November 2000 action had been brought by pharmacists seeking recovery of unpaid overtime and liquidated damages.

105.    Thus, contrary to the Company's repeated public statements that CVS was better suited to handle the pharmacist shortage than most other retailers, the Defendants knew or should have known that CVS was unable to adequately staff its retail stores and the pharmacist shortage was having a material, negative impact on CVS's operations and earnings.  In fact, the pharmacist shortage was actually having a more severe impact on CVS's operations than it was having on many of its competitors.  For example, although one of CVS's main competitors, Walgreen, Inc., had been required to close or reduce hours at approximately 1% of its stores due to the pharmacist shortage, CVS had been required to close or reduce hours at 15% of its stores during the same period.  As the Defendants knew or should have known, these nonpublic adverse facts would have had a substantial negative impact on the value of CVS stock were they disclosed.

**CVS Made Repeated False and Misleading
Statements During the Class Period**

106.    On February 6, 2001, CVS issued a press release announcing "record sales and earnings for the fourth quarter [of 2000] and the year ended December 30, 2000."  The Company reported $5.5 billion in net sales during the fourth quarter and fourth quarter earnings of $0.51 per share, a purported increase of 19.6% over the same period the prior year (after excluding results from an extra week in fiscal 1999).  For the year, the Company reported $20.1 billion in net sales and earnings of $1.80 per share, a purported increase of 17.7% over the results of the prior year (after excluding a nonrecurring gain and the extra week in 1999).

107.    In the same press release, CVS commented on the Company's store growth as follows:

For the year, CVS opened 158 new stores and relocated 230 others. The Company entered three new, high growth markets in 2000 and prepared to enter additional new markets. There remain 41 of the Top 100 U.S. drugstore markets in which CVS currently has no presence, offering significant opportunity for future growth. As of December 30, 2000, CVS operated 4,133 retail and specialty pharmacy stores in 31 states and the District of Columbia.

108.    In the February 6 press release, Defendant Ryan commented on CVS's reported results as follows:

"The year 2000 was another successful year for CVS. We once again achieved double-digit same store sales growth, excellent expense control, and produced record earnings," stated Tom Ryan, Chairman, President and Chief Executive Officer.

109.    Defendant Ryan concluded by stating:

I am very pleased that we have been able to consistently meet or beat our goals, all while we continue to invest in new stores and relocations, as well as in new business channels, which will help accelerate our future growth. I believe we are better positioned than at any other time in the Company's history to capitalize on the significant opportunities in healthcare.

110.    Also on February 6, 2001, CVS held a conference call with the investment community led by Defendant Ryan. During the conference call, Defendant Ryan further stated:

Let me outline our preliminary real estate plan for 2001. We'll open 150 to 170 brand new CVS stores. We'll relocate 140 to 150 CVS stores. We'll close an additional 60 to 70 stores for a net new-store CVS growth of 90 to 100 stores for 2001. This equates to 300-plus new [stores], less than we've had in the past but a much higher net new-store growth because we're closing fewer stores.

111.    Defendants knew, or recklessly or negligently failed to know that the financial results they announced on February 6 and the statements commenting on those results were materially false and misleading, as the Company's gross margins and operating profits had been artificially inflated by *inter alia*, the failure to properly account for marked down and damaged merchandise in violation

33

of GAAP in the last six weeks of fiscal year 2000. As a consequence, reported earnings and other financial results for the fourth quarter and year end 2000 were artificially inflated.

112.    Additionally, Defendants knew, or recklessly or negligently failed to know that their comments regarding CVS's growth plans and business prospects were materially false and misleading because they failed honestly and fully to disclose the fact that CVS had already determined a requirement to close approximately 200 specifically identified unprofitable and underperforming stores, as well as the fact that the Company, overall, was being adversely affected by the ongoing pharmacist shortage.

113.    In March, 2001, CVS issued its Annual Report to Stockholders and filed with the SEC its Form 10-K for fiscal year 2000, both of which also contained similar false and misleading representations. Moreover, other representations and public filings over the Class Period also included similar false and misleading representations, and/or failed to disclose material information regarding necessary store closings and the Company's ongoing and worsening problem hiring and retaining sufficient numbers of qualified pharmacists.

114.    For example, on May 14, 2001, Jim Smith, CVS's Senior Vice President of Health Services, was quoted in an article published by *Racher Press Inc.* as follows: "By making the value it places on pharmacists abundantly clear, CVS Corp. is coping better with the nationwide pharmacist shortage than most retailers."

115.    Similarly, on May 11, 2001, J.P. Morgan issued an analyst report, based on information provided by CVS at its May 10 meeting with securities analysts, which stated the following:

34

> CVS addressed its strategies to attract and retain quality pharmacists
> and technicians. CVS offers stock options to pharmacists, who can
> also participate in 401K and employee stock programs. The
> company discussed Excellence in Pharmacy Innovation and Care
> (EPIC), its program which focuses on workflow processes in the
> pharmacy, automation (for pill counting), as well as labor
> productivity, in terms of the cost benefits of shifting work from the
> pharmacist to the technician. 60% of the company's new pharmacy
> staff are hired away from competitors, while 40% from colleges.

## CVS Is Forced to Make a Partial Disclosure

116.    On June 15, Credit Suisse First Boston ("CSFB") analyst Ed Comeau issued a report

which disclosed information never revealed by the Company, namely that contrary to the Company's

repeated prior assertions, CVS's operations were actually being negatively affected by the pharmacy

shortage:

> [W]e have become increasingly concerned regarding the recent trend
> of softer pharmacy sales. We believe CVS is experiencing staffing
> and service issues in its pharmacy, which may have also complicated
> the roll out of its EPIC pharmacy workflow system. Our recently
> completed survey of CVS pharmacies supports this conclusion.
>
> *  *  *
>
> We surveyed 77 CVS pharmacies across the country. Of that group,
> 35% cited labor shortages in the pharmacy and 53% experienced
> problems keeping up with script volume problems. While these
> results may present pharmacist opinions consistent with the
> challenges facing all drug chains, we did find that 41% cited the loss
> of customers due to service levels issues such as wait times.

117.    Based on these concerns, Comeau downgraded his recommendation on CVS stock

from "strong buy" to "hold." The market reacted adversely to this information, causing the

Company's stock price to drop from $54.49 per share on June 14, 2001 to $47.55 per share on June

15, 2001.

35

118.   As detailed herein, this information, based on Comeau's own investigation, was fully consistent with non-public information readily available and actively discussed by senior management at CVS over the entire course of the Class Period and even before. Rather than disclose this information to the market, however, as described above, senior officers of the Company made repeated misleading representations that falsely implied the pharmacist shortage was not a problem for CVS.

119.   It was thus only in response to the Comeau analyst report, and the strong adverse market reaction thereto, that CVS reported on June 27, 2001 that it expected to miss its earnings target for the second quarter, 2001, and identified the pharmacist shortage as the most significant factor why. Even then, CVS couched this disclosure in deceptive language, describing this long-standing problem as being instead " the result of current economic and business trends."

120.   Later on June 27, CVS held a conference call with securities analysts, during which Defendant Ryan stated, *inter alia*:

> Let me talk a little bit about the pharmacist shortage. Obviously, the shortage is an industry issue and its affecting all of us, all of our competitors. But we have had a severe shortage in four of our major markets. And these markets have—we have—we are the significant leader in these markets. On average, these four markets, we have over a 30-plus share. Markets are Washington– metro Washington DC, Hartford, Connecticut, Detroit and Cleveland. And obviously, we have some other isolated areas.
>
> And as a result, we have actually had to close stores or reduce department hours, leading to obvious service issues. We closed – reduced hours on . . . pharmacy departments on Sunday. We've shortened hours on Saturday. And to be quite honest, we could have lived with this and I think our customers would understand it to a point.

36

> Where we've had the problem is where we've had to actually close some pharmacy departments during the weekday because we didn't have pharmacists to cover the shifts. So a customer may walk into a CVS store in some of these markets and the pharmacy department may be closed at one o'clock and not open again until four o'clock–obviously unacceptable obviously impacting our pharmacy comps.

**The Full Truth Is Revealed**

121.    On October 30, 2001, the last day of the Class Period, CVS shocked the market by issuing a press release announcing that CVS's financial results for the third quarter of 2001 had fallen substantially from the previous year. In this regard, Defendants reported that net earnings were down 16.0% from the third quarter of 2000. In response to this negative information, defendant Ryan commented:

> We are disappointed with our results for the third quarter and committed to taking the necessary actions to improve performance and restore healthy long-term growth. With that in mind, we have completed a thorough analysis of our business and are today announcing a series of actions to best position CVS for the future.
>
> *    *    *
>
> The Company's plan includes a series of sales generation and expense reduction initiatives, including:
>
>     -- Undertaking a store consolidation program, under which approximately 200 stores will be closed during the first quarter of 2002
>
>     -- Closing one of CVS' ten distribution facilities and one of ProCare's two mail order facilities.
>
> *    *    *
>
> In connection with certain of these actions, the Company expects to record a pre-tax restructuring and asset impairment charge of approximately $350 million, of $0.56 per diluted share, in the fourth quarter of 2001.

37

122.   The market reacted immediately to this additional surprising announcement.  On October 30, 2001, the price of CVS stock fell $7.72 to $23.90 per share, a one-day decrease of 24%, and a decrease of 61% from the Class Period high of $62.10 per share reached on March 3, 2001.

123.   As set forth above, throughout the Class Period, Defendants knew or were reckless or negligent in not knowing that the Company's stock price was artificially inflated based on the facts as alleged herein.

**Defendant Ryan Sold With Adverse Inside**
**Information During the Class Period**

124.   Defendant Ryan, as CEO of the Company, was a member of the BPC throughout the Class Period.  As such, he had full access to and thus knew or should have known all of the adverse inside information and earnings manipulation detailed above.

125.   Nonetheless, on May 22 and 23, 2001, Defendant Ryan, while in possession of this material adverse inside information, sold 95,040 shares of CVS stock, garnering $3.54 million in proceeds.  This sale represented approximately 27% of Ryan's total CVS holdings.

126.   Such insider sales constituted a further breach of Defendant Ryan's fiduciary duty to Plan members.

**Defendants Knew Or Should Have Known That CVS Common**
**And Preference Stock Were Not Prudent Plan Investments**

127.   At all relevant times, Defendants knew or should have known that CVS was engaged in the questionable accounting practices and earnings manipulation and, moreover, was facing material operational problems and risks never disclosed to the public or Plan participants, which made CVS common and/or preference stock imprudent Plan investments.

128.    At a minimum, CVS, the Director Defendants, the Plan Committee, the ESOP Administrators and the 401(k) Plan Administrator breached their fiduciary duties by failing reasonably and properly to take into account these material adverse factors that put CVS stock at risk, as well as the fact that CVS stock was inflated in value when determining the prudence of continuing to invest and hold Plan assets in CVS common stock and/or CVS Preference Stock, and permit Plan participants to do so as well.

129.    As a result of Defendants' knowledge (or reckless or negligent disregard) of and, at times, participation in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that CVS made to Plan participants did not effectively or reasonably inform Plan participants of the true and known past, immediate, and future dangers of investing in Company stock during the Class Period.

130.    In addition, named and unnamed Defendants, as fiduciaries responsible for monitoring the investment of assets of the Plans, failed to adequately review the performance of the Plan Committee, Administrators of the Plans, and other fiduciaries to ensure that they were fulfilling their fiduciary duties to Plan participants under the Plans and ERISA.

131.    The Company, the Director Defendants, the Plan Committee, Administrators of the Plans, and other unnamed Plan fiduciaries breached their fiduciary duties by failing to conduct appropriate investigation into whether CVS Stock and/or CVS Preference Stock were prudent investments for the Plans and, in connection therewith, failing to provide Plan participants with reasonable and accurate information regarding CVS's improper activities so that participants could make informed decisions regarding CVS stock in the 401(k) Plan, or otherwise failing to reasonably and appropriately protect the Plans and their participants against inevitable losses.

132.     In light of the material adverse facts which Defendants knew or should have known, any reasonable and adequate investigation by Defendants would have revealed to a reasonable fiduciary that continuing to permit investments of CVS common and/or preference stock in the CVS Stock Fund and/or CVS ESOP under these circumstances, was imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants of the Plans against unnecessary losses, and would have made different investment decisions.

133.     Because Defendants knew or should have known that Company stock, and thus CVS Preference Stock, were not prudent investment options for the Plans, they had an obligation to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' continued investment in Company common and/or preference stock.  Their failure to do so constituted a clear breach of their fiduciary duty to the Plans and to participants in the Plans.

134.     Defendants had available to them several different options for satisfying this duty, including:  making appropriate public disclosures as necessary; refusing to purchase additional common stock or to award additional Preference Stock until assured that the wrongdoing at the Company had ceased and all necessary public disclosures had occurred, divesting the Plans of Company stock and/or Preference Stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; or resigning as fiduciaries of the Plans to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plans in connection with the Plans' continued acquisition and holding of Company common and/or preference stock.

135.    Despite the availability of these and other reasonable options, Defendants, in breach of their fiduciary duties, failed to take any action to protect participants from losses as a result of Plan investments in CVS stock and/or CVS Preference Stock during the Class Period.

**Defendants Communicated With Plan Participants
Concerning CVS Stock Offered By The Plan, Yet Failed
To Disclose The Imprudence Of Investment In Company Stock**

136.    Upon information and belief, the Company communicated with employees, including participants in the 401(k) Plan, about the performance, future financial and business prospects of the Company's common stock, a substantial asset of the 401(k) Plan.  During the Class Period, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the 401(k) Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information they knew or should have known concerning investment in the Company's stock.  As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock, and therefore could not make informed decisions regarding their investments in the 401(k) Plan.

137.    As noted above, these SEC filings and related Company statements and releases were inaccurate, incomplete and materially misleading, causing 401(k) Plan participants to purchase, and to hold and maintain, Plan investments in CVS Stock.

138.    These inaccurate, incomplete and materially misleading representations were specifically directed by the Defendants to 401(k) Plan participants.  For example, the Company filed the Form S-8, dated June 22, 2001.  This document, a registration statement relating to over 3.5 million shares of CVS common stock "to be offered pursuant to the 401(k) Profit Sharing Plan of CVS Corporation and Affiliated Companies," specifically incorporated by reference: "(a) The CVS

41

Annual Report on Form 10-K for the fiscal year ended December 30, 2000" and "(b) All other reports filed by CVS pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 . . . since the end of the fiscal year covered by the Annual Report of Form 10-K referred to in (a) above." The Form S-8 was signed by each of the Director Defendants.

139.    As detailed above, the public filings specifically incorporated by reference in the Form S-8, provided to 401(k) Plan participants by Defendants in their capacity as fiduciaries of the 401(k) Plan, contained false and misleading representations resulting in the price of CVS stock being artificially inflated during the Class Period.

140.    The Company, the Director Defendants, the Plan Committee, the Administrators of the Plans, and or the Plan's other individual fiduciaries breached their fiduciary duties by, *inter alia*, failing to provide 401(k) Plan participants with complete and accurate information regarding CVS stock, such that the participants could reasonably, adequately and accurately appreciate the true risks presented by investments in CVS stock and could make informed decisions regarding their investments in the 401(k) Plan.

## CLAIMS FOR RELIEF UNDER ERISA

141.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

142.    ERISA §502, 29 U.S.C. §1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA §409, 29 U.S.C. §1109.

143.    ERISA §409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be

personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

144.    ERISA §404(a)(1)(A) and (B), 29 U.S.C. §1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

145.    These fiduciary duties under ERISA §404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things,

a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance Company stock, to ensure that each investment is a suitable option for the plan; and

b.    A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

43

146.   ERISA §405(a), 29 U.S.C. §1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> "... in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

147.   Plaintiff therefore brings this action under the authority of ERISA §502 for Plan-wide relief pursuant to ERISA §409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendants.

## CAUSATION

148.   The Plans suffered at least millions of dollars in losses because substantial assets of the Plans were imprudently allowed to be put at great risk by Defendants, through investment by the Plan in CVS Stock and/or CVS Preference Stock during the Class Period, in breach of Defendants' fiduciary duties.

149.   Defendants are responsible for losses caused by participant direction of investment in CVS Stock and/or CVS Preference Stock because Defendants breached their fiduciary duties by, *inter alia*, failing to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA §404©), 29 U.S.C. §1104(c), and the regulations promulgated thereunder.  In addition, Defendants

44

breached their fiduciary duties by concealing material, non-public facts from participants, and providing misleading, inaccurate, and incomplete information to them regarding the nature of the Company's illicit activities and therefore the real ongoing earnings levels of CVS, as well as the true underlying values of CVS stock offered by the 401(k) Plan, misrepresenting its soundness as investment vehicles. As a consequence, 401(k) Plan participants could not and did not exercise independent control over their investments in CVS stock, and Defendants remain liable under ERISA for losses caused by such investment. Likewise, this misconduct resulted in Plan participants receiving artificially inflated CVS Preference Stock in their CVS ESOP and Diversified ESOP Accounts.

150.    Had the Defendants reasonably and properly discharged their fiduciary and/or co-fiduciary duties, including adequately monitoring appointees and the provision of full and accurate disclosure of material facts concerning investment in CVS stock and divesting the Plan of Company stock offered by the 401(k) Plan and/or of CVS Preference Stock offered by the CVS ESOP when maintaining such investment alternatives became imprudent, the Plans would have avoided a substantial portion of the losses that it suffered through its continued investment in these stocks.

151.    Moreover, had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in CVS stock offered by the 401(k) Plan, eliminating this investment alternative when it became imprudent and divesting the Plans from any then-existing investments in this investment alternative and/or in CVS Preference Stock when maintaining such investments became imprudent, the Plans would have avoided a substantial portion of the losses that they suffered through such continued tainted investment.

## COUNT I

**Failure to Prudently and Loyally Manage Plan Assets
(Breaches of Fiduciary Duties in Violation of
ERISA §404 By All Defendants)**

152.    Plaintiff incorporates the allegations contained in the previous paragraphs of this complaint as if fully set forth herein.

153.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

154.    As alleged above the Defendants were all responsible, in different ways and to differing extents, for the selection, maintenance and monitoring of the Plans' investment options, including the option of Company Stock and CVS Preference Stock.

155.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Defendants were responsible for ensuring that all investments in the CVS Stock Fund in the 401(k) Plan and the CVS Preference Stock in the ESOP and Diversified ESOP Account were prudent, and are liable for losses incurred as a result of such investments being imprudent.

156.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would

46

lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan to do so.

157.    The Defendants breached their duties to prudently and loyally manage the Plans' assets.  During the Class Period these Defendants knew or should have known that CVS common stock and/or CVS Preference Stock were not suitable and appropriate investments for the Plans as described herein for either (i) CVS common stock and/or Preference Stock purchased through participant contributions to the 401(k) Plan or contributed to participants in the CVS ESOP, or (ii) CVS common stock and/or Preference Stock accumulated by the Plans through Company matching contributions.   Nonetheless, during the Class Period, these fiduciaries continued to offer the CVS stocks as investment options for the Plan.  Moreover, during the Class Period, despite their knowledge or reckless or negligent disregard of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plans, and indirectly the Plans participants and beneficiaries, from suffering losses as a result of the Plans' investment in CVS common and/or preference stock.

158.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

159.    The Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, making no effort to remedy, and/or knowingly undertaking to conceal, their fellow defendant-fiduciaries' failure to prudently and loyally manage Plans' assets in the exercise of their discretion with respect to the offering Company common and/or preference stock

as investment options in the Plans, despite knowing that such failures were breaches of their ERISA-mandated fiduciary duties.

160.    Defendants named in this Count were unjustly enriched by the fiduciary breaches described in this Count.

161.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

162.    Pursuant to ERISA §502(a), 29 U.S.C. §1132(a) and ERISA §409, 29 U.S.C. §1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**COUNT II**

**Failure to Monitor the Plan Committee and Administrators
of the Plans and Provide Them With Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA
§404 by CVS and the Director Defendants)**

163.    Plaintiff incorporates the allegations contained in the previous paragraphs of this complaint as if fully set forth herein.

164.    At all relevant times, as alleged above, CVS and the Director Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

165.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of CVS and the Director Defendants included the responsibility to monitor other fiduciaries.

166.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries (including, *inter alia,* the Plan Committee and Administrators of the

Plans). In this case, that meant that the monitoring fiduciary, CVS and the Director Defendants, had the duty to:

      a.     Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of Plans' participants.

      b.     Ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed.

      c.     Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job.

      d.     Ensure that the monitored fiduciaries had adequate information and to do their job of overseeing the Plans' investments.

      e.     Ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to investment options of the Plans.

      f.     Ensure that the monitored fiduciaries reported regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

     167.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

168.    The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

169.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

170.    CVS and the Director Defendants breached their fiduciary monitoring duties by, among other things, (i) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business improprieties alleged above, which made the Company's common and/or preference stock an imprudent retirement investments, and (ii) failing to ensure that the monitored fiduciaries appreciated the risks inherent in the substantial investment by rank and file employees in undiversified employer stock funds. CVS and the Director Defendants knew or should have known of the underlying problems and resultant artificial inflation of the value of CVS common and/or preference stock, and thus, that the fiduciaries they were responsible for monitoring were imprudently allowing the Plans to continue offering CVS common and/or preference stock as Plan investments, and continuing to invest in CVS common and/or preference stock when it no longer

50

was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

171.    In addition, as a result of its inappropriate practices and implicit knowledge thereof, CVS and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of CVS that they knew or should have known that these fiduciaries needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, CVS and the Director Defendants breached their monitoring duties under the Plans and ERISA.

172.    CVS and the Director Defendants are liable as a co-fiduciaries because: (i) they knowingly participated in the fiduciary breaches by their fellow defendant-fiduciaries in the activities implicated in this Count; (ii) they enabled the breaches by these defendants; and/or (iii) they had knowledge of these breaches yet failed to make any effort to remedy them.

173.    These defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

174.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

175.    Pursuant to ERISA §502(a), 29 U.S.C. §1132(a) and ERISA §409, 29 U.S.C. §1109(a), defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

51

### Failure to Provide Complete and Accurate Information
### to Plan Participants and Beneficiaries
### (Breaches of Fiduciary Duties in Violation of §§404
### and 405 of ERISA By All Defendants)

176.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

177.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C.§1002(21)(A).

178.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications and material disclosures.

179.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding plan investment options, such that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan.  This duty applies to all 401(k) Plan investment options, including investment in CVS stock.

180.    As alleged herein, Defendants made repeated communications in their capacity as fiduciaries to 401(k) Plan participants which were false and misleading and/or materially omissive regarding material financial and operation problems the Company was facing.    These communications included the Form S-8, filed by CVS in June, 2001, and signed by each of the Director Defendants.

181.    Because investment in the CVS investment fund was not diversified (*i.e.*, the Defendants chose to invest the 401(k) Plan's assets, and/or allow those assets to be invested in CVS common stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to CVS stock.

182.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding CVS common stock, CVS's financial and business improprieties, public misrepresentations and inflated earnings, and the consequent artificial inflation of the value of CVS common and/or preference stock and, generally, by conveying inaccurate information regarding the soundness of CVS stock and the prudence of investing retirement contributions in CVS stock. These failures were particularly devastating to the Plans and their participants; a substantial portion of the 401(k) Plan's assets were invested in CVS common stock and all or substantially all of the ESOP assets were invested in CVS Preference Stock during the Class Period and, thus, losses in these investments had material impact on the value of participants' retirement assets.

183.    Defendants in this Count are also liable as co-fiduciaries because (i) they knowingly (or recklessly or negligently) participated in and undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding CVS stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and/or (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

184.   Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts and omissions of the Defendants in this complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in CVS common and/or preference stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in CVS stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

185.   Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

186.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

187.   Pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) and ERISA §409, 29 U.S.C. §1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of §§404 and 405 of ERISA Against All Defendants)

188.    Plaintiff incorporates the allegations contained in the previous paragraphs of this complaint as if fully set forth herein.

189.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

190.    ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

191.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in the CVS common and/or preference stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made CVS stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company above the interests of the participants with respect to the Plan's investment in Company stock.

192.    In addition, Defendant Ryan breached his fiduciary duty of loyalty by selling CVS common stock during the Class Period while in possession of material adverse inside information, garnering substantial illegal and/or improper profits to himself.

193.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' otherwise participants and beneficiaries, lost a significant portion of their retirement investment.

194.    Pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) and ERISA §409, 29 U.S.C. §1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

195.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been so heavily invested in Company common and/or preference stock.

196.    As a consequence of the Defendants' breaches, the Plans suffered significant losses.

197.    ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA §409, 29 U.S.C. §1109.  Section 409 requires "any person who is a fiduciary ... who breaches any of the ... duties imposed upon fiduciaries ... to make good to such plan any losses to the plan ... ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate ... ."

198.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.

In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

199.     Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, including insider sales, as provided by ERISA §409(a), 29 U.S.C. §1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (iii) reasonable attorney fees and expenses, as provided by ERISA §502(g), 29 U.S.C. §1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and (v) interests on these amounts, as provided by law; and (vi) such other legal or equitable relief as may be just and proper.

200.     Each defendant is jointly liable for the acts of the other defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.     A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to participants of the Plans;

B.     An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans or otherwise as the result of breaches of fiduciary duty;

D.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in CVS common and/or preference stock maintained by the Plans in proportion to the accounts' losses attributable to the decline in the price/value of Company stock;

G.      An Order awarding costs pursuant to 29 U.S.C. §1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. §1132(g) and the common fund doctrine; and

I.    An Order for equitable restitution and other appropriate equitable monetary

relief against the Defendants.

DATED: July 1, 2005

Respectfully submitted,

**LAW OFFICES
BERNARD M. GROSS, P.C.**

By:_____/s_____
Deborah R. Gross (Bar #546151)
100 Penn Sq. East, Suite 450
Philadelphia, PA 19107
Telephone:  215-561-3600
Facsimile:  215-561-3000

OF COUNSEL:

**MORRIS AND MORRIS LLC
COUNSELORS AT LAW**
Karen L. Morris
Patrick F. Morris
4001 Kennett Pike, Suite 300
Greenville, DE 19807Telephone: 302-426-0400
Facsimile: 302-426-0406

**LAW OFFICES OF
BRUCE G. MURPHY**
Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL   32963
Telephone: 828-737-0500