## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES FESCINA, Individually and On Behalf of All Others Similarly Situated, | : : : | |
| | : | Civil Action |
| Plaintiff, | : : | No. 04-12309- JLT |
| vs. | : : | |
| CVS CORPORATION, THOMAS M. RYAN, STANLEY P. GOLDSTEIN, EUGENE APPLEBAUM, W. DON CORNWELL, THOMAS P. GERRITY, MARIAN L. HEARD, WILLIAM H. JOYCE, TERRENCE MURRAY, SHELI Z. ROSENBERG, IVAN G. SEIDENBERG, DAVID RICKARD, ZENON P. LANKOWSKY, ROSEMARY MEDE, and UNKNOWN FIDUCIARY DEFENDANTS 1-100, | : : : : : : : : : : : | |
| Defendants. | : : | |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF
### MOTION FOR APPROVAL OF THE SETTLEMENT
### AND ENTRY OF ORDER AND FINAL JUDGMENT

### I.    OVERVIEW

Plaintiff James Fescina (the "Plaintiff"), by and through undersigned Plaintiff's Counsel,

respectfully moves the Court for entry of an Order and Final Judgment, finally approving the

proposed ERISA Settlement (the "Settlement"), as set forth in the Stipulation and Agreement of

Settlement of ERISA Action, dated July 1, 2004 (the "Settlement Agreement"). As detailed herein,

the Settlement -- entered into following extensive arms-length negotiations between experienced

counsel, well-versed in the strengths and weaknesses of their case -- provides for substantial

monetary and non-monetary benefits to the participants of the CVS 401(k) Profit Sharing Plan (the

"401(k) Plan"), the CVS Corporation and Subsidiaries Employee Stock Ownership Plan (the "CVS ESOP") and the ESOP Diversified Account, (collectively "the ERISA Plans") during the period of December 1, 2000 through October 30, 2001 (the "Class Period").

Specifically, pursuant to the Settlement, on July 11, 2005, Defendants paid into an interest bearing account the amount of $3 million for the benefit of Class members. In addition, the Settlement requires the Company to adopt important governance changes that directly affect how CVS oversees, monitors and administers its ERISA Plans, including the adoption of a formal ERISA Plan Committee Charter, and also imposes on CVS the obligation to separately pay all costs and expenses in providing notice and administering the Settlement. As detailed in the Amended Complaint filed in this action, the alleged breaches of fiduciary duty occurred four years ago. Thus, important to Class members, the Settlement offers the above substantial benefits immediately, foreclosing the significant risks of further delay, added costs and expenses, and the potential for no recovery inherent in the continued litigation of this complex ERISA class action.

The Court preliminarily approved the Settlement, entering the Order Preliminarily Approving Settlement, Conditionally Certifying Class For Purposes of Settlement, Approving Form And Manner of Notice, And Scheduling Hearing on Fairness of Settlement Pursuant to Fed. R. Civ. P. 23(3) (the "Preliminary Order") on July 7, 2005. Thereafter, in accordance with the Preliminary Order, The Garden City Group ("GCG"), designated in the Settlement Agreement as the Claims Administrator, provided notice to class members of the terms and conditions of the Settlement. As testified to in the accompanying Affidavit of Jose C. Fraga Regarding the Mailing of Notice (the "GCG Aff.," attached as Exhibit 1 hereto), GCG sent by first class mail individual notice to 47,047

2

Class members whose names and addresses were provided by CVS, and also separately published a summary notice in *The Wall Street Journal*.

The Court-approved individual notice (the "Individual Notice") specified that the final day for filing objections in connection with the Settlement was August 24, 2005. Neither the Claims Administrator nor counsel for the parties have received a single objection to any of the terms or conditions of the Settlement, or to the proposed plan of allocation. For the reasons set forth herein, Plaintiff respectfully requests that the Court find the Settlement and plan of allocation to be fair, reasonable and adequate, and finally approve them for the benefit of the Class.

## II.    FACTUAL BACKGROUND

On October 29, 2004, based on factual and legal investigation by his counsel, Plaintiff filed his ERISA class action complaint against CVS Corporation ("CVS") and certain individual defendants, including the Board of Directors of CVS. In his complaint, Plaintiff alleged that over the Class Period, Defendants breached their fiduciary duties and otherwise violated ERISA in multiple ways, including by: (i) using employer and employee contributions to the ERISA Plans to purchase CVS stock at times when they knew or should have known that the stock was an unsuitable and imprudent investment for the plans; and (ii) misrepresenting to Plaintiff and other participants in the ERISA Plans the operational and financial status of CVS and, consequently, the value of its stock over the course of the Class Period. The complaint sought recovery from Defendants for losses the ERISA Plans suffered during the Class Period, which Plaintiff alleged were the direct and indirect result of Defendants' breaches of fiduciary duties to participants in the ERISA Plans.

In the months immediately following the filing of the complaint, Plaintiff's Counsel undertook extensive legal analysis of existing ERISA case law, and continued their factual

3

investigation of CVS ERISA issues, including negotiations with Defendants' Counsel regarding the production of plan-related discovery and materials. This work was undertaken in connection with Plaintiff's Counsel's drafting of a proposed Amended Complaint for Breaches of Fiduciary Duty Under the Employee Retirement Income Securities Act (the "Amended Complaint").

On February 11, 2005, Defendants filed a Motion to Consolidate all actions pending against CVS, which included a federal securities class action lawsuit, captioned *In Re CVS Corporation Securities Litigation*, C.A. No. 01-11464-JLT (the "Securities Action"), this ERISA Action, and a derivative litigation, captioned *Krantz v. Ryan, et al.*, C.A. No. 04-12650-REK (the "Derivative Action"). On February 28, 2005, Plaintiff filed his Opposition to Defendants' Motion to Consolidate, arguing against consolidation based on, *inter alia*, the disparity in the progress of the litigation of the three actions. On March 8, 2005, this Court denied Defendants' Motion to Consolidate.

Over the course of the second half of February and early March, 2005, Plaintiff's Counsel successfully negotiated with Defendants' Counsel for the production of thousands of pages of documents -- relevant to the underlying alleged misconduct at issue -- which Defendants had produced previously in connection with a motion for summary judgment in the Securities Action. Plaintiff's Counsel reviewed this documentation with critical emphasis on interpreting the underlying conduct at the Company within the context of ERISA duties and obligations. In particular, Plaintiff's Counsel carefully assessed whether the conduct of the named Defendants, as plan fiduciaries acting in the face of material, adverse information which they knew (or should have known) at the time -- based *inter alia*, on their senior level positions at the Company, and, in certain instances, on their active involvement in the alleged misconduct at issue -- rose to the level of a

4

breach of their fiduciary duties to the plans and plan participants under ERISA. As the result of the careful review and assessment of this extensive document production, as well as of concomitant additional factual investigation and legal research, Plaintiff's Counsel completed the drafting of the Amended Complaint, which was filed with the Court on July 1, 2005.

In mid-April, 2005, after Plaintiff's Counsel had substantially completed review of the document production, the parties began negotiating a potential settlement to the ERISA Action. These negotiations, undertaken over several months, culminated in the execution by the parties and filing with the Court of the Settlement Agreement on July 1, 2005.

## III.    THE SETTLEMENT

### A.    Settlement Negotiations

Plaintiff agreed in principle to settle this case after thorough investigation by his counsel into Plaintiff's claims, the underlying events and transactions alleged in the Amended Complaint, the operation and administration of the ERISA Plans, relevant legal precedent interpreting the provisions of ERISA, and legal and factual issues relevant to ERISA damage theories and calculation methodologies. In addition to the above described discovery, Plaintiff's Counsel also successfully negotiated the production of comprehensive data relevant to the number of participants in the ERISA Plans during the Class Period, and their acquisition and sales of CVS stock both during the Class Period, and, for the ESOP, thereafter. Plaintiff's Counsel consulted with an ERISA fiduciary duty expert and, pursuant to a thorough study of the factual issues and legal principles applicable to the determination of damages within the context of ERISA, also coordinated with a damages expert. It was as the result of the careful analysis of such plan-related data and discovery -- regarding both the limited number of CVS shares in the ERISA Plans, and the timing of the trading of those shares

5

-- that Plaintiff's Counsel were able to determine that the number of damaged shares here at issue were limited -- estimated at approximately 2.236 million, and that actual damages suffered by plan participants here were modest -- estimated at approximately $28.6 million. *See* Section V.B.1. and 4.a. below.

As detailed above, the parties agreed in principle to settle this case only following careful factual and legal analysis by Plaintiff's Counsel, and following lengthy negotiations between the parties, where both sides were in an excellent position to evaluate the strengths and weaknesses of their own and each other's theories and arguments. *Id.*

## B.    The Proposed Plan of Allocation
## the $3 Million Settlement Fund

As described above, the Settlement provides for the distribution of the $3 million settlement fund (plus interest, less any Court approved attorneys' fees and expenses, and any incentive award paid to the named Plaintiff) (the "Net Settlement Fund"). Claims under ERISA are, by the strict provisions of the Act, made for "plan-wide"relief, and the proceeds are paid into such plans as an entity. *See* ERISA §409, 11 U.S.C. §1109. Payments from the Net Settlement Fund made to the benefit of the Plans must therefore be allocated among eligible plan participants in accordance with an approved plan of allocation. In addition to approval of the Settlement itself, Plaintiff therefore also seeks approval of the proposed plan of allocation as being fair, reasonable and adequate to Class members. The plan of allocation was fully described to Class members in the Individual Notice.

### 1.    The Effect of ERISA's Unique Provisions

Because of the unique statutory requirements defining ERISA plans and affecting distributions of proceeds to plan participants, there are significant differences between both the

6

administrative procedures to evaluate claims, and the types of allocation methodologies appropriate in a typical class action versus an ERISA action. In a typical securities, antitrust, or consumer case, class members file proofs of claim. These claims are then reviewed, a decision is made regarding the validity of each, and approved claims are then paid through a claims administrator. This claims process is unnecessary here, principally because there is no need to impose on class members the burden of completing and returning executed proof of claims forms. All the data necessary to the allocation for *all* class members is available from data already in the possession and control of the ERISA Plans themselves. Many class members remain today as current participants in the 401(k) Plan and ESOPs[1], and thus, still have open accounts into which their share of the Net Settlement Fund can be directly deposited. For Class members who have left the ERISA Plans, plan personnel still retain all necessary transactional data to permit the Claims Administrator to calculate the appropriate amount of recovery under the Settlement, and payment, in the form of a check, can then be disbursed as a 401(k) distribution, eligible for roll-over where appropriate, to the Class member's last known address.

### 2.    The Proposed Plan of Allocation

The proposed plan of allocation, agreed to by the parties in the Settlement Agreement, takes into account the parties' informed assessment of the relative strengths and weaknesses of the ERISA claims by plan participants, particularly in light of the timing of Class members' relevant CVS stock acquisitions and sales, and the characteristics of each plan in which such shares were held. Specifically, the allocation plan establishes two groups:

---

[1]    The "ESOPs" means the CVS ESOP and the ESOP Diversified Account, collectively.

7

(i)    CVS 401(k) Plan Participants -- consisting of Class members who held, purchased, acquired, or had contributed CVS common stock in the CVS Stock Fund offered by the 401(k) Plan at any time during the Class Period; and

(ii)    CVS ESOPs Participants -- consisting of Class members who held, purchased, acquired, or had contributed CVS preference stock[2] during the Class Period, and are either still currently participants in the ESOPs, or were vested in those Plans at the time the accounts were terminated.

Based on Plaintiff's Counsel's assessment of the legal and factual risks that each group faces (as described in detail herein at Sections V.B.1. and 4.), Plaintiff's Counsel propose allocating 75% of the settlement fund to cover payment of claims to CVS 401(k) Plan participants, and 25% of the settlement fund to cover payment of claims to CVS ESOPs participants.[3]

The mathematical formulas under which Class members' proportionate shares of the Net Settlement Fund will be calculated are detailed in the Settlement Agreement. The basic concept of this proposed plan of allocation, as described in the Individual Notice, is that the Net Settlement Fund will be shared based on a determination of the relative proportion an individual participant's losses represent to the total losses suffered by that plan. Generally, for the 401(k) Plan, eligible

---

[2]    As explained in the CVS Summary Plan Description, CVS stock acquired in the 401(k) Plan CVS Stock Fund is in the form of CVS common stock. CVS shares acquired or contributed in the ESOPs are in the form of CVS preference shares. Preference shares cannot be traded in the open market. One share of preference stock has the value of 2.314 shares of common stock. For purposes of this calculation, CVS common stock has a guaranteed floor value of $23.10, which means that preference shares have a guaranteed floor value of $53.45.

[3]    The CVS Summary Plan Description states that 401(k) plan members immediately vest in any employee contributions made into the plan. Employer matching contributions vest after five (5) years at the Company.

8

Class members' losses will be calculated based on the absolute decline in the value of their CVS common stock during the Class Period, off-set by the value of any sales of that stock during the Class Period. For the ESOPs, eligible Class members' loses will be calculated based on the absolute decline in the value of their CVS preference shares from the beginning of the Class Period until the termination date of their account, off-set by the value of any sales of such stock on the termination date.

### 3.    The Effect of CVS's Share Price Movement During and Following the Class Period

Based on the price history of the CVS stock over the Class Period, and Plaintiff's Counsel's assessment of the effect this factor had on the ability to demonstrate the existence of compensable ERISA damages (*see, e.g.,* Section V.B.1. below), the proposed plan of allocation requires that to be eligible to recover under the settlement, Class members must meet certain prerequisites:

      (i)    For CVS common stock invested in the CVS 401(k) Plan -- Class members can only recover if they held such stock in their account at the beginning of, or acquired it during the Class Period. Class members *cannot* recover for any common stock sold from their 401(k) Plan account from the beginning of the Class Period on December 1, 2000 through June 14, 2001.[4]

      (ii)    For CVS preference shares invested in the CVS ESOPs -- Class members can recover if they: (i) held such stock in their ESOP account(s) at the beginning of, or acquired

---

[4]      June 15, 2001 is relevant as this was the date of the first public partial disclosure of alleged misconduct at the Company. As such, declines in the trading price of CVS stock from the December 1, 2000 beginning of the Class Period to June 15 were arguably not attributable to the Defendants' alleged breaches of fiduciary duty, and thus, arguably not recoverable under the Settlement.

it during the Class Period; and (ii) their ESOP account(s) were terminated between June 15, 2001 and March 23, 2005. If Class members continued to participate in the CVS ESOP after March 23, 2005, they are not eligible to recover under the proposed settlement, because by that point, CVS common stock price had recovered to pre-Class Period prices above $53.00.

As detailed at Section V.B.1. below, Class members had no discretion over when they could cash out of the ESOP, including moving to any other investment alternatives. These preference shares were only accessible upon the employee's termination or retirement from the Company. With the common stock's recovery to its pre-Class period value in early 2005, it is Plaintiff's Counsel's determination under the facts and circumstances of this case that any ERISA damages to these shares during the Class Period were offset for ESOP participants who continued with the Company after this date. Class members who were terminated or retired in the interim will receive the benefit of the settlement fund in proportion to their individual loss, as provided for under the proposed plan of allocation.

## C.    Other Relief Under the Settlement

As detailed in the Settlement Agreement, in addition to establishing the $3 million settlement fund, the settlement provides for other monetary and non-monetary benefits which offer substantial additional value to plan participants. These additional forms of relief comprise important governance changes at the Company directly relevant to the administration and oversight of the ERISA Plans at CVS, and the separate payment by the Company of all costs for notice and administration of the Settlement.

10

### 1.    Governance Changes at the Company

With respect to governance changes, the Settlement Agreement requires the CVS ERISA Plan Committee to adopt a formal Charter that specifically provides as its principal provisions the following important, delineated obligations and responsibilities. Specifically, the ERISA Plan Committee will:

a.    administer, oversee and monitor the implementation and performance of the ERISA Plans in accordance with all applicable laws, rules and regulations;

b.    appoint necessary and appropriate designated ERISA Plan fiduciaries, including ERISA Plan Administrator(s) and Trustee(s), and oversee and monitor the activities of these ERISA Plan fiduciaries to ensure the effectuation of their responsibilities in accordance with standards of prudence;

c.    oversee the design and implementation of appropriate risk assessment systems, policies and procedures by these designated fiduciaries with respect to the implementation of the ERISA Plans;

d.    have available to it from the Company the financial and personnel resources and authority necessary and appropriate to permit it to discharge its duties and responsibilities (separate from routine administration functions presently paid for out of the Plan funds), including obtaining advice and assistance from internal and external counsel, accountants, auditors and other advisors or consultants as it may determine and select;

e.    be permitted to have up to two of its members attend meetings of the Audit Committee of the Board of CVS;

11

      f.      oversee and monitor on an ongoing basis the effective design and implementation of systems, policies and procedures to ensure the review and assessment of ERISA Plan investment alternatives, administrative matters and disclosure issues in accordance with the legal obligations of plan fiduciaries, in the interest and for the benefit of the ERISA Plan beneficiaries;

      g.      receive, review and assess reports, information and data necessary to ensure the ERISA Plan Committee's sufficient oversight of the operation of the ERISA Plans in conformance with its Charter. This shall include as appropriate attendance at meetings of the Audit Committee of the Board of CVS by up to two members of the ERISA Plan Committee;

      h.      be able to retain, at CVS's expense, any and all experts and/or consultants it deems necessary to perform its functions and responsibilities;

      i.      ensure access to Company financial and operational information necessary to permit it to reasonably and adequately assess the ERISA Plans' participation on an ongoing basis in the offering of Company common and/or preference stock as an appropriate investment option to ERISA Plan participants, including assessment of disclosure related thereto; and

      j.      at least annually, to engage in a self-assessment of the ERISA Plan Committee's operations and functions and to provide, at least annually, to the Audit Committee of the Board, a report of the ERISA Plan Committee's activities and any issues arising therefrom.

In addition, the Settlement Agreement imposes on the Audit Committee of the Board of CVS the obligation to receive periodic reports from the ERISA Plan Committee with respect to the fulfillment of these Plan Committee Charter obligations.

It is the belief of Plaintiff's Counsel, supported by the accompanying Declaration of Mark Johnson (attached as Exhibit 2 hereto), the ERISA and fiduciary duties expert retained by Plaintiff's Counsel, that these governance changes are important, valuable to plan participants, and virtually unprecedented in nature and scope among other approved ERISA settlements around the country. Johnson Dec., ¶28. In accordance with the 401(k) Plan document issued by CVS, the Plan Committee, consisting of at least three individuals directly appointed by the Board, is responsible for the administration and supervision of the Plan. The Plan Committee thus plays a critical role in the safe and efficient operation of the ERISA Plans at CVS.

The ERISA Plan Committee Charter goes well beyond the generalized obligations of "prudent behavior" required under 29 U.S.C. §1104(a)(1) of the ERISA Act (and reflected in CVS's 401(k) Profit Sharing Plan document[5]) to impose specific duties on Plan Committee members. Johnson Dec., ¶¶9-13. Thus, for example, pursuant to the Charter, the members of the Plan Committee are specifically tasked with the responsibility to oversee the design and implementation at the Company of adequate and effective oversight systems, policies and procedures related to compliance oversight of critical aspects of plan administration, including determination of investment alternatives and disclosure issues. *Id.*, ¶14. Plan Committee members are also specifically tasked with responsibility to oversee the design and implementation of adequate and

---

[5]     Paragraph 10.08 of the Plan, entitled "Prudent Conduct," provides that "The Committee shall use that degree of care, skill, prudence and diligence that a prudent man acting in a like capacity and familiar with such matters would use in his conduct of a similar situation."

13

effective risk assessment systems, policies and procedures applicable to the ERISA Plans. *Id.,* ¶15.

Imposing the responsibility to ensure adequate compliance and risk management procedures and systems are in place at CVS to oversee the activities of the ERISA Plans provides important tools to plan fiduciaries to enable them to pro-actively monitor and track these critical areas, allowing for better and more timely decision making on behalf of the ERISA Plans going forward. Johnson Dec., ¶¶16-18. In addition, the Charter imposes specific duties on the Committee in connection with the on-going assessment of the propriety and advisability of offering, and continuing to offer CVS stock in the future as an investment option to plan participants -- the underpinning claim at issue in Plaintiff's ERISA complaint. *Id.,* ¶16.

To help ensure Plan Committee members are fully informed of current financial and operational conditions at the Company -- information vital to their ability to make informed fiduciary decisions, such as whether to continue to offer CVS stock as an investment option -- the Charter specifically empowers Committee members with, *inter alia*: (i) the right to attend meetings of the Audit Committee of the Board; (ii) access to all reports, information and data necessary to ensure they can effectively perform their duties; and (iii) the power to retain -- at CVS's expense[6] -- any experts and/or consultants necessary to allow them to perform their functions and responsibilities. Johnson Dec. ¶¶19-22.

---

[6]      The 401(k) Profit Sharing Plan provided at paragraph 10.02 that the Plan Committee "may retain counsel, employ agents and provide for such clerical, accounting, and consulting services as they may require in carrying out the  provisions of the Plan." Specifying under the proposed Charter that the costs of such retention will be treated as an expense of the Company and *not* of the plans (and thus, indirectly, of plan participants) constitutes an important additional benefit. Johnson Dec., ¶21.

The Charter further imposes on Plan Committee members the requirement to undertake a rigorous self-assessment of the Committee's operations and functions at least annually, and to report on the Committee's activities and any issues arising therefrom to the Audit Committee of the Board. Johnson Dec., ¶23. This obligation, combined with the requirement to attend meetings of the Audit Committee of the CVS Board, as appropriate, will facilitate important and effective lines of communication between this critical Board committee and the individual fiduciaries specifically tasked by the Board to administer and oversee CVS's ERISA Plans. *Id.*, ¶24. This important tie-in with the Audit Committee of the Board is further reflected in the Settlement in that the Audit Committee of the Board now assumes oversight responsibility over the performance of the Plan Committee in the execution of its enumerated duties and responsibilities under the Charter. *Id.*, ¶25.

As reflected in the Declaration of Plaintiff's ERISA expert, what has been designed and agreed to under the settlement reflects critical elements of a 'best-in-class' compliance and risk management system at CVS. Johnson Dec., ¶26. The Plan Committee has expressly agreed to undertake enumerated oversight and monitoring responsibilities for the investment function and administration of the CVS ERISA Plans, and has been expressly assured access to all necessary information and resources on a continuing basis going forward to assess plan operations and investment options, in particular in connection with the offering of CVS stock. *Id.*, ¶¶27-28. The fact that the Plan Committee has agreed to accept these express obligations, Plaintiff's Counsel respectfully submit, provides an important component to the fostering of an environment at CVS where effective oversight and attention to the operation, administration and investment processes of the CVS ERISA Plans will be emphasized.

15

**2.    Payment of Notice and Administration Costs and Expenses**

Finally, the Settlement requires CVS to pay, separate from the $3 million settlement fund,

all costs and expenses involved in providing notice and administering the Settlement, a significant

monetary benefit to Class members in that it helps to preserve the settlement fund for actual

distribution to plan participants.  These costs are currently estimated at between $200,000 and

$250,000.

**IV.    THE ERISA CLASS SHOULD BE FINALLY CERTIFIED**

In the Preliminary Order, the Court preliminarily certified the Settlement Class. Plaintiff now

seeks final certification of the Settlement Class pursuant to Fed. R. Civ. P. 23(b)(1) and/or (b)(2).

The Class defined in the Settlement Agreement includes:

> all persons, other than persons who are named as Defendants in the
> Amended Complaint and their immediate family members, who were
> participants or beneficiaries under the ERISA Plans during any
> portion of the Class Period (December 1, 2000 - October 30, 2001)
> and who held, purchased, acquired or had contributed CVS Stock in
> their plan account(s) at any time during the Class Period.

The Court may certify the proposed Class upon finding the action satisfies the four

prerequisites of Rule 23(a), and one or more of the three prerequisites of 23(b).  *See generally*

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-629 (1997); *In re Prudential Ins. Co. Of Am.*

*Sale Practices Litig.*, 148 F. 3d 283, 308 (3rd Cir. 1998), *cert. denied*, 525 U.S. 1114

(1999)(certifying class for settlement purposes).

Based on the structure of ERISA plans and the nature of the claims brought in ERISA class

action litigations, courts have routinely found that the requirements for class certification are easily

met in the context of ERISA class action litigation.  *See, e.g., In re Syncor ERISA Litigation*, 227

16

F.R.D. 338 (C.D. Calif. March 28, 2005); *In re CMS Energy-ERISA Litigation*, 225 F.R.D. 539 (E.D. Mich. Dec. 27, 2004); *In re WorldCom, Inc. ERISA Litigation*, 2004 U.S. Dist. LEXIS 19786 (S.D.N.Y. Oct. 4, 2004); *Furstenau v. AT&T Corp.*, 2004 U.S. Dist. LEXIS 27042 (D. N.J. Sept. 2, 2004); *Rankin v. Rots*, 220 F.R.D. 511 (E.D. Mich. 2004); *Nelson v. IPALCO Enterprises, Inc.*, 2003 U.S. Dist. LEXIS 26392 (S.D. Ind. Sept. 30, 2003); and *In re IKON Office Solutions, Inc. Securities Litigation*, 191 F.R.D. 457 (E.D. Pa. 2000), all of which certified 401(k) company stock classes in an adversarial setting;, and *In re Global Crossing ERISA Litigation*, 225 F.R.D. 436 (S.D.N.Y 2004); *Reinhart v. Lucent Technologies, Inc.*, 327 F. Supp 2d 426 (D.N.J. March 15, 2004); and *Kolar v. Rite Aid Corp.*, 2003 U.S. Dist. LEXIS 3646 (E.D. Pa. Mar 11, 2003), all of which certified 401(k) company stock classes in the context of settlement.

## A.    The Proposed Class Satisfies the Requirements of Fed. R. Civ. P. 23(a)

### 1.    Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." While there is no *per se* rule for establishing numerosity, the general rule in Massachusetts is that "a 40 person class is 'generally found to establish numerosity.'" *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 307 (D. Mass. 2004); *see also Rodrigues v. Members Mortgage Co., Inc.*, 226 F.R.D. 147, 150 (D. Mass. 2005)(*citing McLaughlin*); *In re Carbon Black Antitrust Litig.*,2005 U.S. Dist. LEXIS 660 (D. Mass. Jan. 18, 2005)(numerosity is not a difficult standard to satisfy, and allegations of hundreds of purchasers throughout the country satisfies the numerosity requirement); *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003). As noted above, the Claims Administrator mailed out Individual Notices to over 47,000 prospective

17

Class members in this case. *See* GCG Aff., ¶6. Plaintiff's allegations regarding numerosity easily satisfy the tenets of Massachusetts case law, and Plaintiff has clearly established numerosity.

**2.    Commonality**

As many courts have recognized, "commonality, or shared issues of law and fact" under Rule 23(a)(2) "is not a high burden." *See, e.g., Mullen v. Treasure Chest Casino LLC*, 186 F. 3d 620, 625 (5th Cir. 1999). Commonality does not require a showing that the interests and claims of the Class members are identical; "the commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative Class members." *In re Carbon Black*, 2005 U.S. Dist. LEXIS 660, *48; *see also Forbush v. J.C. Penny Co., Inc.*, 994 F. 2d 1101, 1106 (5th Cir. 1993).

Common questions abound in ERISA cases involving alleged breaches of fiduciary duties. Plaintiff and all Class members are similarly situated in their need to establish answers to these questions. "In general, the question of defendant's liability for ERISA violations is common to all Class members because a breach of fiduciary duty affects all participants and beneficiaries." *Banyal v. Mazur*, 205 F.R.D. 160, 163 (S.D.N.Y. 2002). Consequently, in the ERISA context, courts repeatedly have held that such questions satisfy Rule 23(a)'s commonality requirement. *See, e.g., Rankin*, 220 F.R.D. at 518 (common questions include, among others, whether Defendants were fiduciaries of the plan and whether defendants breached their fiduciary duties").

Commonality is easily met here. Defendants' alleged violations of ERISA arise from a common nucleus of operative facts -- Defendants' actions and/or failures to act with respect to the Plans, and the fact Class members have been similarly injured by these common breaches of

18

fiduciary duty. The Amended Complaint lists multiple common issues of fact and law concerning the proposed Class, including:

> (i)    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

> (ii)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

> (iii)    whether Defendants violated ERISA; and

> (iv)    whether the members of the Class have sustained damages, and, if so, what is the proper measure of damages.

Each of these issues apply equally to all Class members. Where, as here, there are numerous common issues of fact and law, the commonality requirement of Rule 23(a)(2) is plainly satisfied.

### 3.    Typicality

The typicality requirement examines whether the proposed class representative has the same interests and seeks a remedy for the same injuries as other class members. *See, e.g., E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). However, there is no requirement that the circumstances of the named plaintiff and the potential class be entirely identical. As long as the class representative's claims are "reasonably coextensive with those of absent class members, typicality if established." *Hanlon v. Chrysler Corp.*, 150 F. 3d 1011, 1020 (9th Cir. 1988); *see also Becher v. Long Island Lighting Co.*, 164 F.R.D. 144, 151 (E.D.N.Y. 1996). The critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and/or share the same legal theory, factual

differences will not defeat typicality. 5 *James Wm. Moore, et al., Moore's Federal Practice*

§23.24[4](3d ed. 2000).

Likewise, difference in damages among Class members will not defeat typicality. As the

court in *IKON* explained:

> Even if there are significant differences in the damages that may be
> claimed by those who acquired stock based on misrepresentations and
> those who held stock based on misrepresentations, both groups must
> prove the same core issues: whether there were misrepresentations
> and whether the defendants even acted as fiduciaries.

*Id.* 191 F.R.D. at 465; *see also Walsh v. Northop Grumman Corp.*, 162 F.R.D. 440, 445 (E.D.N.Y.

1995)(finding the issue of damages is not germane to a Rule 23 inquiry). Here, the named Plaintiff

was a participant in the ERISA Plans, and held and acquired CVS stock for his Plan account(s).

Plaintiff seeks recovery for the ERISA Plans as a whole, based on Defendants' conduct over the

course of the Class Period, which affected all plan participants similarly. Thus, Plaintiff's claims

are completely in line with the claims of other Settlement Class members, and so meet the typicality

requirement. *IKON*, 191 F.R.D. at 465 (finding typicality of claims where "the named plaintiffs and

the putative class would necessarily allege a similar course of conduct: that IKON and the individual

defendants failed to provide accurate information in violation of ERISA obligations").

Further, because of ERISA's unique standing and remedial provisions, each class member

seeks, and is entitled to plan-wide relief. ERISA §409(a), 29 U.S.C. §1109(a) (liability for breach

of fiduciary duty is to the plan): ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) (authorizing plan

participant to sue for breach of fiduciary duty under §409(a)); *see also Kayes v. Pac. Lumber Co.*,

51 F. 3d 1449, 1463 (9th Cir. 1995), *cert. denied*, 516 U.S. 914 (1995). With each Class member

stating the same claim, premised on the same conduct, and seeking the same relief, there can be no

credible doubt that the claims asserted by members of the Class are sufficiently typical for purposes of Rule 23(a)(3).

### 4.    Adequacy

Rule 23(a)(4) requires that class representatives fairly and adequately protect the interests of the class they seek to represent. There are two prongs to this requirement. The representatives must have: (i) interests that are not antagonistic to the interest of other members of the class; and (ii) retained attorneys who are qualified, experienced and able to conduct the litigation. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975). These requirements are easily met here, where Plaintiff "seek[s] to have the fiduciaries 'personally restore to the Fund any losses incurred'... [and] the named Plaintiff[']s [] interests are the same as those of the absentee class members: all seek to increase the value of the Fund." *Kane v. United Independent Union Welfare Fund*, 1998 U.S. Dist. LEXIS 1965, *21 (E.D. Pa. 1998). Clearly, the Named Plaintiff's interests are aligned with those of the Class, and he has retained qualified counsel with extensive experience in representing plaintiffs in complex class action litigation.

As demonstrated by the above, Plaintiff has thus fully satisfied each of the requirements of Rule 23(a).

### B.    The Proposed Settlement Class also Fully Satisfies The Requirements of Rule 23(b)(1) and (b)(2)

#### 1.    Individual Actions Would Establish Incompatible Standards of Conduct or Would be Dispositive of the Interests of Absent Class Members

A class may be certified under Rule 23(b)(1) if, in addition to meeting the requirements of Rule 23(a), the prosecution of separate actions by individual class members would create the risk

of inconsistent adjudications, which would create incompatible standards of conduct for the

defendants, or would, as a practical matter, be dispositive of the interests of absent class members.

The district court in *In re: ENRON Corp. Securities, Derivative & ERISA Litigation*, quoting the

Advisory Committee Notes to the Federal Rules of Civil Procedure, found:

> The Advisory Committee Note states that certification under Rule
> 23(b)(1)(B) is appropriate in "an action which charges breach of trust
> by an indenture trustee or other fiduciary similarly affecting the
> members of a large class of security holders or other beneficiaries,
> and which requires an accounting or like measures to restore the
> subject of the trust." *See, e.g., Godschall v. The Franklin Mint,* No.
> 01-CV-6539, 2004 WL 2745890, *3 (E.D.Pa. Dec.1, 2004)("When
> a breach of fiduciary duty is at issue, any individual adjudication
> regarding the breach would necessarily affect the interests of others"
> and "[t]herefore it is appropriate to certify the class pursuant to Rule
> 23(b)(1)(B).").

*Id.*, 2005 WL 1330787 at *22 fn.3. (S.D. Texas, May 24, 2005). Based on the nature of ERISA

litigation, and the generalized allegations of breach of fiduciary claims it entails, courts have

routinely certified plaintiff classes under Rule 23(b)(1) in ERISA cases. For example, the *IKON*

court observed:

> Fed.R.Civ.P. 23(b)(1).   That is, 23(b)(1)(A) considers possible
> prejudice to the defendants, while 23(b)(1)(B) looks to possible
> prejudice to the putative class members. *See Bunnion,* 1998 WL
> 372644, at *13. Certifications under either subsection are common in
> [ERISA] labor cases such as this one because of the defendants'
> 'unitary treatment' of putative class members. *Id.; see also* Fed.R.
> Civ.P. 23 advisory comm. notes (stating that certification under
> 23(b)(1) is appropriate in cases charging breach of trust by a fiduciary
> to large class of beneficiaries.
>
>                 \*   \*   \*
>
> The court agrees that, given the nature of an ERISA claim which
> authorizes plan-wide relief, there is a risk that failure to certify the
> class would leave future plaintiffs without relief. *See, e.g., Feret,*

22

> 1998 WL 512933, at *13; *Bunnion,* 1998 WL 372644, at *14; *Kane
> v. United Indep. Union Welfare Fund,* Civ. A. No. 97-105, 1998 WL
> 78985, at *8-9 (E.D.Pa. Feb. 24, 1998). There is also risk of
> inconsistent dispositions that would prejudice the defendants:
> contradictory rulings as to whether Ikon had itself acted as a
> fiduciary, whether the individual defendants had, in this context,
> acted as fiduciaries, or whether the alleged misrepresentations were
> material would create difficulties in implementing such decisions.

*Id.*, 191 F.R.D. at 466. As demonstrated by the above, certification of the proposed Class under Rule

23(b)(1) is appropriate.

### 2.    Defendants Have Acted or Refused to Act on Grounds Generally Applicable to the Class, and Injunctive Relief for the Class as a Whole is Appropriate

A class may be certified under Rule 23(b)(2) if, in addition to meeting the requirements of

Rule 23(a), "the party opposing the class has acted or refused to act on grounds generally applicable

to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief

with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

Plaintiff's claims are based on conduct by Defendants that is generally applicable to the Class

as a whole. Plaintiff alleges that Defendants breached their fiduciary duties to the Plans (and thus,

to their participants) by, *inter alia*: (i) failing to ensure that Company common and preference stock

were prudent investments for the Plans over the Class Period, in light of material, non-public adverse

information they knew or should have known; (ii) misrepresenting material information concerning

the value of Company stock and the prudence of investing Plan assets in the such stock; and (iii)

failing to disclose material information regarding the value of Company stock, and the prudence of

investing Plan assets in such stock. These fiduciary breaches were directed to the ERISA Plans as

a whole, not specific class members or even a subset of class members. Indeed, ERISA's remedial

provisions, including restoration of the Plans' losses, are, by definition, plan-wide remedies. *See, e.g., Berger v. Xerox Corp.*, 338 F. 3d 755, 764 (7th Cir. 2003)(approving class certification under Rule 23(b)(2) in ERISA breach of fiduciary duty case); *Bublitz v. E.I. du Pont de Nemours & Co.*, 202 F.R.D. 251, 259 (S.D. Iowa 2001)(granting certification of Rule 23(b)(2) class in ERISA breach of fiduciary duty case).

Thus, it cannot be disputed that Defendants' alleged misconduct was "generally applicable to the class." *See Amara v. CIGNA Corp.*, 2002 WL 31993224 at *4 (D. Conn. 2002)(claim for plan-wide relief under ERISA falls squarely within the purview of subsection (b)(2); *see also LaFlamme v. Carpenters Local #370 Pension Plan*, 212 F.R.D. 448, 456-57 (N.D.N.Y. 2003)(certifying ERISA class under (b)(2) where plaintiffs challenged defendants' conduct generally applicable to the class, and sought declaratory relief that defendants had violated ERISA). Accordingly, Plaintiff's claims are also properly certified under Rule 23(b)(2).

## C.     The Proposed Settlement also Satisfies the Requirements of Rule 23(g)

Rule 23(g) requires a court that certifies a class under Rule 23 to also appoint class counsel. The purpose of the Rule is to ensure that counsel appointed to serve as class counsel "must fairly and adequately represent the interests of the class." To comply with this requirement, the court must examine the capabilities and resources of plaintiff's counsel. To assist the court in this process, the Rule sets forth specific factors the court must consider in making such an appointment:

- the work counsel has done in identifying or investigating potential claims in the action;

- counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action;

24

- • counsel's knowledge of the applicable law; and

- • the resources counsel will commit to representing the class.

An assessment of the history of this litigation and the work performed by Plaintiff's Counsel on behalf of Plaintiff and the Class amply demonstrates that they have fully, fairly and adequately represented the best interests of the Class here. In an efficient and thorough manner, they performed substantial work in identifying, investigating and pleading potential claims in this action, and comprehensively refined those allegations in the Amended Complaint. Plaintiff's Counsel's efforts on behalf of the Class have included, *inter alia*, examining publicly available information, reviewing thousands of pages of documents obtained in the course of discovery, negotiating for and assessing extensive additional computer data specific to the ERISA Plans regarding membership size and number of CVS share purchases during relevant time periods, and consulting with damages and ERISA and fiduciary duties experts. Moreover, all of this work was undertaken on a fully contingent basis, with no assurances of any compensation ultimately being paid.

Plaintiff's Counsel have substantial experience and expertise in handling large and complex class actions litigations. Plaintiff's Counsel have consistently demonstrated knowledge of the specific legal principles presented in this case. Finally, Plaintiff's Counsel have devoted appropriate resources to this litigation, including the efficient delegation of work and responsibility among firms and attorneys. Plaintiff's Counsel respectfully submit that the Court may appropriately find that the requirements of Rule 23(g) are satisfied, and that Plaintiff's Counsel should be formally appointed as class counsel here.

### D.    Notice

Plaintiff's Counsel proposed that both individual and summary notice be given to Class members. The purpose of class notice is to fulfill the requirements of due process, alerting and informing Settlement Class members of the Settlement, and of their opportunity to appear and be heard at the fairness hearing. In order to satisfy due process, notice to class members must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Notice should also provide a "very general description of the proposed settlement." *Weinberger v Kendrick*, 698 F. 2d 61, 70 (2d Cir. 1982).

Pursuant to the Preliminary Order, on or about July 15, 2005, Individual Notice was sent by first class mail to approximately 47,047 prospective Class members. GCG Aff., ¶¶3, 6. On July 28, 2005, the Court approved summary notice was published in *The Wall Street Journal. Id.*, ¶6. In addition, a copy of the Individual Notice -- along with other documents relevant to the case and the Settlement, including the Settlement Agreement -- were also posted on the webpage set up by the Claims Administrator in this case. *Id.*, ¶5. There have been over 10,000 hits to this webpage as of August 26, 2005. *Id.* Plaintiff and his counsel respectfully submit that in this case, the notice provided was not merely "appropriate," but rather was the "best notice practicable."

## V.    THE SETTLEMENT SHOULD BE APPROVED
## AS FAIR, REASONABLE AND ADEQUATE

### A.    The Standards Governing the
### Approval of Class Action Settlements

The federal courts have long expressed a preference for the negotiated resolution of litigation. *See, e.g., Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims

are favored by the courts."); *Durrett v. Housing Auth. Of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) (noting "the clear policy in favor of encouraging settlements") (citations omitted); *In re First Commodity Corp. Customer Accounts Litig.*, 119 F.R.D. 301, 313 (D. Mass. 1987) (noting that "settlements are favored"). The judicial policy of promoting settlements is especially strong with respect to complex class actions, because they invariably result in the expenditure of substantial resources by the parties and the courts. *See, e.g., In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) ("Indeed, there is a 'general policy favoring the settlement of litigation'. . . . This is particularly true of class actions." *quoting Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)).

The judicial preference for promoting appropriate settlements operates in concert with the significant role that courts must play in protecting the interests of class members. Thus, a court should approve a class action settlement only after determining it to be fair, reasonable and adequate from the perspective of the class. *See, e.g., Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 7 (1st Cir. 1999) ("In these situations, courts assess whether the settlements are fair, reasonable and adequate."); *City Partnership Co. v. Atlantic Acquisition L.P.*, 100 F.3d 1041, 1043 (1st Cir. 1996) ("A district court can approve a class action settlement only if it is fair, adequate and reasonable."); *In re First Commodity Corp. Customer Accounts Litig.*, 119 F.R.D. 301, 313 (D. Mass. 1987); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 105 (D.R.I. 1996).

Consistent with this general precept, courts assess the fairness and adequacy of proposed class action settlements by considering both their substance, and the process that led to the parties' arrival at the proposed compromise. No "single inflexible litmus" test governs whether a proposed settlement is fair. Rather, a court must make a "studied review of a wide variety of factors bearing

27

on the central question of whether the settlement is reasonable in light of the uncertainty of litigation." *Bussie v. Allmerica Financial Corp.*, 50 F.Supp.2d 59, 72 (D. Mass. 1999). *See also M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822-23 (D. Mass. 1987) ("there is a series of factors which I have felt obliged to consider and have considered in determining that this proposed settlement is fair and reasonable and adequate").

Specifically, courts in this Circuit have weighed the following factors, among others, in assessing whether a proposed class action settlement is fair, reasonable and adequate, and should be approved:

- the potentially significant obstacles to a recovery;
- the complexity and likely duration of the litigation;
- the stage of the proceedings at which the settlement was reached;
- the amount of the settlement in light of the risks of litigation;
- whether the settlement was reached after arm's length negotiations;
- the opinion of qualified counsel concerning the fairness of the settlement; and
- the reaction of the class to the proposed settlement.

*See, e.g., Bussie*, 50 F. Supp.2d at 76-78; *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 67-72 (D. Mass. 1997); *Fleet/Norstar*, 935 F. Supp. at 105; *M. Berenson Co.*, 671 F. Supp. at 822-23.

Courts, however, have cautioned that none of these factors are dispositive, and that different factors may carry greater or lesser importance or significance to the court's analysis under the particular circumstances of any given case. *See, e.g., Torrisi v. Tucson Elec. Power Co.*, 8 F.3d

28

1370, 1376 (9ᵗʰ Cir. 1993). An assessment of these relevant factors fully supports the Court's final approval of the proposed Settlement here.

**B.      An Assessment of Relevant Factors Demonstrates that the Settlement is Fair and Reasonable**

As logic would dictate, many of the above-enumerated factors overlap and intertwine with each other in an effort to provide the court a multi-faceted assessment of the litigation and proposed settlement. Each of the factors the court considered in *Bussie* is considered in detail below.

**1.      Potentially Significant Obstacles to Recovery**

Plaintiffs in ERISA litigations typically face unique obstacles to recovery. Demonstrating that the decision by ERISA plan fiduciaries to either continue to hold company stock in a 401(k) plan, or to continue to make company stock an investment option for plan participants constitutes a breach of fiduciary duty can prove difficult. This is particularly true under the present circumstances, where the Company stock enjoyed a dramatic increase in value over the several years preceding the Class Period (supporting arguments as to the proven long-term benefits for retaining the stock), and the alleged financial fraud, even if proven to have occurred, would have faced substantial materiality challenges. Plaintiff here would face the significant obstacle at trial of not only proving that alleged misconduct occurred, but also that it was material to CVS's consolidated financial position -- both facts hotly disputed by Defendants.

Plaintiff's ability to make such a showing would arguably be substantially more difficult to achieve within the context of the Company ESOPs -- which are statutorily established funds, set up for the express purpose of acquiring and holding company stock. As the First Circuit recognized in *Lalonde v. Textron*, 270 F.Supp.2d 272, 278 (D.R.I. 2003):

> ESOPs are unlike other benefit plans, because they have competing purposes which, at times, can be in tension with one another. Any allegation of breach of a fiduciary duty must be considered in light of the special nature of ESOPs. An ESOP is an ERISA plan that invests primarily in "qualifying employer securities," which typically are shares of stock in the employer that creates the plan. 29 U.S.C. §1107(d)(6)(A). In creating ESOPs, Congress sought to develop plans that would function as both "'an employee retirement benefit plan and a 'technique of corporate finance' that would encourage employee ownership' "of a company. *Kuper*, 66 F.3d at 1457 (quoting *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir.1992)). As a result of these dual purposes, ESOPs are not intended to guarantee retirement funds, and they place employee retirement assets at a greater risk than the typical diversified, ERISA-regulated plan. *See Moench*, 62 F.3d at 568.

Courts have thus recognized under appropriate circumstances a clear presumption in favor of fiduciaries' deciding to buy and hold company stock in an ESOP or ESOP-related ERISA plan. *Id.* This presumption has been read by some courts to require a heightened showing of the patently deleterious nature of the wrong to overcome such a presumption. *Id.*, 270 F.Supp.2d at 280("Courts have held that an ESOP fiduciary's presumption of reasonableness may be overcome when a precipitous decline in the employer's stock is combined with evidence that the company is on the brink of collapse or undergoing serious mismanagement. (Citations omitted.)").

As reflected by the above, Plaintiff here faced substantial obstacles in demonstrating the alleged misconduct occurred, that the ERISA Plan fiduciaries knew (or should have known) of its occurrence in a timely manner over the course of the Class Period, and that the misconduct was so egregious that the failure to sell off CVS stock from the various plans constituted a breach of their fiduciary duties.

An additional obstacle to recovery would have been the calculation of damages. ERISA case law is unsettled in this area. The facts of this case highlight the problem Plaintiff would have faced.

30

CVS's stock price rose substantially over the several years preceding the Class Period from single digits to almost $54.00 by the end of December, 2000. While the stock price fell over the course of the Class Period by almost $30.00 -- closing at $23.79 on October 30, 2001 -- the actual decline arguably attributable to the fraud (*i.e.*, based on stock price reaction on dates of partial disclosures of the alleged wrongdoing to the market) was only about $21.00, and arguably, even a substantial portion of those "damages" resulted *not* from disclosure of past misconduct, but rather due to the Company's repeated lowering of future revenue estimates -- and thus were arguable not recoverable. Finally, the stock price eventually fully returned to pre-Class Period level by early 2005. These factors created substantial obstacles to recovery for the Class, including having to resolve at trial such issues as: (i) should damages be measured at the $53.66 price at the beginning of the Class Period, or the likely substantially lower actual "purchase" or "base" price of the stock over the preceding years when the shares were acquired for Plan participants at much lower prices; (ii) what was the proper measure of damages suffered over the course of the Class Period, the full stock price decline, or some other measure arguably more reasonably tied to the timing and nature of the market disclosures; and (iii) to what extent should damages for ESOP participants who continue to hold preference shares be affected by the ultimate recovery of the stock price. This final risk is premised on the fact that Class members had no discretion over when they could cash out of the ESOP, including moving to any other investment alternatives. These preference shares were only accessible upon the employee's termination or retirement from the Company, and thus constituted highly illiquid assets.

31

As these examples demonstrate, while Plaintiff was confident in the merits of his claims, he faced real and substantial obstacles in ultimately prevailing at trial and obtaining a recovery for himself and the Class in this case.

### 2.    The Complexity and Likely Duration of the Litigation

Courts have long recognized that securities and ERISA based class actions are both complex and lengthy to litigate. *See, e.g., American Bank Note*, 127 F.Supp.2d at 426 ("Securities litigation . . . generally involves complex issues of fact and law, and these actions are no exception."); *Sumitomo*, 189 F.R.D. at 281 ("in evaluating the settlement of a securities class action, federal courts, including this Court, 'have long recognized that such litigation is notably difficult and notoriously uncertain.' (Citation omitted)"). As detailed above, Plaintiff's Counsel had completed the review and analysis of expansive documentary and computer data discovery preceding and pursuant to the negotiation process. As such, Plaintiff's Counsel fully appreciated the potential strengths and weaknesses of Plaintiff's case and the potential risks they faced on how the various issues -- factual and legal -- could ultimately be resolved by a trier of fact and/or as a matter of law.

Had the parties not reached settlement of this action, the litigation would have proceeded to motion practice, including both to dismiss and (should Plaintiff have prevailed) summary judgment. Should the case have survived and proceeded to trial, substantial deposition discovery and expert discovery would have ensued. Appeal would likely have followed the trial, regardless of who prevailed. Under any set of reasonable circumstances, absent settlement, this ERISA action would have faced substantial risk of a lengthy, contentious and expensive litigation process. Clearly, the parties' decision to settle these complex class action claims at this time -- claims based on conduct

32

already over four years old (allegedly having occurred in late 2000 and the first part of 2001) -- is both reasonable and in Class members' best interests.

### 3.    The Stage of the Proceedings at which the Settlement was Reached

Plaintiff's Counsel had access to -- and expended substantial time and effort in reviewing and assessing -- thousands of pages of highly relevant documentation first produced by the Company in connection with the motion for summary judgment in the Securities Action, as well as the extensive motion papers themselves. This documentation was directly responsive to the various allegations of wrongdoing Plaintiff raised in his complaint underpinning his claims of breach of fiduciary duty. The review of these materials, the drafting of the Amended Complaint to incorporate these materials, and the significant legal research undertaken in connection with these two efforts, provided Plaintiff and his counsel a full and complete understanding of the factual and legal strengths and weaknesses of his claims, as well of the likely responses and arguments of Defendants should the claims proceed to litigation and trial.

In addition, pursuant to the settlement negotiations, Plaintiff's Counsel were successful in obtaining from Defendants additional computer data directly relevant to fully understanding the numbers of participants in the various ERISA Plans, the size of the plan investments in CVS stock, and the trading history in such stock over the course of the Class Period, and (for the ESOP) up to the present. This additional data was crucial to Plaintiff's assessment of likely damages ultimately recoverable by the Class.

The more the parties and counsel know about a particular litigation, the greater their ability to assess whether a proposed resolution of the action is fair to their clients. *See, e.g., PaineWebber,*

33

171 F.R.D. at 126 (approving class action settlement where "Class Counsel 'has had sufficient information to act intelligently on behalf of the class'") (citation omitted); *Duhaime*, 177 F.R.D. at 67 ("the stage of the proceedings at which settlement is reached is important because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims."); *Fleet/Norstar*, 935 F. Supp. at 106 ("the timing of the agreement indicates that counsel for both sides were sufficiently apprised of all proffered theories and defenses"). Plaintiff's Counsel thus reviewed extensive documentary and plan-related data preceding and over the course of the settlement negotiations prior to reaching any agreement. In light of this fact, consideration of the stage of the litigation at the time the settlement was reached also fully supports that the Settlement was reached in good faith, reflected a thorough and sophisticated understanding of the underlying merits and potential strengths and weaknesses of the claims and appreciation for the true scope of trading in CVS stock by the ERISA Plans preceding and following the Class Period.

### 4.    The Amount of the Settlement in Light of the Risks of Litigation

As with any resolution of a litigation, class action settlements must be assessed by comparing "the terms of the compromise with the likely rewards of litigation." *Bussie*, 50 F.Supp.2d at 76 (*quoting Weinbeger*, 698 F.2d at 73); *see also Duhaime*, 177 F.R.D. at 68 (the compensation provided by means of a settlement must be weighed in relation to "the plaintiffs' likelihood of success on the merits"). As discussed in detail above, Plaintiff faced substantial risks of succeeding in this litigation. In addition, even if successful on the merits at trial, Plaintiff would have faced significant risks in demonstrating damages to the Class, particularly in light of the small size of the Class, the limited amount of CVS stock held by the ERISA Plans, and the fact the stock price

ultimately recovered -- arguably negating any showing of damages to ESOP participants who continue to hold the CVS preference shares up to the present.

In the face of these risks, Plaintiff was nonetheless successful in negotiating a Settlement advantageous to the Class.

### a.    The $3 million Settlement Fund

Over the course of the settlement negotiations, Plaintiff's Counsel continued to refine their ERISA-based damages estimates. As noted above, the law is unsettled in this area. In calculating ranges of potential damages, Plaintiff's Counsel therefore sought to adapt damages formulas applicable to more traditional securities fraud litigation, as well as to incorporate concepts of damages applicable to the area of trusts. Plaintiff's Counsel had access to specific member and trading data relevant to the particular ERISA Plans. Using this data, Plaintiff's Counsel assessed damages pursuant to several methodologies and used the resulting estimates in forming their negotiation strategies and arguments. The process entailed, *inter alia,* substantial debate regarding the appropriateness of considering reinvestment rates of return of funds, particularly here given the poor performance of alternative investment options available to plan participants over the Class Period.

One approach, for example, was based on a determination of the total loss suffered by the Plans attributable to the Defendants' alleged misconduct. In calculating this estimated loss, Plaintiff's Counsel gave serious consideration to the various risks detailed at Section V.B.1. above -- including the appropriate "purchase" price for CVS stock held in plan accounts at the beginning of the Class Period, and the actual price decline legally cognizable as having been due to the disclosure of the misconduct to the market. To appropriately "value" these risks, Plaintiff's Counsel used what

35

they considered to be reasonably conservative and supportable factors for these two contingencies, and arrived at an aggregate loss of approximately $2.86 million. Using this estimate, the $3 million settlement fund would result in an estimated recovery to the Class of almost 10.5 cents on the dollar of loss (prior to payment of any Court-approved fees, expenses or awards).

Plaintiff's Counsel estimated a second measure of the recovery by determining the total number of damaged shares, and then calculating the return to Class members per damaged share. Based on available trading data from CVS, Plaintiff's Counsel calculated approximately 2.236 million shares of CVS stock were held and/or acquired by Plan participants and suffered damages as the result of Defendants' alleged misconduct. The $3 million settlement fund thus would provide payment of approximately $1.35 per damaged share to Class members (again prior to payment of any Court-approved fees, expenses or awards).

### b.    Other Monetary and Non-Monetary Benefits

As noted above, another material benefit of the settlement is that Class members are not required to bear the significant costs and expenses already incurred, and still to be incurred in printing and mailing out notice and in administering the Settlement. These costs, estimated at between $200,000 and $250,000, are being separately borne by CVS. In addition, Plaintiff's Counsel are reasonably likely to face continued work in overseeing the Claims Administrator and assisting in the claims administration process.

Finally, Plaintiff's Counsel successfully negotiated important governance changes directly affecting how CVS administers and monitors its ERISA Plans. *See* Section III.C.1. *infra.* As detailed above, these changes provide an important benefit to Class members in the form of specific, enumerated obligations and duties imposed on principal plan fiduciaries, and also provide for Board-

36

level oversight at the Audit Committee. As Plaintiff's ERISA expert has testified, these changes are significant and cutting edge in the area of ERISA plan oversight and administration and offer important protections to the CVS ERISA Plans and plan participants. *See, e.g.*, Johnson Dec., ¶¶26-28.

Plaintiff thus respectfully submits that under any circumstances -- but particularly in light of the significant risks he faced going forward on his claims -- the terms of the proposed Settlement are fair, reasonable and adequate, and offer real and substantial monetary and non-monetary relief to Class members.

### 5.    Whether the Settlement was Reached After Arm's Length Negotiations

Courts have consistently recognized that, when a class action settlement is the result of arm's length negotiations, those negotiations are a significant indicator that such settlements are fair to class members. *See, e.g., City P'ship*, 100 F.3d at 1043 ("when sufficient discovery has been provided and the parties have bargained at arm's length, there is a presumption in favor of the settlement"); *M. Berenson Co.*, 671 F. Supp. at 822 (where "a proposed class settlement has been reached after meaningful discovery, [and] after arm's length negotiation, conducted by capable counsel, it is presumptive fair"); *Duhaime*, 177 F.R.D. at 68.

As is reflected herein, and in the accompanying Memorandum in Support of Plaintiff's Counsel's Joint Petition For An Award Of Attorneys' Fees, Reimbursement Of Expenses, And Payment Of An Incentive Award To The Named Plaintiff (the "Memo in Support of Fees"), this Settlement was reached only after intensive, good faith negotiations over several months, undertaken

totally at arm's length between two parties ably represented by experienced and sophisticated counsel. The proposed Settlement is demonstrably non-collusive.

### 6.    Plaintiff's Counsel Fully Endorse the Fairness of the Settlement

Courts have also repeatedly noted that the opinion of qualified counsel that a settlement is fair and reasonable to a class normally weights heavily in support of approving the settlement, because of their necessarily greater familiarity over the relevant facts of the case. *See, e.g., Sumitomo,* 189 F.R.D. at 280; *New York & Maryland v. Nintendo of Am., Inc.,* 775 F. Supp. 676, 680-81 (S.D.N.Y. 1991). Here, as demonstrated by the firm resumes of Plaintiff's Counsel attached to the Memo in Support of Fees, Plaintiff's Counsel have substantial experience litigating complex class actions, federal securities fraud claims and corporate derivative claims. *See* Declarations of Patrick F. Morris and Deborah R. Gross, Exhibits 1 and 2, respectively of the Memo in Support of Fees.

As described herein, the settlement is the result of substantial effort, extensive and arm's length negotiations, and comprehensive legal analysis undertaken by those counsel. This process entailed active exchange of arguments and assessments of the relative strengths and weaknesses of each other's positions, took into account all parties' perceptions of the risks facing both sides in the ERISA Action going forward, and, from Plaintiff's perspective, strove at all times to maximize the best interests of the ERISA Class. The proposed settlement reflects what Plaintiff's Counsel believe to be informed consideration of a vast array of legal and factual issues. It also reflects the Plaintiff's Counsel's dispassionate appraisal of the ultimate likelihood of success of the claims on the merits.

Plaintiff's Counsel respectfully submit the fact they fully support the settlement is a factor the Court should consider as militating towards finding the settlement fair, reasonable and adequate to the Class. *See, e.g., Weinberger*, 698 F.2d at 74 (fact that settlement was the product of "arm's-length negotiations" by counsel who have "the experience and ability . . . necessary to effective representation of the class' interests" weighed in favor of approval).

## 7. The Class' Reaction to the Settlements Supports the Conclusion that the Settlement is Fair

Another factor courts in this Circuit have considered in determining whether to approve proposed class action settlements is the nature of the reaction of the class to the proposed settlement terms. *See, e.g., Bussie*, 50 F.Supp.2d at 77 ("The number of requests for exclusion from the settlement, as well as the number and substance of objections filed, is relevant to this Court's analysis of the settlement"); *Duhaime*, 177 F.R.D. at 71 ("in addition to conducting an independent evaluation of the settlement, the court must consider the number and substance of objections.").

As attested to in the GCG Affidavit, on July 15, 2005, Plaintiff's Claims Administrator sent Individual Notices by first class mail to over 47,000 potential Class members. *See* GCG Aff., ¶3. The Individual Notice specifically informed these Class members of their right to object to the Settlement, and clearly stated that the deadline for mailing such objections to counsel for the parties and the Court was August 24, 2004. The Individual Notice was also posted on the website set up and maintained by the Claims Administrator pursuant to the Settlement. *Id.*, ¶5. In addition, the Court-approved summary notice, reflecting the terms of the Settlement, including notice of the right to object, was separately published in *The Wall Street Journal* on July 28. *Id.*, ¶6.

Relevant to this Court's assessment of the fairness of the Settlement, after completion of this comprehensive notice program, while the parties and the Claims Administrator received multiple correspondence from Class members, not a single Class member has objected to any of the terms of the proposed Settlement or the proposed plan of allocation.[7] This lack of any objection to the terms of the proposed Settlement further weighs in favor of the Court approving the settlement as fair and reasonable from the perspective of the members of the Class. *See, e.g., In re Auction House Antitrust Litigation*, 2001 U.S. Dist. LEXIS 1713, at \*28 (S.D.N.Y. Feb. 22, 2001)(existence of only 916 requests for exclusion and 61 objections in a class consisting of approximately 130,000 class members strongly supported the adequacy of the settlement), *aff'd*, 2002 U.S. App. LEXIS 15327 (2d Cir. Jul. 30, 2002); *Bussie*, 50 F.Supp.2d at 77; *Duhaime*, 177 F.R.D. at 71.

## VI.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

The Individual Notice (at Section 12, pages 4-5) included a detailed description of the plan of allocation pursuant to which the Claims Administrator will calculate proportionate losses and pro rata distribution amounts for each Class member. The plan of allocation, as explained in both a narrative manner and mathematically in the Individual Notice, provides for Class members to receive their *pro rata* share of the settlement, based upon specific formulas, depending on whether the member held CVS stock in his or her 401(k) account, ESOP account, or both. *See* Section III.B. above. As with the settlement itself, no Class member has filed or registered any objections to the proposed plan of allocation.

---

[7]    While several letters used the term "object," (*see* Exhibit 3 hereto), it is clear from a plain reading that none of these letters actually object to any term or condition of the proposed Settlement or plan of allocation, but rather reflect the individual's desire for personal reasons not to be included in the settlement.

Courts have consistently recognized that plans of allocation should be approved so long as they have a reasonable, rational basis, particularly when, as is true here, they are recommended by "experienced and competent" class counsel. *See, e.g., White v. NFL*, 822 F. Supp. 1389, 1420-24 (D. Minn. 1993), *aff'd.* 41 F.3d 402 (8th Cir. 1994); *accord, e.g., Maley v. Del Global Techs Corp.*, 186 F.Supp.2d 358, 367 (S.D.N.Y. 2002) (plan of allocation should be approved as long as it has a "reasonable, rational basis"); *PaineWebber*, 171 F.R.D. at 133 ("the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information"). Here, the proposed plan of allocation is based upon the extensive discovery and legal research of ERISA legal precedent undertaken by Plaintiff's Counsel. Plaintiff respectfully submits that the proposed plan of allocation should be approved by the Court as fair, reasonable and adequate to the Class.

## VII.   CONCLUSION

For all of the reasons set forth above, Plaintiff respectfully requests that his Motion For

Approval Of The Settlement And Entry Of Order And Final Judgment be granted in all respects.

Dated: August 31, 2005

Respectfully submitted,

**LAW OFFICES OF BERNARD M. GROSS, P.C**

By:   /s/ Deborah R. Gross
    Deborah R. Gross (Bar # 546151)
Suite 450- John Wanamaker Bldg.
100 Penn Square East
Philadelphia, PA 19102
Telephone: 215-561-3600
Facsimile: 215-561-3000

**Plaintiff's Counsel**

**Of Counsel:**

Karen L. Morris
Patrick F. Morris
**MORRIS AND MORRIS, LLC
   COUNSELORS AT LAW**
4001 Kennett Pike
Suite 300
Wilmington, DE   19807
Telephone: 302-426-0400
Facsimile: 302-426-0406

Bruce G. Murphy
**LAW OFFICES OF BRUCE G.
   MURPHY**
265 Lywyds Lane
Vero Beach, FL 32963
Telephone: 828-737-0500