## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MASSACHUSETTS

| | |
|---|---|
| JAMES FESCINA, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>      vs.<br><br>CVS CORPORATION, THOMAS M. RYAN, STANLEY P. GOLDSTEIN, EUGENE APPLEBAUM, W. DON CORNWELL, THOMAS P. GERRITY, MARIAN L. HEARD, WILLIAM H. JOYCE, TERRENCE MURRAY, SHELI Z. ROSENBERG, IVAN G. SEIDENBERG, DAVID RICKARD, ZENON P. LANKOWSKY, ROSEMARY MEDE, and UNKNOWN FIDUCIARY DEFENDANTS 1-100,<br><br>                    Defendants. | Civil Action<br>No. 04-12309- JLT |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S COUNSEL'S JOINT PETITION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND PAYMENT OF AN INCENTIVE AWARD TO THE NAMED PLAINTIFF

### I.     INTRODUCTION

Counsel for Plaintiff James Fescina submits this Memorandum of Law In Support of their Joint Petition for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of an Incentive Award to the Named Plaintiff.  As detailed herein and in the accompanying Plaintiff's Memorandum Of Law in Support of Motion for Final Approval of ERISA Settlement ("Settlement Brief"), filed concurrently herewith, the proposed settlement of this litigation provides for substantial monetary and non-monetary benefits to Class members -- present and former participants

in CVS's various ERISA pension plans (the "ERISA Plans").[1]   The Individual Notice mailed to

Class members disclosed that, pursuant to the Stipulation of Settlement, Plaintiff's Counsel may

seek the payment of attorneys' fees in an amount not to exceed thirty percent (30%) of the

$3,000,000 cash settlement fund, the reimbursement of costs and expenses incurred in the litigation,

and the payment of an incentive award to the named Plaintiff in an amount not to exceed $10,000.

The notice further made clear that the actual amounts of any such awards lie within the sound

discretion of the Court.  The deadline for filing objections to the proposed settlement was Friday,

October 26, 2005.  No Class member filed any objection regarding the payment of attorneys' fees

in the amount disclosed in the Individual Notice of up to 30% of the settlement fund.  Plaintiff's

Counsel here seek fees in the amount of 27.5% of the settlement fund.

Plaintiff's Counsel respectfully submit that an award of attorneys' fees in the amount of

27.5% of the settlement fund (with interest) is eminently reasonable in light of multiple factors

federal courts routinely find compelling, the most important being the excellent results achieved for

the Class in the face of substantial litigation risk.  As detailed herein, and in the Settlement Brief,

this case, and its proposed resolution, involve complex and challenging issues of fact and law in the

unsettled area of ERISA pension fund litigation.  The benefits ultimately negotiated and agreed to

here are substantial, and include: (i) the creation of a $3 million cash settlement fund; (ii) the

adoption of virtually unprecedented ERISA-related governance provisions at CVS, including the

adoption of a formal ERISA Plan Committee Charter imposing specific responsibilities and duties

on the ERISA Plan Committee regarding the administration of the ERISA Plans at CVS going

---

[1]       The term ERISA Plans collectively includes the following plan at CVS: the CVS
401(k) Profit Sharing Plan (the "401(k) Plan"), the CVS Corporation and Subsidiaries Employee
Stock Ownership Plan (the "CVS ESOP"), and the ESOP Diversified Account.

forward; and (iii) the Company's agreement to separately pay all administration and notice costs incurred in the settlement,  As detailed herein and in the Settlement Brief, the $3 million amount is substantial, particularly in light of the small size of the CVS ERISA Plans and the limited number of damaged shares involved.  *See, e.g.*, Section III.C.2. below.  In addition, the governance changes to be adopted by CVS pursuant to the proposed Settlement are cutting edge and provide significant benefit to plan participants.   As Plaintiff's ERISA and fiduciary duty expert, Mark Johnson, recognized in his Declaration:

> formal adoption [of the proposed governance changes] through the implementation of the settlement provides meaningful and cutting edge protections to ERISA plan participants, and would impose real and important enumerated duties and obligations on the principal fiduciaries of the CVS ERISA plans -- the Plan Committee -- of a virtually unprecedented nature among ERISA settlements in recent years around the country.

Johnson Dec. ¶29 (attached as Exhibit 2 to the Settlement Brief).

As detailed in the attached firm declarations offered in support of this request (*see* Exhibits 1 and 2 attached to the Declaration of Patrick F. Morris In Support of Plaintiff's Counsel's Joint Petition For An Award Of Attorneys' Fees, Reimbursement Of Expenses, And Payment Of An Incentive Award To The Named Plaintiff ("Morris Decl."), filed concurrently hereto, Plaintiff's Counsel have incurred in the aggregate more than $687,908.75 in lodestar in investigating and litigating these claims.  In addition, we have expended a total of $17,742.88 in unreimbursed expenses, including expert costs, necessary to the successful prosecution of the Class' claim.

In line with similar awards by other courts around the country, Plaintiff's Counsel also seek payment of an incentive award in the amount of $10,000 on behalf of the named Plaintiff.  The Plaintiff is currently employed at CVS as a pharmacist.  Payment of the requested incentive award

of this amount would recognize the professional risks and litigation burdens he assumed in coming forward and representing the interests of the Class in this litigation.

## II.     HISTORY OF THE LITIGATION

### A.     Plaintiff's Claims and Prosecution of the Action

On October 29, 2004, based on factual and legal investigation by his counsel, Plaintiff filed his ERISA class action complaint against CVS Corporation ("CVS") and certain individual defendants, including the Board of Directors of CVS.  In his complaint, Plaintiff alleged that over the Class Period, Defendants breached their fiduciary duties and otherwise violated ERISA in multiple ways, including by: (i) using employer and employee contributions to the ERISA Plans to purchase CVS stock at times when they knew or should have known that the stock was an unsuitable and imprudent investment for the Plans; and (ii) misrepresenting to Plaintiff and other participants in the ERISA Plans the operational and financial status of CVS and, consequently, the value of its stock over the course of the Class Period.  The complaint sought recovery from Defendants for losses the ERISA Plans suffered during the Class Period, which Plaintiff alleged were the direct and indirect result of Defendants' breaches of fiduciary duties to participants in the ERISA Plans.

In the months immediately following the filing of the complaint, Plaintiff's Counsel undertook extensive legal analysis of existing ERISA case law, and continued their factual investigation of CVS ERISA issues, including negotiations with Defendants' Counsel regarding the production of Plan-related discovery and materials.  This work was undertaken in connection with Plaintiff's Counsel's drafting of a proposed Amended Complaint for Breaches of Fiduciary Duty Under the Employee Retirement Income Securities Act (the "Amended Complaint").

On February 11, 2005, Defendants filed a Motion to Consolidate all actions pending against CVS, which included a federal securities class action lawsuit, captioned *In Re CVS Corporation Securities Litigation*, C.A. No. 01-11464-JLT (the "Securities Action"), this ERISA Action, and a derivative litigation, captioned *Krantz v. Ryan, et al.*, C.A. No. 04-12650-REK (the "Derivative Action"). On February 28, 2005, Plaintiff filed his Opposition to Defendants' Motion to Consolidate, arguing against consolidation based on, *inter alia*, the disparity in the progress of the litigation of the three actions. On March 8, 2005, this Court denied Defendants' Motion to Consolidate.

Over the course of the second half of February and early March, 2005, Plaintiff's Counsel successfully negotiated with Defendants' Counsel for the production of thousands of pages of documents -- relevant to the underlying alleged misconduct at issue -- which Defendants had produced previously in connection with a motion for summary judgment in the Securities Action. Plaintiff's Counsel reviewed this documentation with critical emphasis on interpreting the underlying conduct at the Company within the context of ERISA duties and obligations. In particular, Plaintiff's Counsel carefully assessed whether the conduct of the named Defendants, as plan fiduciaries acting in the face of material, adverse information which they knew (or should have known) at the time -- based *inter alia*, on their senior level positions at the Company, and, in certain instances, on their active involvement in the alleged misconduct at issue -- rose to the level of a breach of their fiduciary duties to the plans and plan participants under ERISA. As the result of the careful review and assessment of this extensive document production, as well as of concomitant additional factual investigation and legal research, Plaintiff's Counsel completed the drafting of the Amended Complaint, which was filed with the Court on July 1, 2005.

In mid-April, 2005, after Plaintiff's Counsel had substantially completed review of the document production, the parties began negotiating a potential settlement to the ERISA Action. These negotiations, undertaken over several months, culminated in the execution by the parties and filing with the Court of the Settlement Agreement on July 1, 2005.

**B.      Settlement Negotiations**

Plaintiff agreed in principle to settle this case after thorough investigation by his counsel into Plaintiff's claims, the underlying events and transactions alleged in the Amended Complaint, the operation and administration of the ERISA Plans, and relevant legal precedent interpreting the provisions of ERISA -- an area of currently largely developing and unsettled law. The inherent complexity and unsettled nature of this relevant case law directly affected Plaintiff's ability to assess, *inter alia*, legal and factual issues relevant to ERISA damage theories and calculation methodologies. As detailed herein, the underlying uncertainties reflected in ERISA damages legal precedent generally were exacerbated here based on certain facts of this case, including the substantial movement of the value of CVS common stock -- both preceding and following the Class Period. *See* Section III.C.1. below.

Pursuant to the settlement process, Plaintiff's Counsel also successfully negotiated the production of comprehensive data relevant to the number of participants in the ERISA Plans during the Class Period, and their acquisition and sales of CVS stock both during the Class Period, and, for the ESOP, thereafter. Plaintiff's Counsel consulted with an ERISA fiduciary duty expert and, pursuant to a thorough study of the factual issues and legal principles applicable to the determination of damages within the context of ERISA, also coordinated with a damages expert. It was as the result of the careful analysis of such plan-related data and discovery -- regarding both the limited

6

number of CVS shares in the ERISA Plans, and the timing of the trading of those shares -- that Plaintiff's Counsel were able to determine that the number of damaged shares here at issue were limited -- estimated at approximately 2.236 million, and that actual damages suffered by plan participants here were modest -- estimated at approximately $28.6 million.  *See* Section III.C.2. below.

As detailed above, the parties agreed in principle to settle this case only following careful factual and legal analysis by Plaintiff's Counsel, and following lengthy negotiations between the parties, where both sides were in an excellent position to evaluate the strengths and weaknesses of their own and each other's theories and arguments.  *See also* Section III.C.1. below.

## C.     Preliminary Approval and Notice of the Proposed Settlement

On July 1, 2005, Plaintiff's Counsel filed the executed Settlement Agreement between the parties, and filed a Motion And Memorandum in Support of Plaintiff's Motion For an Order Preliminarily Approving Settlement, Certifying the Class, and Setting a Date and Time for the Fairness Hearing (the "Preliminary Approval Motion"), with exhibits.  This Court granted preliminary approval of the proposed settlement shortly thereafter, entering the Order Preliminarily Approving Settlement, Conditionally Certifying Class For Purposes of Settlement, Approving Form And Manner of Notice, And Scheduling Hearing on Fairness of Settlement Pursuant to FED. R. CIV. P. 23(3) (the "Preliminary Order") on July 7, 2005.  The Preliminary Order, *inter alia*, preliminarily certified the following Class:

> All persons, other than persons who are named as Defendants in the Amended Complaint and their immediate family members, who were participants or beneficiaries under the CVS ERISA Plans during any portion of the Class Period (December 1, 2000 and October 30, 2001)

and who held, purchased, acquired or had contributed CVS Stock in
their plan account(s) at any time during the Class Period.

In addition, the Preliminary Order approved the form of the Notice of Pendency of Class

Action, Proposed Settlement, and Fairness Hearing (the "Individual Notice") and the summary

notice provided as Exhibits A and B to the Preliminary Approval Motion, and authorized the mailing

of the Individual Notice to Class members and the publication of the summary notice.  As reflected

in the Affidavit of Jose C. Fraga Regarding the Mailing of Notice (the "Fraga Aff.") on July 15,

2005, the Garden City Group ("GCG"), Claims Administrator in this action, sent 47,047 copies of

the Individual Notice by first class mail to eligible current and former CVS ERISA plan participant

Class members identified by the records of CVS.  Fraga Aff., ¶3.  In addition, on July 28, 2005, the

summary notice was published in *The Wall Street Journal*.  *Id.*, ¶6.  Both of these documents, as well

as a copy of the Settlement Agreement was also posted on the webpage GCG set up specifically in

support of the action.  *Id.*, ¶5.  Pursuant to the Preliminary Order, the Court scheduled the Final

Settlement hearing in the ERISA Action for the same date and time as the other two CVS Actions,

namely on September 7, 2005, at 11:00 a.m.

## III.  THE COURT SHOULD APPROVE PLAINTIFF'S
COUNSEL'S FEE AND EXPENSES REQUEST
AS FAIR AND REASONABLE

Courts have long recognized that a lawyer who recovers a "common fund" is entitled to

reasonable attorneys' fees from the fund as a whole.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478

(1980); *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.

3d 295, 305 n. 6 (1st Cir. 1995)("[t]he common fund doctrine is founded on the equitable principle

that those who have profited from litigation should share its costs"); *In re Fidelity/Micron Securities

Litig.*, 167 F. 3d 735, 737 (1st Cir. 1999)("lawyers whose efforts succeed in creating a common fund

for the benefit of a class are entitled not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax"); *see also Bebchick v. Washington Metro. Area Transit Comm'n.*, 805 F.2d 396, 402 (D.C Cir. 1986)("The 'common fund' doctrine is designed to spread the costs of litigation among all the beneficiaries of an identifiable fund over which a court can exercise legitimate control, in effect guarding against the unjust enrichment of passive beneficiaries at the expense of the active beneficiary.").

Common fund fee awards are routine in class action settlements, including ERISA class actions.[2] *See, e.g., In re Xcel Energy, Inc. Securities, Derivative & ERISA Litigation*, 364 F.Supp.2d 980, 1000 (D. Minn. 2005); *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 2004 U.S. Dist. LEXIS 7490 (S.D. Tex. 2004); *Kolar v. Rite Aid Corporation*, 2003 U.S. Dist. LEXIS 3646 (E.D. Pa 2003); *Great Neck Capital Appreciation v. PricewaterhouseCoopers*, 212 F.R.D. 400 (E.D. Wis. 2002).

Successful resolution of class action litigation can serve the important function of enforcing public policy. For example, private ERISA litigation is a necessary and desirable tool to help assure the effective enforcement of the ERISA laws and to protect against illegal or improper management and administration of ERISA pension funds. As such, important public policy issues bisect here

---

[2]     ERISA class action settlements creating a common fund are unique from individual ERISA actions or actions proceeding to judgment where claimants may be entitled to attorneys' fees under the statute. Courts have often awarded a percentage-of-recovery fee in class action settlements under the common fund doctrine where a statutory fee provision would have applied in individual matters or had the case gone to judgment. *See, e.g. Florin v. Nationsbank of Georgia, N.A.*, 34 F. 3d 560, 563 (7th Cir. 1994); *Skelton v. General Motors Corp.*, 860 F. 2d 250, 255 (7th Cir. 1988). When there has been a settlement, the basis for the statutory fee has been discharged and it is only the fund that remains from which to compensate counsel.

with particular force.  Reasonable fee awards in successful cases, such as the present action, encourage and support meritorious class actions -- and thereby promote private enforcement of and compliance with -- the critical area of ERISA, helping to ensure adequate protection and vindication of class members' legal rights.  "[A] financial incentive is necessary to entice attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid."  *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp 679, 687 (M.D. Ala. 1988).  Writing within the context of securities litigation, but equally relevant to the area of ERISA class action litigation, federal courts have long recognized the importance of attracting qualified counsel.  *See e.g. Eltman v. Grandma Lee's, Inc.*, where the court found:

> Private lawsuits serve to further the objective of the federal securities laws which is to protect investors and consumers against fraudulent and other deceptive practices.  As a practical matter, those lawsuits can be maintained only if competent counsel can be obtained to prosecute them.  Competent counsel can be obtained if reasonable and adequate compensation for their services were awarded if a successful result is achieved.  "To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.  The concept of a private attorney acting as a 'private attorney general' is vital to the continued enforcement and effectiveness of the Securities Acts."  *Bleznak v. C.G.S. Scientific Corp.,* 387 F. Supp. 1184, 1189 (E.D. Pa. 1974); *In re Warner Communications Securities Litigation,* 618 F. Supp. at 750-751.

*Id.*, 1986 WL 53400 at *9 (E.D.N.Y. May 28, 1986).

## A.    Percentage-of-the-Fund is the Preferred Method for Calculating Attorneys' Fees in this Circuit

The United States Supreme Court has long and repeatedly held in cases involving the computation of common fund fee awards that it is appropriate for the fee to be determined based on

10

a percentage-of-the-fund approach.  *See Blum v. Stenson*, 465 U.S. 886, 900, n. 16 (1984)("under the common fund doctrine, . . . a reasonable fee is based on a percentage of the fund bestowed on the class"); *see also Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-166 (1939); *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 124-125(1885); *Trustees v. Greenough*, 105 U.S. 527, 532 (1881).

Although the First Circuit has left to the trial court's discretion whether to apply the lodestar or percentage-of-the-fund method to award attorneys' fees, it has also recognized that the percentage-of-the-fund method is the prevailing approach used in common fund cases, and that there are distinct advantages to support its adoption in such cases.  These recognized advantages include that the percentage-of-the-fund method is less burdensome to administer, lessens the possibility of collateral disputes, enhances efficiency throughout the litigation, and better approximates the workings of the marketplace.  *See e.g. In re Thirteen Appeals*, 56 F.3d at 307-308; *see also In re Fidelity/Micron Sec. Litig.*, 167 F.3d at 737.

District courts within the First Circuit, in exercising their discretion in this important area, have demonstrated a clear preference for the percentage-of-the-fund method over the lodestar method.  *See, e.g. In re Fidelity/Micron Securities Litig.*, 1998 U.S. Dist. LEXIS 21698 (D. Mass 1998)(reversed on other grounds); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. ME. 2003)(describing the appropriate method as determining whether the "total fee [is] reasonable when examined as a percentage of recovery"); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 187 (D. Mass 1998); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp 375, 377 (D. Mass 1997); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp 99, 108 (D.R. I. 1996). Reflecting this respected line of legal precedent, in supporting the adoption of the percentage-of-the-

fund method in awarding attorneys' fees in *In re Lupron Marketing and Sales Practices Litigation*, this Court most recently found:

> While in the First Circuit, a judge has the discretion to apply either the lodestar or POF method in making an award of attorneys' fees in a common fund case, the Court of Appeals acknowledged the "distinct advantages that the POF method can bring to bear"-it is less burdensome to administer, it reduces the possibility of collateral disputes, it enhances efficiency throughout the litigation, it is less taxing on judicial resources, and it better approximates the workings of the marketplace. *In re Thirteen Appeals,* 56 F.3d at 307.

*Id.*, 2005 WL 2006833, at *3 (D. Mass, August 17, 2005).

The trend in this Circuit is consistent with legal precedent nationwide awarding fees in common fund cases based on a percentage of the total common fund recovered.[3]  *See e.g. Manual for Complex Litigation*, §14.121 (Fourth 2004)("The vast majority of courts of appeals now permit or direct district courts to use the percentage-fee method in common fund case").  Recognizing this fact, the *Lupron* court further found:

> At least nine other Circuits-the Second, Third, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and the District of Columbia-have approved the use of the POF method in common fund cases.

*Id.*, 2005 WL 2006833 at *3.

---

[3]    *See e.g. In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F. 3d 768, 822 (3d Cir. 1995)("[i]n common fund cases, a district judge can award attorneys' fees as a percentage of the fund recovered," and in prior cases "fee awards have ranged from nineteen percent to forty-five percent of the settlement fund"); *Gottlieb v. Barry*, 43 F.3d 474, 487(10th Cir. 1994); *In re Vitamins*, 2001 U.S. Dist. LEXIS 25067, (D.D.C. 2001)(*quoting In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp 2d 418, 431-432 (S.D.N.Y. 2001)(court found percentage-of-the-fund method to award attorneys' fees in a common fund case "[d]irectly aligns the interests of the Class and its counsel for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system.").

**B.    Award of the Requested 27.5% Fee is Fair and Reasonable as a Percentage of the Cash Settlement Fund, and Fairly Compensates Plaintiff's Counsel for the Other Material Monetary and Non-Monetary Benefits Achieved for the Class under the Proposed Settlement**

**1.    This Amount is in Line with Established Legal Precedent**

Courts in this Circuit have recognized that fee awards in common fund cases typically range from 20 to 30 percent. *See, e.g., In re Fleet/Norstar*, 935 F. Supp at 109; *Conley*, 222 B.R. at 187; *In re Compact Disc.*, 216 F.R.D. at 216 n. 45. *See also Manual for Complex Litigation*, §14.121 ("Attorney fees awarded under the percentage method are often between 25% and 30% of the fund."). In considering this issue, the *Lupron* court cited with approval the following:

> *See also* Theodore Eisenberg & Geoffrey Miller, *Attorneys Fees in Class Action Settlements: An Empirical Study,* 1 J.E.L.S.2004, at 6 (finding that 1996 and 1999 NERA studies found a "remarkable uniformity in fee awards [in security class actions] between roughly 30 to 33 percent of a settlement amount. A 1996 Federal Judicial Center study examined all class actions terminated between July 1, 1992 and June 30, 1994, in four district courts. This study reports mean and median fee awards of between 24 and 30 percent of the net monetary distribution to the class."); *Manual For Complex Litigation* § 14.121 ("Attorney fees awarded under the percentage method are often between 25 percent and 30 percent of the fund."). The Ninth Circuit has identified 25 percent as the appropriate "benchmark" fee award in common fund cases. *See Six (6) Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990). Other courts have utilized the 25 percent benchmark, with adjustments depending on the complexity of the case, the risk of nonpayment, and the magnitude of success. *See, e.g., Gaskill v. Gordon,* 160 F.3d 361, 362-363 (7th Cir.1998) (affirming a fee award of 38 percent of the settlement fund); *In re Pacific Enterprises Sec. Litig.,* 47 F.3d 373, 379 (9th Cir.1995) (approving a 33 percent award of a $12 million common settlement fund); *In re Lorazepam & Clorazepate Antitrust Litig.,* 2003 WL 22037741, *8 (D.D.C.2003) (30 percent); *In re Rite Aid Corp. Sec. Litig.,* 146 F.Supp.2d 706, 735-36 (E.D.Pa.2001) (noting expert testimony that the average fee is 28.1 percent in settlements between $100 and $200 million in awarding 25 percent of a $193 million common fund); *In re Vitamins Antitrust Litig.,* 2001

> WL 34312839, *12 (D.D.C.2001) (determining that a 33 1/3 percent fee award was reasonable and granting class counsels' fee petition in the amount of $123,188,032 plus interest).

*Id.*, 2005 WL 2006833 at *5.

Referring to the legal precedent cited by the *Lupron* court as a guide, the requested fee award of 27.5% of the common fund in this case is in line with other class action settlements around the country. This request is also consistent with other ERISA class actions. *See, e.g., Berger & Tsupros v. Xerox Corp. Retirement Income Guarantee Plan*, 2004 U.S. Dist. LEXIS 1819 (S.D. Ill. 2004) (awarding 29% attorney fee); *Kolar v. Rite Aid Corp.*, 2003 U.S. Dist. LEXIS 3646 (E.D. Pa 2003)(awarding over $5 million in attorney fees from an ERISA settlement *valued* at $67.76 million, of which only $10.76 million was cash); *Vizcaino v. Microsoft Corp.*, 290 F. 3d 1043(9th Cir. 2003)(awarding 28% attorney fees).

> **2.    Plaintiff's Counsel's Fee Award Should Also Consider The Value to the Class of the Other Monetary and Non-Monetary Benefits of the Settlement**

Plaintiff's Counsel further respectfully submit that the requested 27.5% fee amount is appropriate here to compensate counsel for the creation of significant monetary and non-monetary benefits beyond the establishment of the $3 million settlement fund, namely: (i) important governance changes at the Company directly relevant to the administration and oversight of the ERISA Plans at CVS, and (ii) the separate payment by the Company of all costs for notice and administration of the Settlement.

14

a.       **Governance Changes at the Company**

As detailed in the Settlement Brief, the Settlement Agreement requires the CVS ERISA Plan Committee to adopt a formal Charter that specifically provides as its principal provisions the following important, delineated obligations and responsibilities, and imposes on the Audit Committee of the Board of CVS the obligation to receive periodic reports from the ERISA Plan Committee with respect to the fulfillment of these Plan Committee Charter obligations.

As Plaintiff's ERISA and fiduciary duties expert, Mr. Mark Johnson testifies to in his Declaration (attached as Exhibit 2 to the Settlement Brief), these governance changes are important, valuable to plan participants, and virtually unprecedented in nature and scope among other approved ERISA settlements around the country as the proposed ERISA Plan Committee Charter goes well beyond the generalized obligations of "prudent behavior" required under ERISA to impose specific duties on Plan Committee members, to include, *inter alia*, the requirement to oversee the design and implementation at CVS of adequate and effective oversight systems, policies and procedures related to *both* compliance oversight and effective risk assessment applicable to the ERISA Plans. *Id.*, ¶¶9-15.[4]

Imposing direct responsibility on the Plan Committee over compliance and risk management, as well as over the on-going assessment of the propriety and advisability of offering CVS stock as

---

[4]       Plaintiff's Counsel are aware of only limited other instances in which ERISA settlements included governance changes.  These are generally limited to providing the right for 401(k) plan participants to immediately convert company matching contributions (made in company stock) out of company stock and into other investment options rather than being required to first hold the company stock for some period of time (not an issue here as CVS ERISA Plan participants already have this right), or, for example, to providing educational information to be sent to plan participants regarding the importance of diversification in investment options, and to offering periodic training of plan administrators regarding their fiduciary duties and legal/regulatory developments in the area of ERISA plans.

an investment option, provides important tools to enable committee members to pro-actively monitor and track these critical areas, allowing for better and more timely decision-making on behalf of the ERISA Plans going forward.  Johnson Dec., ¶¶16-18.

The proposed Charter also specifically empowers Committee members with, *inter alia*: (i) the right to attend meetings of the Audit Committee of the Board; (ii) access to all reports, information and data necessary to ensure they can effectively perform their duties; and (iii) the power to retain -- at CVS's expense -- any experts and/or consultants necessary to allow them to perform their functions and responsibilities.  Johnson Dec., ¶¶19-21.  These delineated powers offer essential tools to Plan Committee members to assure they remain fully informed of current financial and operational conditions at the Company -- information vital to their ability to make informed fiduciary decisions, such as whether to continue to offer CVS stock as an investment option.  *Id.*, ¶22.

The Charter further requires Plan Committee members to undertake a rigorous self-assessment of the Committee's operations and functions at least annually, and to report on the Committee's activities to the Audit Committee.  Johnson Dec., ¶23.  The proposed Settlement also requires that the Audit Committee of the Board now assumes oversight responsibility over the performance of the Plan Committee in the execution of its enumerated duties and responsibilities under the Charter.  *See* Section 8.1.; Johnson Dec., ¶25.

Mr. Johnson makes clear in his Declaration, what has been designed and agreed to under the Settlement reflects critical elements of a 'best-in-class' compliance and risk management system at CVS, (Johnson Dec. ¶26), and formal adoption of these governance provisions through the implementation of the settlement will provide "meaningful and cutting edge protections to ERISA

plan participants, and would impose real and important enumerated duties and obligations on the principal fiduciaries of the CVS ERISA plans -- the Plan Committee -- of a virtually unprecedented nature among ERISA settlements in recent years around the country." *Id.* ¶¶27-28.

Plaintiff's Counsel respectfully submit that adoption of the proposed Charter will provide an important component to fostering an environment at CVS where effective oversight and attention to the operation, administration and investment processes of the CVS ERISA Plans will be emphasized. It is beyond cavil that these important governance provisions provide a substantial and long-term benefit to the ERISA Plans and to plan participants, deserving of compensation to the counsel responsible for their creation. *See, e.g.*, *Seinfeld v. Coker*, 847 A.2d 330, 333 (Del.Ch. 2000)("in class and derivative actions, plaintiffs' counsel are entitled to an award of attorneys' fees and expenses where their efforts achieve a benefit for the corporation or its shareholders."). Such award is fully appropriate when the benefit resulting from a proposed settlement is therapeutic in nature. *See e.g. In re Golden State Bancorp Inc. Shareholder Litigation*, 2000 WL 62964 (Del.Ch. 2000).

### b. Payment of Notice and Administration Costs and Expenses

Finally, the Settlement requires CVS to pay, separate from the $3 million settlement fund, all costs and expenses involved in providing notice and administering the Settlement, a significant monetary benefit to Class members in that it helps to preserve the settlement fund for actual distribution to plan participants. These costs are currently estimated at between $200,000 and $250,000. The award of the requested attorneys' fees in the amount of 27.5% of the settlement fund would also reasonably also take this significant monetary benefit to the Class into consideration.

**C.     Various Factors Considered by This Circuit and Other Courts Further Support Plaintiff's Counsel's Request for a Fee of 27.5% of the Settlement Fund Amount**

Courts in this Circuit have noted that: "The Court of Appeals for the First Circuit has not set forth any benchmark percentage figure, nor has it provided a definitive list of factors for the fee determination. Rather, it has remarked that, "in respect to fee awards, the trial court's latitude is 'extremely broad'." *In re Thirteen Appeals Arising Out of San Juan,* 56 F.3d at 309, *quoting Lipsett v. Blanco,* 975 F.2d 934, 937 (1st Cir.1992).  While the First Circuit has not required that district courts use a particular set of factors to determine the reasonableness of a fee request, assessment of factors courts routinely consider under such circumstances further supports Plaintiff's Counsel's fee request here.  For example, Judge Stearns of this Court recently cited the following as factors for a court to consider in undertaking such an analysis:

> In common fund cases of this sort - in which the attorneys' fees and the clients' award come from the same source and the fees are based on a percentage amount of the clients' settlement award - district courts should consider several factors in setting a fee award.  Among other things, these factors include: (1) the size of the fund created and the number of persons benefitted; (2) the skill and efficiency of the attorneys involved ; (3) the complexity and duration of the litigation; (4) the risk of non payment; (5) the amount of time devoted to the case by plaintiffs' counsel; and (6) the awards in similar cases.  *See Third Circuit Task Force, Court Awarded Attorneys Fee*, 108 F.R.D. 237, 2555-156 (1985); *Goldberg v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2d Cir. 2000).

*Lupron*, 2005 WL 2006833 at *3; *see also Gunter v. Ridgewood Energy Corp.*, 223 F. 3d 190, 195

n.1 (3d Cir. 768, 819-22 (3d. Cir. 1995).[5]  As demonstrated below, an assessment of such factors in

this case fully supports an award of the fee Plaintiff's Counsel request.

### 1.    Risks Involved and Difficulty and Novelty of the Legal and Factual Issues

Plaintiff faced, and -- should the case have proceeded to trial -- would have continued to face

substantial challenges in this action, including: (i) proving the underlying claims of wrongdoing

alleged in the Amended Complaint; (ii) calculating cognizable ERISA damages; and (iii) being able

to successfully prosecute the multiple complex legal theories inherent in ERISA litigation.  As

detailed in the Individual Notice, not surprisingly, Defendants denied all wrongdoing and actively

disputed that they had engaged in any wrongdoing with respect to either the operations of the

Company or the accounting of the Company's financial results, or that they had misrepresented in

any way the existence or impact of the pharmacist shortage or store closings at CVS in public

statements made during the Class Period.

At trial, Plaintiff's Counsel would have faced substantial factual and legal risks related to

such issues as:(i) when and what the plan fiduciaries knew or should have known about allegedly

improper and illegal operational and accounting conduct occurring at the Company during the Class

Period; (ii) what is the appropriate scope of inquiry that ERISA imposes on plan fiduciaries

regarding appraising themselves of operational and financial circumstances at CVS; and (iii) what

---

[5]    The Second Circuit has adopted a similar list of factors, which include: (i) the time and labor expended by Plaintiff's Counsel; (ii) the complexities of the litigation; (iii) the risks borne by Plaintiff's Counsel in litigating this case on a contingency fee basis; (iv) the quality of the representation provided; (v) the fee request in relation to the settlement; (vi) public policy considerations; and (vii) the reaction of the Class to the settlement.  *See e.g. Goldberger v. Integrated Res. Inc.*, 209 F. 3d 43, 50 (2d Cir. 2000).

discretion do fiduciaries actually have -- either under law or based on accepted ERISA practices -- regarding decisions to retain and/or acquire additional CVS stock during the Class Period -- in particular CVS preference stock for the ESOP. This is so because of the statutory purpose behind ESOPs -- namely to hold company stock -- and the resultant recognized legal presumption of the propriety of plan fiduciaries in investing and retaining investments in company stock through an ESOP. This ESOP presumption would have raised the additional risk of Plaintiff being able to prove at trial that, under such circumstances here present, the failure of plan fiduciaries to act to reduce the Plans' positions in CVS stock during the Class Period did constitute a breach of their fiduciary duties to plan participants, exposing them to liability under ERISA.

In Plaintiff's Counsel's assessment, Plaintiff would have faced further substantial risks should these claims continue to trial based on an examination of: (i) the relatively small number of CVS shares held by any of the ERISA Plans during the Class Period; (ii) the CVS stock trading data of participants in those Plans; (iii) the Company's stock price history, reflecting a sharp rise in value over the period preceding the Class Period and its eventual recovery in the years thereafter; and (iv) the unsettled nature of damage theories in ERISA litigation generally. As with the assessment of the plan fiduciaries' liability, Defendants have substantial counter-arguments to Plaintiff's damage theories. In particular, the calculation of damage amounts is not clear in the context of ERISA cases, including whether damages are calculated based on the total stock decline over the course of the Class Period or on some other measure of decline.

Defendants could have successfully argued that 401(k) and ESOP termination damages should be measured *not* by the value of CVS stock at the beginning of the Class Period, an all time high price of $53.66 per share, but rather should be calculated based on the stock price at which

those shares were actually purchased, awarded or contributed to the respective plan accounts --

prices arguably substantially lower than the record high prices trading around December 1, 2000.

In addition, the recovery in the years following the end of the Class Period of the Company's

common stock price to values at or near those at the beginning of the Class Period created a further

risk in demonstrating damages, particularly in connection with ESOP participants who continued

to hold CVS preference stock, a highly illiquid stock over which ESOP participants have limited

discretion. Any of these arguments, should they ultimately succeed, would have significantly

reduced, and in some instances cases even eliminated, claims of damages as to these shares.

In addition to the above enumerated risks, the area of ERISA law itself is still in its

developmental stages, with limited precedent existing to test whether long established trust

principles would or even should apply to 401(k) plans. *See e.g. Xcel*, 364 F.Supp.2d at 101; *In re*

*Enron Securities Derivative & ERISA Litigation*, 284 F. Supp.2d 511 (S.D. Tex. 2004). Thus, courts

recognize that litigation of ERISA cases generally imposes significant and potentially unique risks

because "ERISA law is, in general, extremely complex and unsettled . . . ." *Curry v. Contract*

*Fabricators Inc. Profit Sharing Plan*, 744 F. Supp. 1061, 1071 (M.D. Ala 1990). *See also John*

*Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 109(1993)(recognizing "the

complexity of ERISA.").

Finally, it is important to keep in mind that there would have been no recovery or

compensation at all to injured CVS ERISA Plan participants but for the actions of Plaintiff's

Counsel in undertaking and successfully settling the present litigation. Even after the action was

commenced, the substantial risks and uncertainties present in ERISA cases as a whole, and the

circumstances of this litigation in particular, made it far from certain that there would be any

recovery for the Class, much less the substantial recovery here obtained. Indeed, rulings in this and other circuits make it clear that the risk of no recovery (and, hence, no fee) is very real in ERISA litigation. *See e.g. In re Schering-Plough Corp. ERISA Litigation*, 2004 U.S. Dist. LEXIS 16265 (D.N.J. June 28, 2004) (ERISA claims denied).

### 2.     Benefit Conferred on the Class

In light of these substantial risks of further litigation, the nature of the benefits achieved for Class members under the proposed Settlement adds additional strong support for Plaintiff's Counsel's fee request here. As noted above, the proposed settlement includes three principal benefits for Class members: (i) the $3,000,000 cash payment to a common fund, which has been accruing interest for the benefit of Class members since July 11, 2005; (ii) important governance changes to how CVS administers its ERISA Plans, including the adoption of a formal CVS Plan Committee Charter that sets forth specific obligations and duties; and (iii) the separate payment by the Defendants of all costs and expenses incurred in the dissemination of notice and administration of the settlement. In addition, Plaintiff's Counsel specifically negotiated for and preserved for members of the ERISA Class the right to also pursue recovery of eligible claims under the Securities Action. There is no off-set of claims between the two proposed settlements.

Assessment of the value to Class members of the $3 million settlement fund must be put into context by considering the size of the Class, and the reasonable range of estimated damages. As detailed in the Settlement Brief, based on Plaintiff's Counsel's detailed assessment of plan specific data regarding both the limited number of CVS shares in the ERISA Plans, and the timing of the trading of those shares -- that Plaintiff's Counsel were able to estimate that the number of damaged shares here at issue were limited -- estimated at approximately 2.236 million, and that, based on,

*inter alia*, CVS common stock trading history, the actual damages suffered by plan participants here were modest. Specifically, using this data, Plaintiff's Counsel assessed damages pursuant to several methodologies, and arrived at an aggregate loss to Class members of approximately $28.6 million. Based on this calculation, the $3 million settlement fund would result in an estimated recovery to the Class of approximately 10.5 cents on the dollar of loss (prior to payment of any Court-approved fees, expenses or awards). *See also* Settlement Brief, pp. 5-6, 35.

Finally, Plaintiff's Counsel respectfully submit that in addition to the nature of the relief afforded pursuant to the proposed settlement, the timing of that relief is also significant. Even were Plaintiff ultimately successful in this action should he proceed to trial, this continued litigation could likely have extended over several more years, further delaying recovery by the Class -- who have already waited almost four years from the date of the alleged wrongdoing for compensation. The proposed settlement, if approved, would provide immediate benefits to eligible Class members.

### 3.    The Experience and Ability of Plaintiff's Counsel

Another factor which courts have routinely considered in assessing the reasonableness of fee award requests in class action litigation is the experience and expertise of plaintiff's counsel. Plaintiff's Counsel here respectfully submit that their success in efficiently bringing this litigation to an appropriate conclusion are the best indicator of the experience and ability of the attorneys involved. Plaintiff's Counsel have managed the litigation in a disciplined and pragmatic fashion, confirming that this litigation was ably prosecuted for the benefit of the Class. The experience of Plaintiff's Counsel in multiple, complex class action litigations around the country is described in the declarations of counsel. *See* Exhibits 1-2 to the Morris Decl.

Courts have also recognized that the standing of opposing counsel may appropriately be considered in considering the reasonableness of a fee, because such standing reflects the challenge faced by plaintiffs' attorneys. *See e.g. In re King Recs. Co. Sec. Litig.*, 420 F. Supp 610, 634 (D. Colo. 1976). Here, Defendants were ably represented by the New York offices of Davis Polk & Wardwell.

### 4.    The Risks Inherent in Contingent Litigation

Federal courts have long recognized in complex litigation (such as securities and ERISA class action cases) that a factor to consider in assessing attorney fee requests is whether such litigation was undertaken on a wholly contingent basis, necessarily resulting in substantially increased risks to plaintiff's counsel. *See In re Washington Public Power Supply Systems Litig.*, 19 F.3d 1291, 1300-1302 (9th Cir.)(In determining the amount of the fee in a common fund contingency case, courts should consider the amount of risk involved), *aff'd. in part*, 19 F.3d 1306 (1994); *Matter of Continental Illinois Securities Litigation*, 962 F.2d 566, 569 (7th Cir. 1992). As Judge Posner stated in *Continental Illinois Securities Litig.*:

> [w]e are not trying to put the [district court] in a strait jacket but are merely emphasizing that the failure to make any provision for risk of loss may result in systematic under compensation of plaintiffs' counsel in a class action case, where as we have said the only fee that counsel can obtain is, in the nature of the case, a contingent one.

*Id.*, 962 F.2d at 569.

The importance of recognizing in the fee the risks of litigating complex and lengthy contingent ERISA claims such as those here at issue is based on the reasonable theory that:

> [i]ndividuals damaged by violations of the federal securities laws should have reasonable access to counsel with the ability and experience necessary to analyze and litigate complex cases . . . . A large segment of the public might be denied a remedy for violations

24

> of the securities laws if contingent fees awarded by the courts did not
> fairly compensate counsel for the services provided and the risks
> undertaken.

*In re Washington Public Power Supply Sys. Lit.*, 19 F.3d at 1300; *see also Continental Illinois Sec.*

*Lit.*, 962 F.2d at 569.

As detailed herein, Plaintiff's Counsel undertook the contingent representation of current and

former CVS ERISA Plan participants here despite the many complexities and obstacles posed by

such litigation. Thereafter, they continued to expend substantial time and effort over many months

on this litigation -- at the expense of other prospective work by their respective firms -- because of

their good faith belief in the importance of effective litigation on behalf of injured ERISA plan

participants under the circumstances found here. When this action was commenced, Plaintiff's

Counsel clearly recognized that undertaking this action would require an investment of substantial

attorney time and money with no assurance that counsels' efforts would be successful, much less

ever compensated. This factor thus further supports payment of the amount of attorneys' fees here

requested. *See e.g. In re Washington Public Power Supply Systems Litig.*, 19 F.3d at 1300-1302;

*Matter of Continental Illinois Securities Litigation*, 962 F.2d at 569; *Nyman*, 1981 WL 1705 at \*2.

### 5.    Plaintiff's Counsel's Fee Request is Appropriate
####      When Checked Against Counsel's Lodestar

This Court has recognized that while the percentage-of-the-fee method is the most

appropriate method to assess the reasonableness of a fee request in a complex class action, and a

blind adherence to the use of lodestar, without consideration of other important factors can prove

counterproductive,[6] review of counsel's lodestar can nonetheless provide an important second

---

[6]    *See also Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 368
(S.D.N.Y. 2002)(noting that courts in the district award 33⅓% in securities cases where significant

consideration.  *See Fidelity/ Micron Sec. Litig.*, 1998 WL 313725, at *2 ("Ordinarily a court approving a fee award should determine what sort of action the court is adjudicating and then primarily rely on the corresponding method of awarding fees, using the alternative method to doublecheck the reasonableness of the fee." *quoting Conley v. Sears, Roebuck and Co.,* 1998 WL 255356, at *7 (D.Mass.1998) (citations omitted)).

Consideration of the actual lodestar of Plaintiff's Counsel in the present Action fully supports the payment of the requested fees here.  Specifically, as set forth in the Morris Declaration, the two law firms representing Plaintiff here have expended a total of 1,251.75 hours litigating the ERISA Action.  At each firm's normal billing rates, this equates to an aggregate lodestar amount of $687,908.75.  *See* Aggregate Lodestar and Expenses Chart for ERISA Plaintiff's Counsel, attached as Exhibit 3 to the Morris Decl.  In addition, Plaintiff's Counsel will have a sustained involvement in the administration of the Settlement going forward, if approved by the Court, including direct involvement in the overseeing the appropriate disbursement of funds to Class members.  Based on the lodestar to date of Plaintiff's Counsel in this case, payment of a fee in the amount of 27.5% of the settlement fund would result in the award of a fee with a multiplier of less than 1.2.  Awarding such a multiplier for a complex class action litigation is fully consistent with current practice in this Court.  *See, e.g.*, *Lupron*, 2005 WL 2006833, at *6(where court awarded a fee representing a multiplier of 1.41, finding that this was "a reasonable bonus justified by the satisfactory outcome.").

---

monetary recovery was achieved early in litigation and stating that "[I]n the context of a complex class action, early settlement has far reaching benefits in the judicial system.).  *See also Prandini v. National Tea Co.*, 557 F.2d 1015, 1019 n.5 (3d Cir. 1977) ("One thousand plodding hours may be far less productive than one imaginative, brilliant hour") (citation omitted);  *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 193 (E.D. Pa. 2000) (a larger recovery with fewer hours expended benefits all parties).

6.    **Reaction of the Class**

The notice, which was mailed to more than 47,000 potential Class members, advised the Class that Plaintiff's Counsel would apply for a fee award of up to 30% of the Settlement fund, plus expenses.  The Notice also expressly advised Class members that they could object to the fee application.  No Class member has submitted any objections to either the terms of the proposed Settlement or to the payment or amount of any fee award in this case.  The absence of any objections is noteworthy, and further supports Plaintiff's Counsel's request for fees.

D.    **Plaintiff's Counsel's Expenses Should be Reimbursed**

It is well-settled that "lawyers whose efforts succeed in creating a common fund for the benefit of a class are entitled not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax." *Fidelity/Micron Sec. Litig.*, 167 F. 3d at 737.  *See also In re Nineteen Appeals - San Juan Dupont Plaza Hotel Fire Litig.*, 982 F. 2d 603, 606 (1st Cir. 1992); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist LEXIS 25067)(D.D.C. 2001)(holding that "an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of . . . reasonable litigation expenses from that fund")(citations omitted)).

As described in the attached declarations of Plaintiff's Counsel (*see* Exhibits 1 and 2 to the Morris Decl.), Plaintiff's Counsel paid unreimbursed expenses in this litigation in the aggregate amount of $17,742.88.  As reflected in the declarations, these modest expenses include the retention costs entailed with the essential work done with our ERISA and damages experts, and also of litigation expenses routinely billed by attorneys to paying clients in the marketplace, including such costs as computerized research and travel.  These expenses were reasonable and necessary for the

successful prosecution of this litigation, and should be separately reimbursed out of the Settlement Fund.

## IV.  THE PROPOSED INCENTIVE AWARD FOR THE NAMED PLAINTIFF IS APPROPRIATE

Plaintiff's Counsel further request a payment out of the Settlement Fund of a compensatory award to the named Plaintiff, James Fescina, in the amount of $10,000.  Such awards are well-recognized by courts as being reasonable under appropriate circumstances.  *See e.g. Spann v. AOL Time Warner Inc.*, 2005 U.S. Dist. LEXIS 10848 (S.D.N.Y. June 7, 2005) (approving $10,000 incentive award to each plaintiff in ERISA suit); *In re Catfish Antitrust Litig.*, 939 F. Supp at 504 (approving incentive award of $10,000 to the four named plaintiffs); *Shaw*, 91 F.Supp at 973 (approving incentive awards of $25,000).  Incentive awards to named plaintiffs "are not uncommon in class action litigation . . . particularly where a common fund has been created for the benefit of the entire class."  *In re Lorazepam & Clorezepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002).  "Numerous courts, recognizing that serving as a class representative involves substantial time commitment to the litigation, have permitted such awards."  *In re Revco Sec. Litig.*, 1992 U.S. Dist. LEXIS 7852, (N. D. Ohio 1992).  A district court in the First Circuit has stated that "because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit."  *In re Compact Disc*, 29 F. Supp.2d at 189.  Further, in determining whether such an award is warranted, courts have considered not only the efforts of the plaintiff in pursuing the claims, but also the important public policy fostering enforcement of laws and rewarding representative plaintiffs for being instrumental in obtaining recoveries for persons other than themselves.  *Bussie v. Allmerica Finn. Corp.*, 1999 U.S. Dist. LEXIS 7793 (D. Mass 1999)(approving incentive awards of $5,000 per representative). *See also In*

*re: Lupron Marketing and Sales Practices Litigation*, 228 F.R.D. 75, 98 (D. Mass. 2005)("Incentive awards are recognized as serving an important function in promoting class action settlements, particularly where as here, the named plaintiffs participated actively in the litigation. *Denney v. Jenkens & Gilchrist*, 2005 WL 388562, at *31 (S.D.N.Y. Feb.18, 2005).")

Courts have awarded incentive payments to class representatives that substantially exceed the modest award requested here. *See e.g. Revco*, 1992 U.S. Dist. LEXIS 7852, at *21)(Awarding $200,000 to the named plaintiff); *Roberts v. Texaco, Inc.*, 979 F. Supp at 203-04(awarding $85,000 to a named plaintiff). Plaintiff Fescina has been a hands-on class representative, and has been actively engaged with Plaintiff's Counsel at all stages of the litigation. As such, he has helped achieve the substantial benefits accruing to the Class in the proposed settlement. In addition, as a current employee of CVS, he placed himself at potential professional risk when he commenced this action. Finally, the Individual Notice advised Class members that Plaintiff's Counsel would apply for such an incentive award on the named Plaintiff's behalf. Plaintiff's Counsel received no objections to either the payment or the proposed amount of such an incentive award.

For these reasons, Plaintiff's Counsel respectfully submit that the requested incentive award for the named Plaintiff be approved as appropriate and reasonable.

## CONCLUSION

Without any guarantee of success or payment in an unsettled area of the law, Plaintiff's Counsel conducted an extensive investigation of the facts of this matter, actively litigated the claims, and successfully negotiated the proposed settlement with able and experienced opposing counsel, all at their own risk and expense. For the reasons set forth above, Plaintiff's Counsel respectfully and jointly request that the Court approve: (i) the fee and expense petition and enter an order

awarding Plaintiff's Counsel 27.5%  (or $825,000) of the Settlement Fund, plus accrued interest, for attorneys' fees; (ii) the reimbursement of $17,742.88 in expenses; and (iii) the payment of a $10,000 incentive award to the named Plaintiff for his participation in the prosecution of this action.

     Dated: August 31, 2005

     Respectfully submitted,

**LAW OFFICES OF BERNARD M. GROSS, P.C**

By:   /s/ Deborah R. Gross

     Deborah R. Gross (Bar # 546151)
Suite 450- John Wanamaker Bldg.
100 Penn Square East
Philadelphia, PA 19102
Telephone: 215-561-3600
Facsimile: 215-561-3000

**Plaintiff's Counsel**

**Of Counsel:**

Karen L. Morris
Patrick F. Morris
**MORRIS AND MORRIS, LLC
   COUNSELORS AT LAW**
4001 Kennett Pike, Suite 300
Wilmington, DE   19807
Telephone: 302-426-0400
Facsimile: 302-426-0406

Bruce G. Murphy
**LAW OFFICES OF BRUCE G. MURPHY**
265 Lywyds Lane
Vero Beach, FL 32963
Telephone: 828-737-0500